[ARGUMENT NOT YET SCHEDULED]
**UNITED STATES COURT OF APPEALS**
*for the* **District of Columbia Circuit**

|  |  |
|---|---|
| In re: ABD AL-RAHIM HUSSEIN AL-NASHIRI, | ) |
| | ) |
| | ) No. _____ |
| | ) |
| | ) **PETITION FOR A WRIT** |
| | ) **OF MANDAMUS AND** |
| | ) **PROHIBITION** |
| | ) |
| | ) Dated: October 4, 2018 |
| | ) |
| | ) |

Michel Paradis
CAPT Brian Mizer, USN, JAGC
LT Alaric Piette, USN, JAGC
U.S. Department of Defense
Military Commission Defense Organization
1620 Defense Pentagon
Washington, DC 20301

*Counsel for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

**I.     Parties and *Amici* Appearing Below**

　　1.  Abd Al-Rahim Hussein Al-Nashiri, *Appellee*

　　2.  United States of America, *Appellant*

**II.     Parties and *amici* Appearing in this Court**

　　1.  Abd Al-Rahim Hussein Al-Nashiri, *Petitioner*

　　2.  United States of America, *Respondent*

**III.   Rulings under Review**

　　This case involves a petition for a writ of mandamus and prohibition to the Department of Defense and, in the alternative, to the United States Court of Military Commission Review, which issued an order denying the relief requested on September 28, 2018 (Attachment A).

**IV.   Related Cases**

　　This case has not previously been filed with this court or any other court. Petitioner has a habeas petition in the United States District Court for the District of Columbia, Case No. 08-1207.

 Dated: October 4, 2018              /s/     Michel Paradis
                                    Michel Paradis
                                    U.S. Department of Defense
                                    Military Commission Defense Organization
                                    1620 Defense Pentagon
                                    Washington, DC 20301

                                    *Counsel for Petitioner*

i

**TABLE OF CONTENTS**

**Table of Authorities** .......................................................................... iv

**Jurisdiction** ......................................................................................... 1

**Relief Sought** ...................................................................................... 1

**Issues Presented** ................................................................................. 2

**Statement of Facts** ............................................................................. 4

    A.   Background of the military commission proceedings convened
to try Petitioner. ................................................................................. 4

    B.   Col Spath refuses to address a microphone discovered in
attorney-client meeting spaces. ......................................................... 6

    C.   Col Spath attempts to countermand BGen Baker's excusal of
civilian counsel. ............................................................................... 10

    D.   Col Spath orders that military commission hearings continue in
the absence of learned counsel. ...................................................... 13

    E.   Abatement and relevant proceedings in the Court of Military
Commission Review. ....................................................................... 21

**Reasons for Granting the Writ** ...................................................... 28

  I.  There is no other adequate means of obtaining relief. ................... 30

 II.  Petitioner's entitlement to relief is clear and indisputable. ........... 31

    A.   Secretly pursuing employment with the Justice Department
whilst serving as a judge in a high-profile criminal case involving the
Justice Department creates a disqualifying conflict of interest. .................... 31

    B.   Col Spath violated every standard and rule governing the pursuit
of employment by a sitting judge. ................................................... 38

    C.   The only adequate remedy to cure the structural error in this case
is to vacate the proceedings below. ................................................ 47

ii

D.   In the alternative, this Court should vacate all of Col Spath's orders tainted by the period of misconduct..................................................... 50

E.   At a minimum, this Court must direct the CMCR to conduct a proper inquiry into Col Spath's misconduct. .................................................. 50

III. Issuance of the writ is in the public interest.................................................. 53

**Conclusion** ................................................................................................... **55**

**Certificate of Compliance with Rule 32(a)** ...................................... **56**

**Certificate of Service** ............................................................................. **57**

**Attachments**............................................................................................... **58**

# TABLE OF AUTHORITIES

*Authorities upon which Petitioner chiefly relies are marked with an asterisk.

**Cases**

*Apple v. Jewish Hosp. and Medical Ctr.*,
  829 F.2d 326 (2d Cir.1987) ......................................................... 46, 50

*Baker v. Spath*, __ F. Supp. 3d __,
  2018 WL 3029140 (D.D.C. June 18, 2018) ...................................... 13

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) ................................................................... 36

*Cheney v. U.S. District Court*,
  542 U.S. 367 (2004) ........................................................... 27, 28, 29

*Cobell v. Norton*,
  334 F.3d 1128 (D.C. Cir. 2003) ..................................................... 30

*DeNike v. Cupo*,
  958 A.2d 446 (N.J. 2008) .............................................................. 37

*Easley v. University of Michigan Bd. of Regents*,
  853 F.2d 1351 (6th Cir. 1988) ....................................................... 51

*Gonzalez v. Pliler*,
  341 F.3d 897 (9th Cir. 2003) ........................................................ 50

In re Al-Nashiri,
  791 F.3d 71 (D.C. Cir. 2015) ........................................... 28, 30, 53, 54

*In re Al-Nashiri*,
  835 F.3d 110 (D.C. Cir. 2016) ......................................................... 5

*In re Brooks*,
  383 F.3d 1036 (D.C. Cir. 2004) ...................................................... 30

*In re IBM*,
  618 F.2d 923 (2d Cir. 1980) .......................................................... 29

*In re Kempthorne*,
  449 F.3d 1265 (D.C. Cir. 2006) ...................................................... 30

*In re Mohammad*,
  866 F.3d 473 (D.C. Cir. 2017) ............................................. 28, 30, 48

*In re United States*,
   666 F.2d 690 (1st Cir. 1981) ............................................................. 29

*Jenkins v. Sterlacci*,
   849 F.2d 627 (D.C. Cir. 1988) ........................................................... 54

*Ligon v. City of New York*,
   736 F.3d 118 (2d Cir. 2013) ............................................................... 46

*Liljeberg v. Health Services Acquisition*,
   486 U.S. 847 (1988) ................................................................... 31, 47

*Lucia v. SEC*,
   138 S.Ct. 2044 (2018) ....................................................................... 23

\*Pepsico v. McMillen*,
   764 F.2d 458 (7th Cir. 1985) ............................................................. 37

\*Scott v. United States*,
   559 A.2d 745 (D.C. 1989) ........................................................ 32, 38, 48

*Tumey v. Ohio*,
   273 U.S. 510 (1927) ......................................................................... 35

*Union Carbide v. U.S. Cutting Service*,
   782 F.2d 710 (7th Cir. 1986) ......................................................... 29, 52

*United States v. Clark*,
   184 F.3d 858 (D.C. Cir. 1999) ........................................................... 43

*United States v. Donato*,
   99 F.3d 426 (D.C. Cir. 1996) ............................................................. 48

*United States v. Gonzalez-Lopez*,
   548 U.S. 140 (2006) ......................................................................... 49

*United States v. Horton*,
   98 F.3d 313 (7th Cir. 1996) ............................................................... 29

*United States v. McIlwain*,
   66 M.J. 312 (C.A.A.F. 2008) ............................................................. 53

*United States v. Microsoft*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................. 46

*United States v. Mikhel*,
   889 F.3d 1003 (9th Cir. 2018) ....................................................... 34, 44

*United States v. Patti*,
   337 F.3d 1317 (11th Cir. 2003) ......................................................... 31

*United States v. Quintanilla*,
  56 M.J. 37 (C.A.A.F. 2001) ............................................................ 52

*United States v. Sells Engineering*,
  463 U.S. 418 (1983) ........................................................................ 32

*United States v. Vargas*,
  2018 CCA LEXIS 137 (A.F. Ct. Crim. App. 2018) ........................ 53

*Williams v. Pennsylvania*,
  136 S. Ct. 1899 (2016) ................................................ 36, 45, 47, 49

**US Code**

10 U.S.C. § 1101 ................................................................................... 42

10 U.S.C. § 948k ..................................................................................... 6

10 U.S.C. § 950d ........................................................................... 8, 22, 26

10 U.S.C. § 950g ..................................................................................... 1

28 U.S.C. § 1651 ..................................................................................... 1

**Congressional Materials**

Military Commissions Act of 2006,
  120 Stat. 2600 ................................................................................... 4

Military Commissions Act of 2009,
  123 Stat. 2190 §§ 1801-1807 ........................................................... 4

Sen. Jeff Sessions, Letter to President Obama,
  2010 WLNR 584318 (January 10, 2010) ........................................ 39

## Executive Materials

Chief Defense Counsel Policy Memorandum 5-15 Ch. 5, MCDO Uniform and Civilian Attire Policy for Military Personnel (May 18, 2017) ........................... 21

Department of Justice, Press Release: EOIR Swears in 46 Immigration Judges (September 28, 2018) .................................................................................. 27

Harvey Rishikof, Convening Authority, Memorandum for BGen John G. Baker, Chief Defense Counsel (Nov. 21, 2017) .......................................... 16

R.M.C. 103 ............................................................................................... 40

R.M.C. 505 ............................................................................................... 11

*R.M.C. 902 ............................................................................................. 36

## Other Authorities

Carol Rosenberg, *Controversial Guantánamo judge joins Jeff Sessions in immigration judge ceremony*, MCCLATCHY (September 14, 2018) ................... 25

Carol Rosenberg, Military judge wants civilian attorneys arrested for quitting USS Cole case, MIAMI HERALD (Feb. 13, 2018) ......................................... 18

Carol Rosenberg, *New Air Force colonel to preside in Guantánamo's stalled USS Cole case*, MIAMI HERALD (August 9, 2018) ......................................... 5

Code of Conduct for United States Judges (2014) ................................................. 32

Jack Metzler, *Cleaning Up Quotations*, 18 J. OF APPELLATE PRACTICE AND PROCESS (2017) .......................................... 28

Memorandum for Trial Counsel (July 9, 2018) ...................................................... 39

MOORE'S FEDERAL PRACTICE ............................................................................... 29

*Sessions Affirms Use of Prison; Attorney General Sessions Visits Guantanamo Bay Prison*, Associated Press (July 8, 2017) ............................................... 39

*The Guide to Judiciary Policy (2014) ...................................................... 32, 33, 35

*United States v. al-Badawi, et al.*, No. 98-CR-1023 (S.D.N.Y., unsealed May 15, 2003) .......................................... 4

## JURISDICTION

This Court has exclusive supervisory jurisdiction over military commission proceedings under the Military Commissions Act of 2009, 123 Stat. 2190 and the United States Court of Military Commission Review pursuant 10 U.S.C. § 950g. This Court has the remedial authority to issue all writs necessary and appropriate in aid of that jurisdiction pursuant to 28 U.S.C. § 1651.

## RELIEF SOUGHT

Petitioner, Abd Al Rahim Hussein Al-Nashiri, asks this Court to issue a writ of mandamus and prohibition directing the vacatur of the orders convening the military commission convened to try him due to judicial misconduct that has irreparably harmed his ability to mount a defense and the public integrity of a capital trial. In the alternative, he asks this Court to direct the vacatur of all orders entered by the military commission judge whilst he was under a concealed and disqualifying ethical conflict, including but not limited to, all orders presently under review by the Court of Military Commission Review (CMCR). In the alternative, and at a minimum, he asks this Court to direct the CMCR to order an evidentiary hearing to ascertain the full scope and effect of the misconduct.

1

## ISSUES PRESENTED

This petition seeks to remedy disqualifying judicial misconduct in a capital case. On February 21, 2018, the United States took an interlocutory appeal to the United States Court of Military Commission Review (CMCR) from an order of abatement issued by military commission judge Col Vance Spath, USAF, in the capital military commission convened to try Petitioner. In September 2018, while this appeal was pending, Petitioner discovered that for at least a year prior, Col Spath had been secretly negotiating future employment with the Justice Department as an immigration judge, a position he ultimately obtained on September 28, 2018.

During these secret negotiations, Col Spath conducted Petitioner's trial under what he described as an "aggressive schedule" that appears to have been driven by a now obvious goal: to rush Petitioner's capital trial to completion so that Col Spath could retire from the military at full pension and assume additional employment in the Justice Department. When Col Spath confronted obstacles to this goal, he took a series of then-inexplicable actions in favor of haste that resulted in the collapse of Petitioner's longstanding defense team, the wrongful imprisonment of a Marine Corps Brigadier General, and a total breakdown in the public reputation of the proceedings. As all of this transpired, Col Spath routinely delivered stream-of-consciousness rants, often addressed directly to the public,

2

against the "defense community," "fake news," the American Bar Association, and the media coverage of his behavior.

Having discovered the previously undisclosed ethical conflict, Petitioner asked the CMCR to dismiss, to vacate the orders previously issued by Col Spath whilst he was under this disqualifying conflict and, in the alternative, to order discovery to ascertain the full scope of Col Spath's misconduct. In a two-page order, the CMCR denied all relief citing Petitioner's purported failure to bring forward evidence that Col Spath had, in fact, engaged in the misconduct alleged (*i.e.* negotiated for employment with the Justice Department).

Col Spath's secret negotiation for employment with the Justice Department violated long-settled, bright-line rules governing judicial conduct. Given the active and continuous role of the Justice Department in prosecuting Petitioner's case and given the evident effect those secret negotiations had on Col Spath's behavior toward Petitioner, Col Spath's misconduct was disqualifying and prejudicial. Petitioner therefore asks this Court to issue a writ of mandamus and prohibition directing any one of three alternative forms of relief stated above to remedy the irreparable harms he has already suffered and to protect the integrity of this country's judicial proceedings.

## STATEMENT OF FACTS

### A. Background of the military commission proceedings convened to try Petitioner.

In 2008, the Department of Defense issued orders pursuant to the Military Commissions Act of 2006, 120 Stat. 2600, directing that Petitioner to stand trial before a military commission for his alleged involvement in plots to bomb the USS COLE in Yemen in October 2000 and a French oil tanker in Yemen in 2002. These initial charges carried the death penalty and mirrored a capital indictment that has been pending in the Southern District of New York since 2003 in which Petitioner is named as an unindicted co-conspirator. *United States v. al-Badawi, et al.*, No. 98-CR-1023 (S.D.N.Y., unsealed May 15, 2003). The 2008 military commission was disbanded in 2009 following President Obama's taking office and the initiation of an agency review of the military commissions. In 2011, the Department of Defense issued Military Commission Order 11-02 (September 28, 2011) pursuant to the Military Commissions Act of 2009, 123 Stat. 2190 §§ 1801-1807 (codified at 10 U.S.C. §§ 948a, *et seq.*), directing that Petitioner again stand trial before a military commission on substantively identical charges.

Since 2008, the military commission proceedings against Petitioner have been plagued by irregularity, political interference, and delay, including three interlocutory appeals brought by counsel for the prosecution to the Court of Military Commission Review (CMCR). Petitioner's case has proceeded fitfully

4

over the past decade for a number of reasons. But the root cause of most of these issues is the fact that Petitioner was held incommunicado in secret "black sites" as part of the CIA's Rendition, Detention, and Interrogation Program for four years. During this time, he was subjected to "total darkness…loud continuous noise, isolation, [] dietary manipulation…[t]hey were kept naked, shackled to the wall, and given buckets for waste…there is no question that [Petitioner] was 'waterboarded' … forced into 'stress positions' … menaced with a handgun … There is also evidence [Petitioner] was, in fact, forcibly sodimized, possibly under the pretext of a cavity search." *In re Al-Nashiri*, 835 F.3d 110, 141-42 (D.C. Cir. 2016) (Tatel, J., dissenting).

Over the course of the past decade of proceedings, three different military commission judges have presided over Petitioner's case. Relevant here, on July 10, 2014, the Chief Judge of the Military Commissions Trial Judiciary assigned Col Vance Spath, USAF, to preside over Petitioner's military commission. On August 6, 2018, Col Spath was replaced by Col Shelly Schools, USAF, after it was publicly announced that Col Spath would be retiring from the Air Force, effective November 1, 2018. Carol Rosenberg, *New Air Force colonel to preside in Guantánamo's stalled USS Cole case*, MIAMI HERALD (August 9, 2018).

**B. Col Spath refuses to address a microphone discovered in attorney-client meeting spaces.**

On June 14, 2017, the Chief Defense Counsel of the Military Commissions Defense Organization (MCDO), BGen John Baker, USMC, issued a memorandum advising defense counsel that the meeting spaces in which military commission defendants met with their lawyers could not guarantee confidentiality.[1] He cautioned counsel to "not conduct any attorney-client meetings at Guantanamo Bay, Cuba until they know with certainty that improper monitoring of such meetings is not occurring." He then continued:

> At present, I am not confident that the prohibition on improper monitoring of attorney-client meetings a GTMO as ordered by the commission is being followed. My loss of confidence extends to all potential attorney-client meeting locations at GTMO. Consequently, I have found it necessary as part of my supervisory responsibilities under 9-1a.2 and 9-1a.9 of the Regulations for Trial by Military Commission to make the above-described

---

[1] The Chief Defense Counsel is an office created by Congress, 10 U.S.C. § 948k(d), to administer the provision of legal defense services to defendants before military commissions. The Chief Defense Counsel is a general officer nominated by the President and confirmed by the Senate, 161 Cong. Rec. S4555 (daily ed., Jun. 23, 2015) (confirmation as Chief Defense Counsel and Brigadier General), after being selected by a joint selection board. Under the applicable regulations, the Chief Defense Counsel serves in a role similar to that of a federal district judge under the Criminal Justice Act, respecting the supervision of defense counsel who appear before military commissions. *See* Reg. T. Mil. Comm. 9-1, *et seq*. He is the sole actor within the military commission system empowered to assign defense counsel (a process called "detailing"), to supervise defense counsel, and to excuse defense counsel. R.M.C. 505(d)(2).

6

>       recommendations to all MCDO defense counsel. Whether,
>       and to what extent, defense teams follow this advice is up
>       to the individual defense team.

Brig. Gen. John Baker, USMC, *Improper Monitoring of Attorney-Client Meetings*

(June 17, 2017) (Attachment C). This action was taken in light of a long history of

intrusions by government agents into the attorney-client confidentiality of military

commission defendants.[2]

-----------------------

[2] In October 2011, for example, the JTF-GTMO guard staff confiscated privileged
legal materials from the detainees' cells. The Legal Department at the Naval Base
read defense counsel's correspondence and in January 2012, the Chief Defense
Counsel issued an ethics instruction prohibiting defense counsel from using the
Guantanamo legal mail system for privileged communications as incapable of
safeguarding attorney client-privileged communications. As a consequence,
defense counsel were unable to exchange confidential written communications
with their client for almost two years until a consent order regarding privileged
written communications management was entered.

Even attorney-client work product has not been immune from improper intrusion.
In March 2013, defense counsel discovered, through a series of IT-related failures,
that some unknown amount of privileged work product had been provided to
counsel for the prosecution, IT personnel not bound by non-disclosure agreements,
and other unknown entities in the government. It was also discovered, despite
assurances to the contrary, that active content monitoring of defense counsel's
internet usage was being undertaken on a government-wide basis. As a
consequence of this and other similar episodes, the Chief Defense Counsel issued
an ethics instruction prohibiting defense counsel from using Department of
Defense computer networks, including email, to transmit privileged or confidential
information. Efforts to mitigate the risk of improper disclosure more than tripled
the amount of time necessary to draft and file pleadings. And the previous military
commission judge presiding over Petitioner's case was forced to abate the
proceedings for two months as a result.

After receiving this memorandum, Petitioner's former military commission defense counsel filed a motion with Col Spath seeking permission to notify Petitioner of BGen Baker's concerns. Col Spath denied Petitioner's motion on the ground that he was not authorized to approve the disclosure of classified information and because counsel for the prosecution "as officers of the court, have represented facts which negate what the Defense seeks to disclose to the Accused." AE369OO (July 7, 2017).

Petitioner's former counsel subsequently discovered evidence that unambiguously contradicted the prosecution's previous assurances. The precise factual basis for this representation remains classified and is contained in the attached Dolphin Declaration. Declaration of Marc Dolphin (August 4, 2017) (Attachment E). Petitioner's undersigned counsel can represent, based upon later public admissions by counsel for the prosecution in the course of litigation, however, that a hidden microphone was discovered in his attorney-client meeting room. CMCR Case 18-002, Appellant's Opposition to Appellee's Motion to Dismiss for Want of Jurisdiction under 10 U.S.C. § 950d (March 5, 2018).

This was not the first time an undisclosed microphone was discovered in Petitioner's attorney-client meeting spaces. In December 2012, military commission defense counsel traced the brand name of one of the smoke detectors in the attorney-client meeting rooms to a private surveillance company. *See*

8

AE149C (May 16, 2013). This "smoke detector" was, in truth, a disguised microphone connected to a nearby "listening room."

Upon discovering this most recent hidden microphone and other facts described in the Dolphin Declaration, Petitioner's former counsel again sought relief from Col Spath. Petitioner moved for discovery, an evidentiary hearing, and orders preventing further intrusions. Petitioner's counsel also sought, in the interim, permission to conduct attorney-client meetings in a designated area of the ELC, where confidentiality could be more reasonably assured.

On September 20, 2017, Col Spath denied Petitioner's requests for discovery and other relief. These rulings remain classified. However, it can be stated publicly that Col Spath concluded, as a matter of law, that Petitioner's entitlement to attorney-client confidentiality extended *only* to the prohibition on counsel for the prosecution using his attorney-client communications as evidence. In other words, Col Spath determined that Petitioner had no expectation of confidentiality when conferring with counsel, except insofar as his communications might be used against him in the military commission proceedings. And because of Col Spath's previous rulings, Petitioner's counsel could not inform Petitioner of the broader risks to confidentiality they had discovered.

9

**C. Col Spath attempts to countermand BGen Baker's excusal of civilian counsel.**

Mr. Richard Kammen, Petitioner's former learned counsel,[3] brought Col Spath's orders to BGen Baker, the Chief Defense Counsel. BGen Baker reviewed both Col Spath's classified orders as well as the underlying classified facts. Pursuant to his obligations as a member of the Indiana Bar, Mr. Kammen also sought an expert ethics opinion from Prof. Ellen Yaroshefsky, the Howard Lichtenstein Distinguished Professor of Legal Ethics and Executive Director of the Monroe Freedman Institute for the Study of Legal Ethics at Hofstra University School of Law. He provided her with an unclassified version of the history of government interference in attorney-client relationships within the military commissions and general representations facts contained in the Dolphin Declaration. Prof. Yaroshefsky, in turn, concluded that Mr. Kammen's continued representation of Petitioner was unethical:

> You cannot, consistent with your ethical obligation
> continue to represent [Petitioner]. Rule 1.16(a)(1) of
> Professional Conduct mandates that you withdraw from
> representation. It provides that a lawyer "shall withdraw
> from representation of a client if the representation
> involves a violation of the rules of professional conduct or

---

[3] Under the Military Commissions Act and the rules governing military commissions, defendants are entitled to counsel learned in the law of capital litigation in "any case" in which the death penalty is sought R.M.C. 506(b); see also 10 U.S.C. § 949a(b)(2)(C)(ii).

10

> other law." You are required to withdraw as his counsel
> because continued representation will result in a violation
> of IRPCs and MRPCs 1.1, 1.3., 1.4 and 1.6.

AE389, Attachment C (October 16, 2017).[4]

On October 6, 2017, Mr. Kammen and two other civilian defense counsel

submitted applications to BGen Baker to withdraw from representing Petitioner on

the grounds that their continued involvement in this case violated the ethical rules

to which they are subject. AE389, Attachment C (October 16, 2017). Under the

unique rules the Secretary of Defense has promulgated to govern military

commissions, the Chief Defense Counsel is given the sole authority to supervise

and excuse defense counsel after an attorney-client relationship has been formed.

R.M.C. 505(d)(2) (2010). Pursuant to that authority, BGen Baker determined that

good cause existed and granted these applications, specifically referencing the

classified information to which he was privy. AE389, Attachment C (October 16,

2017); AE389C (October 24, 2017). BGen Baker then filed a notice with the

Convening Authority (the Department of Defense official responsible, *inter alia*,

for the funding of the military commissions) that he had "begun the process of

locating a qualified outside learned counsel to serve as [Petitioner]'s learned

---

[4] All unclassified pleadings are available at http://www.mc.mil and filed according
to Appellate Exhibit (AE) numbers.

counsel and I will submit a request for funding approval as soon as I have

identified such counsel." AE389, Attachment C (October 16, 2017).

The excusal of civilian counsel left Petitioner represented by LT Alaric

Piette, USN, a Navy Judge Advocate, who graduated from law school in 2012, has

no capital litigation experience, and has never tried a homicide case.[5] On October

13, 2017, LT Piette filed notices with the military commission of the civilian

counsels' excusal. LT Piette also moved to continue proceedings until BGen Baker

had located new learned counsel. AE389 (October 16, 2017).

Col Spath denied LT Piette's motion to continue and on the morning of

October 31, 2017, Col Spath convened a hearing of the military commission at

which he ordered BGen Baker to testify about his decision to excuse Mr. Kammen

and Petitioner's other civilian counsel. BGen Baker objected to providing

testimony beyond the documentary record, asserting attorney-client and

deliberative process privilege. Col Spath then attempted to order BGen Baker "to

rescind the direction you gave when you excused both learned outside – appointed

---

[5] Due to separate rules governing the ethical supervision of military officers, LT Piette submitted a separate request for ethics advice to the Navy Judge Advocate General, which had not yet rendered its opinion at the time Petitioner's civilian counsel requested to withdraw.

12

learned counsel and the two civilians." Trans. 10042.⁶ When BGen Baker asserted that this order was *ultra vires*, Col Spath became irate, refused to accept pleadings or argument from BGen Baker, and stated explicitly, "I'm denying you the opportunity to be heard." Trans. 10054. Col Spath then held BGen Baker in contempt, ordering him confined for 21 days and to pay a $1,000 fine. BGen Baker subsequently obtained a writ of habeas corpus in the U.S. District Court for the District of Columbia vacating Col Spath's order as unlawful. *Baker v. Spath*, __ F. Supp. 3d __, 2018 WL 3029140 (D.D.C. June 18, 2018).

The following day, Mr. Kammen filed a federal action seeking, *inter alia*, to enjoin his involuntary recall to Petitioner's case. *Kammen v. Mattis*, No. 1:17-cv-03951 (S.D. Ind., filed November 2, 2017). And on November 3, 2017, the district court granted Mr. Kammen's request for a temporary restraining order. *Kammen v. Mattis*, No. 1:17-cv-03951, Dkt. 15 (S.D. Ind., November 3, 2017).

### D. Col Spath orders that military commission hearings continue in the absence of learned counsel.

From the bench, Col Spath announced his intention to continue to move forward with the case, including through trial and capital sentencing, regardless of

---

⁶ Petitioner has included all cited to excerpts of the record of trial sequentially as Attachment D. All other unclassified transcripts of proceedings are available at http://www.mc.mil.

13

whether Petitioner was represented by learned counsel or anyone other than LT

Piette. Trans. 10048. This urgent press forward was to meet what Col Spath

described as his "aggressive 2018 calendar year schedule, with significant time to

be spent here at Guantanamo Bay," Trans. 12344, which he had issued on April 11,

2017. AE203Q (April 11, 2017).

    From November 2017 through February 2018, Col Spath proceeded apace

with his "aggressive schedule," including the holding of evidentiary hearings, the

testimony of witnesses, and the ruling on the admission of evidence. Col Spath also

relieved the prosecution of any further discovery obligations relating to Petitioner's

treatment in U.S. custody, Trans. 10585, despite the fact that on September 1,

2017, counsel for the prosecution represented that it was unlikely to meet its

obligations to produce such discovery until the middle of 2018. AE203S

(September 1, 2017).

    All the while, Petitioner was represented solely by LT Piette, who

respectfully declined to take substantive positions or to cross-examine witnesses in

the absence of learned counsel. In support of his position, LT Piette submitted an

affidavit from Ms. Emily Olsen-Gault, Director and Chief Counsel, ABA Death

Penalty Representation Project, who explained the need for learned counsel at all

critical stages of a death penalty case. AE389K, Attachment B (November 6,

2017). On November 6, 2017, Col Spath *sua sponte* ordered Prof. Yaroshefsky and

14

Ms. Olsen-Gault to testify from a video-teleconference site in Virginia. Ms. Olsen-Gault testified about the ABA's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* and reiterated her view that LT Piette was not competent to represent Petitioner without the assistance of learned counsel under the ABA Guidelines.

During subsequent hearings, Col Spath repeatedly berated LT Piette for refusing to proceed in the absence of learned counsel and repeatedly voiced his personal "frustration" with an ill-defined group that he and the prosecution derisively called "the defense community." *See*, *e.g.*, Trans. 11538. This defense community, he contended, were "just violat[ing] orders willy-nilly," *id*. 12370, and attempting to mount a "revolution to the system." *Id*. 12373.

Col Spath's expressed animus toward the "defense community" prompted him to summarily rule against Petitioner and anyone else he deemed complicit in the "defense community" without reviewing their pleadings. For example, at the outset of a hearing on Monday, February 12, 2018, Col Spath addressed the issue of a subpoena he issued for two of Petitioner's former counsel to appear. Represented by outside counsel, those attorneys moved to quash the subpoena and Col Spath, from the bench, refused to even accept their pleadings, stating "the docketing order I think was a fair indication that I'm not granting any motion to quash." Trans. 11536. Col Spath continued, stating "I'm not accepting those. I've

15

already seen them. There's nothing new." *Ibid*. While Petitioner takes no position on the propriety of his former counsel being subpoenaed in this fashion, he does feel compelled to note that counsel for the prosecution responded to this remark by stating, "Sir, about these third-party filings … I understand that you're not going to accept them, but I do believe there is new information in there that should concern the commission." *Id*. 11537.

Col Spath then engaged counsel for the prosecution in a stream-of-consciousness colloquy that veered between the rudiments of his authority as a military commission judge, to Petitioner's former attorneys' employment by the federal government, to the efforts of Petitioner's then-lone trial attorney, LT Piette, to secure replacement learned counsel. Trans. 11538-70. Col Spath even mocked the then-classified and still unexplained discovery of the microphone in Petitioner's attorney-client meeting room as "fake news," addressing the public directly and casting Petitioner's former attorneys as fabricating the impetus for their withdrawal. *Id*. 11558.[7]

---

[7] This was despite the former Convening Authority's recommendation to "the Joint Detention Group that a 'clean' facility be designated or constructed which would provide assurances and confidence that attorney-client meeting spaces are not subject to monitoring." Harvey Rishikof, Convening Authority, Memorandum for BGen John G. Baker, Chief Defense Counsel (November 21, 2017) *available at* https://www.documentcloud.org/documents/4273591-Convening-Authority-memo-for-Brig-Gen-John-Baker.html.

16

Col Spath, for his part, was candid about how personally invested he had become in Petitioner's case saying, "And in the spirit of full disclosure, there are days, right, where this is tough work. And it would be a lot easier for me to say I'm going home, which is exactly, by the way, what happened on this side, which is so frustrating: I'm going home." Trans. 11552. And before turning to the taking of testimony, Col Spath again harangued LT Piette for refraining from taking substantive positions in the absence of learned counsel:

> MJ [Col SPATH]: Again, I've ruled on that. And I've ruled – first, there are jurisdictions that disagree with you, you know that.
>
> DDC [LT PIETTE]: Uh-huh.
>
> MJ [Col SPATH]: Flat out. There are jurisdictions that frankly do not buy into this ABA requirement – a policy group – this ABA requirement – and it's not even a requirement, a guideline of capitally qualified counsel. There are jurisdictions who believe that is not helpful for a variety of reasons, many of them political, frankly, and you know that.

*Id*. 11568.

Addressing the refusal of Petitioner's former counsel to return to the case, Col Spath initially stated that he was not going to issue "any rulings from the bench on this issue today, because I want to reflect, and reflect in the right state of mind." Trans. 11719. Later that same afternoon, however, Col Spath announced, "I'm going to issue warrants of attachment [ordering U.S. Marshalls to arrest

17

Petitioner's former counsel] – I plan to do it tomorrow – to have them brought

sometime on Thursday or Friday." *Id*. 11910.

This order to arrest Petitioner's former counsel was covered in the press.

*See*, *e.g.*, Carol Rosenberg, *Military Judge Wants Civilian Attorneys Arrested for*

*Quitting USS Cole Case*, MIAMI HERALD (February 13, 2018). The following day,

however, Col Spath denied having ever made this remark and lashed out at the

media for its coverage:

> And yes, I use CAAFlog. I don't read the comments and I
> tend not to read the analysis; I don't need their help,
> because some people suggest it has a bias. … So I was a
> little surprised last night when I opened it to find this case
> making their – the top of the banner, and noticed very
> quickly that it said that I had ordered, or was going to order
> today, writs be issued against civilians to be dragged to
> GTMO. Imagine my surprise. Fortunately, there was a link
> to figure out where in the wide, wide world of sports is that
> coming from.
>
> And it's coming from a [Miami Herald] reporter who we
> brought down here and we bring down here willingly, and
> you know, put up, who got it wrong. I said very clearly
> yesterday I want draft writs so I have options as I figure
> out what to do, and I hadn't made a decision yet. I don't
> know if I could have been more clear.
>
> ***
>
> I have no control. But it's just always remarkable to me
> that words matter and accuracy matters when we are
> dealing with significant issues that affect people. … In that
> same article, again, talks about the secret court. I look out
> at all the people we bring. We haven't had a classified
> session in months.

18

Trans. 11924-25. In response to follow-on press reporting fact-checking his denial,

Col Spath returned to the issue the next day and claimed that his statement was

misheard by the press and the court reporter, stating, "I've had a chance to listen to

audio, I actually know what I said, which is, of course, what I think you all heard,

'if I issue the subpoenas,' but [the public] can't listen to audio because we don't

put the audio out there." *Id*. 12286.

    Col Spath openly recognized that he was acting outside of his "lane" as a

presiding judicial officer:

> But I've got to tell you I feel like I'm in the wilderness on
> the – fighting this particular issue because it's not my
> fight. I am attempting to do what I can, but really, what are
> you all doing to – what are you all doing to make sure the
> people who are doing this are held responsible? I can't do
> it, 'that's clear. And again, is it in my lane? How much is
> in my lane?

Trans. 11551-52. And he admitted that he was consciously trying to be careful

about what he said on the record so as to not end up like "the military judge in a

courts-martial, *Hassan*, [who took] on a battle that was not his, right, the beard

issue, and ultimately [had] to recuse himself." *Ibid*. Yet the day after this remark,

he demanded testimony from a senior Pentagon official about "the clear evidence

of [defense] misconduct in all of these cases[.]" *Id*. 11911.[8] This senior Pentagon

---

[8] It is unclear to what Col Spath was referring when he said, "all these cases." Col
Spath and the prosecution have endeavored to paint the current dysfunction in

official testified, however, that it was Department of Defense policy to respect to the professional judgment of BGen Baker as the Chief Defense Counsel.

On February 16, 2018, Col Spath began the day's hearing with a thirty-minute invective. "Over the last five months – yes, my frustration with the defense has been apparent. I said it yesterday and I'll continue to say it. I believe it's demonstrated lawlessness on their side; they don't follow orders." Trans. 12364-65. Instead of *bona fide* legal questions, Col Spath characterized ongoing disputes over the lawfulness of his orders, such as the jailing of the Chief Defense Counsel, as personal attacks. "I'm not ordering the Third Reich to engage in genocide," he complained. "This isn't My Lai, or My Lai." Trans. 12369.

 "These last few months," Col Spath continued, "I think we can all say, have demonstrated significant flaws within the commission process, particularly within the defense organization, and it demonstrates an organization intent on stopping the system, not working within the system that they signed up to work

---

Petitioner's case as a consequence of MCDO's "mismanagement" or what Col Spath later described as its effort to foment a "revolution to the system." Trans. 12373. There are at least ten other active cases under the supervision of the MCDO that are in various stages of trial and post-trial proceedings. The Chief Defense Counsel has refused to allow defense counsel withdraw, even with the consent of the accused, when he determined that no good cause had been shown. *See United States v. Mohammed, et al.*, AE380SS (June 28, 2016). If there is some vast "defense community" conspiracy, there is no indication that it has affected any of these other cases, which are proceeding in the ordinary course.

within." *Id*. 12372. He even accused the Deputy Chief Defense counsel of wearing a "contemptuous" uniform at a hearing earlier in the week, specifically the Army's Class "B" uniform: "I'm not oblivious; I know what that says. What little respect you have for the commission is obvious. A short-sleeve shirt, no tie, not coat; I get it. That's the message. That's been the message from the defense for five months. And it's well received. I got it. I've heard you." Trans. 12366. This was despite the fact that the Deputy was *required* to wear his Class B uniform in commission proceedings under the governing rules because the Deputy was not appearing on behalf of an accused.[9]

Concluding the proceeding, Col Spath again reiterated how personally invested he had become in the disputes over his authority within the military commission process. "I've got to tell you," he admitted, "after 26 years of service, it's shaken me more than I would have expected." Trans. 12373.

### E. Abatement and relevant proceedings in the Court of Military Commission Review.

At the conclusion of the hearing on February 16, 2018, Col Spath ordered an indefinite abatement of proceedings:

> We're done until a superior court tells me to keep going.
> It can be CMCR. It can be the Washington – or the District

---

[9] *See* Chief Defense Counsel Policy Memorandum 5-15 Ch. 5, MCDO Uniform and Civilian Attire Policy for Military Personnel §1(b) (May 18, 2017).

in D.C. They're all superior to me. But that's where we're at. We need action. We need somebody to look at this process. We need somebody to give us direction. I would suggest it sooner than later, but that's where we're at.

\*\*\*

We are in abatement. We're out. Thank you. We're in recess.

Trans. 12377.

On February 21, 2018, the prosecution gave notice of its intent to seek an interlocutory appeal to the Court of Military Commission Review (CMCR). In its opening brief, counsel for the prosecution asked the CMCR to affirm three of Col Spath's orders and to vacate a fourth.[10] Various motions and pleadings have been filed in that proceeding, including challenges to subject-matter jurisdiction, which have not yet been ruled upon and which are not relevant to the relief Petitioner seeks in the instant petition.[11]

_____

[10] Counsel for the prosecution asked the CMCR to: 1) affirm Col Spath's ruling that the military commission judge, not the Chief Defense Counsel, should be the excusal authority for defense counsel; 2) affirm Col Spath's ruling that learned counsel was only necessary to the "extent practicable"; 3) affirm Col Spath's ruling that the absence of counsel was a strategic choice by the defense; and 4) overturn Col Spath's abatement order.  *See* CMCR Case 18-002, Brief On Behalf Of Appellant (March 5, 2018).

[11] Petitioner challenged the CMCR's subject-matter jurisdiction over 1) the abatement order, insofar as abatement orders are not within the narrow categories of claims over which the CMCR is given interlocutory appellate jurisdiction by 10 U.S.C. § 950d, 2) counsel for the prosecution's request to have the CMCR to *affirm* orders issued by the military commission in its favor, and 3) the appeal writ

22

Relevant here, on September 13, 2018, Petitioner moved, *inter alia*, to dismiss after it was discovered that Col Spath had been operating under a disqualifying ethical conflict at the time he entered the orders under review. This disqualification, in turn, required the vacatur of his orders dating back potentially 742 days and therefore included the orders ostensibly giving rise to the CMCR's subject-matter jurisdiction. The reason for the disqualification was that Col Spath had, unbeknownst to counsel for Petitioner, been pursuing a position as an immigration judge at the Executive Office for Immigration Review (EOIR) for at least the previous year. At no time, however, did Col Spath disclose this fact.

Petitioner's counsel first heard credible reports that Col Spath was pursuing such employment in July 2018 and sent counsel for the prosecution a discovery request to determine if the rumors were true. The prosecution denied the discovery request, asserting that Petitioner failed to prove that the Justice Department had hired Col Spath as an employee. "This request," counsel for the prosecution asserted, "is wholly conclusory in nature and *fails to provide any evidence or proof in support*." Government Response to Defense Request for Discovery (September 5, 2018) (Attachment B) (original emphasis). "Based on its review of the

_____

large, due to a jurisdictional defect in the underlying convening order that was created by the Supreme Court's intervening decision in *Lucia v. SEC*, 138 S.Ct. 2044 (2018).

23

unsubstantiated assertions provided in the Defense discovery request, the Government finds no reasonable objective basis to question the impartiality of the former presiding Military Judge and therefore no cause to act on the request." *Ibid*.

Five days after tendering this negative response, Attorney General Sessions greeted his newest employees at a public ceremony in which he hailed "the Largest Class of Immigration Judges in History for the Executive Office for Immigration Review."[12] In his remarks, the Attorney General warned the new immigration judges of the "good lawyers" who would come before them representing non-citizens, "just like they do in federal criminal court,"[13] and likened these defense lawyers to "water seeping through an earthen dam to get around the plain words of [immigration law] to advance their clients' interests."[14] The Attorney General then attended a reception with these new employees, where a press photographer captured the Attorney General standing next to Col Spath, who is pictured below wearing a dark suit and blue tie:

---

[12] *Available at* https://www.justice.gov/eoir.

[13] The Attorney General's reference to criminal defense attorneys appears to have been unscripted as it does not appear in his prepared remarks, *available at* https://www.bing.com/videos/search?q=attorney+general+remarks+to+largest+class+of+immigration+judges.

[14] *Available at* https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-largest-class-immigration-judges-history.

24



Carol Rosenberg, *Controversial Guantánamo judge joins Jeff Sessions in immigration judge ceremony*, McClatchy (September 14, 2018).

According to an EOIR press release, this most recent group of immigration judges completed the appointment process in an average of "approximately 266 days, down from an average of 742 days just one year ago."[15] Col Spath was therefore potentially negotiating for this employment for the final two years he was presiding over Petitioner's military commission.

Petitioner contended below that the public record was sufficient to establish that Col Spath was proceeding under an undisclosed conflict or, at a minimum, the appearance of a disqualifying conflict. Petitioner further recognized that due to the

---

[15] *Available at* https://www.justice.gov/opa/pr/executive-office-immigration-review-announces-largest-immigration-judge-investiture-least.

prosecution's refusal to turn over discovery, the record was still uncertain respecting the precise dates and terms on which Col Spath applied, interviewed, and accepted employment as an immigration judge. Petitioner therefore asked, in the alternative, that the CMCR compel discovery relevant to the question of Col Spath's employment negotiations. This would, Petitioner contended, establish with certainty which rulings were tainted by the undisclosed conflict.

Counsel for the prosecution opposed this motion and contended that the issue was not properly before the CMCR, insofar as there had been no hearing below and that Petitioner was not entitled to raise issues in an interlocutory appeal taken under 10 U.S.C. § 950d. Counsel for the prosecution also contended that there was "no authority" for the proposition that "an Executive Branch judge applying for another judicial position is automatically disqualified from Appellee's case from the moment of application" or that "automatic disqualification is required when the same federal department employs both the prosecution counsel and the judge." C.M.C.R Case No. 18-002, Appellant's Opposition to Motion to Vacate Rulings and Compel Discovery, at 13 (September 18, 2018). The prosecution disputed whether Col Spath had applied to be an immigration judge and "[e]ven if it is true that Judge Spath is now, after retiring from active duty, associated with an Executive Branch agency other than DOD, such employment does not mean that he would have lacked the impartiality to preside over a DOD-

26

convened Commission." *Id.* at 24. Finally, it contended that Petitioner's motion

should be construed as a petition for an extraordinary writ and denied because

Petitioner's entitlement relief was not clear and indisputable. *Id.* at 25-26.

On September 28, 2018, the CMCR denied all relief. In a two-page order,

the CMCR held:

> Appellee does not indicate when Judge Spath allegedly
> negotiated with DOJ for employment. We take judicial
> notice that Judge Spath is scheduled to retire from the Air
> Force on November 1, 2018. None of appellee's
> contentions were raised before the military commission
> because the case has been abated. Thus, we have no factual
> record or findings of the military judge at the trial level to
> support appellee's allegations for this Court to review.

CMCR Case No. 18-002, Order (September 28, 2018) (Attachment A). Without

further analysis, the CMCR concluded that Petitioner had failed to demonstrate a

"clear and indisputable" right to relief under *Cheney v. U.S. District Court*, 542

U.S. 367, 381 (2004). The same day as the CMCR issued its order, the Justice

Department announced that "Attorney General Jeff Sessions appointed Vance H.

Spath to begin hearing cases [before the Arlington Immigration Court] in October

2018." Department of Justice, Press Release: EOIR Swears in 46 Immigration

Judges, at 11 (September 28, 2018).[16]

---

[16] *Available at* https://www.justice.gov/eoir/page/file/1097241/download

## REASONS FOR GRANTING THE WRIT

In the military commission context, the All Writs Act empowers this Court to "issue all writs necessary or appropriate in aid of our jurisdiction such that we can issue a writ of mandamus *now* to protect the exercise of our appellate jurisdiction *later*." *In re Al-Nashiri*, 791 F.3d 71, 75-76 (D.C. Cir. 2015) (internal quotations omitted) (original emphasis). In particular, this Court has reaffirmed "Mandamus is an appropriate vehicle for seeking recusal of a judicial officer during the pendency of a case, as ordinary appellate review following a final judgment is insufficient to cure the existence of actual or apparent bias— with actual bias ... because it is too difficult to detect all of the ways that bias can influence a proceeding and with apparent bias because it fails to restore public confidence in the integrity of the judicial process." *In re Mohammad*, 866 F.3d 473, 475 (D.C. Cir. 2017) (cleaned up).[17]

While mandamus is often described an "drastic and extraordinary remedy reserved for really extraordinary causes," *Cheney*, 542 U.S. at 380 (cleaned up), questions of judicial disqualification present a special case in the law of mandamus. This is because questions of judicial ethics cast "a shadow not only

---

[17] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 J. OF APPELLATE PRACTICE AND PROCESS 143 (2017).

28

over the individual litigation but over the integrity of the federal judicial process as a whole. … In recognition of this point we have been liberal in allowing the use of the extraordinary writ of mandamus to review orders denying motions to disqualify." *Union Carbide v. U.S. Cutting Service*, 782 F.2d 710, 712 (7th Cir. 1986); *see also In re IBM*, 618 F.2d 923, 926-27 (2d Cir. 1980); *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981); 9 MOORE'S FEDERAL PRACTICE ¶ 110.13[10]. In fact, when matters of judicial disqualification arise, some circuits hold that a litigant is obliged, on pain of waiver, to petition for mandamus. *See, e.g., United States v. Horton*, 98 F.3d 313, 316 (7th Cir. 1996).

On the merits, writs of mandamus turn on the three factors enumerated in *Cheney*, 542 U.S. at 380-81. And here, all three factors are readily satisfied. *First*, the issuance of the writ is the only means by which Col Spath's disqualifying conduct can be remedied. *Second*, Col Spath clearly and indisputably disqualified himself from presiding over Petitioner's military commission when he 1) failed to disclose his intent to retire; 2) secretly negotiated employment with the Justice Department; and 3) expressed and acted upon his acknowledged bias, indeed animus, against Petitioner's counsel. *Third*, issuance of the writ under these circumstances is not only appropriate, but necessary, to protect the the integrity of the judicial system.

## I.   THERE IS NO OTHER ADEQUATE MEANS OF OBTAINING RELIEF.

This Court has consistently recognized that challenges to a judge's fitness can and should be raised as via a writ of mandamus at the earliest opportunity. *Mohammad*, 866 F.3d at 473; *see also In re Kempthorne*, 449 F.3d 1265 (D.C. Cir. 2006) (mandamus disqualifying a special master); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (same); *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003) (mandamus disqualifying a court monitor). This is because "[w]hen the relief sought is recusal of a disqualified judicial officer … the injury suffered by a party required to complete judicial proceedings overseen by that officer is by its nature irreparable." *Cobell*, 334 F.3d at 1139. And it is this "irreparable injury that justified mandamus." *Al-Nashiri*, 791 F.3d at 79.

Leaving these issues to the future appellate review is especially inadequate here given the current state of proceedings before the CMCR. The CMCR is presently reviewing the merits of a number of Col Spath's rulings in the context of the prosecution's third interlocutory appeal in this case. If Col Spath was disqualified due to bias, the very rulings under review are a nullity, thereby mooting the CMCR's continuing review of their merits.

As apparently contemplated by the CMCR, however, the question of whether Col Spath was disqualified from issuing those orders in the first place must wait an eventual remand after the CMCR has passed on the soundness of

30

those orders. Should the CMCR affirm some or all of Col Spath's rulings on the

merits, Petitioner will then have to persuade the military commission judge to

vacate and reconsider orders that the CMCR will have already concluded were

correct. It is not even clear what rules would govern such an exercise. And

assuming the military commission judge treats the CMCR's merits rulings as

controlling, Petitioner will permanently lose the opportunity to litigate those issues

fully and fairly before a neutral judge and fact-finder.

## II.   PETITIONER'S ENTITLEMENT TO RELIEF IS CLEAR AND INDISPUTABLE.

### A.   Secretly pursuing employment with the Justice Department whilst serving as a judge in a high-profile criminal case involving the Justice Department creates a disqualifying conflict of interest.

The disqualification of a judge is governed by an objective test that is

satisfied whenever there is a reasonable "appearance of partiality ... even though no

actual partiality exists." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S.

847, 860 (1988). In evaluating whether there is such an appearance of partiality,

"any doubts must be resolved in favor of recusal." *United States v. Patti*, 337 F.3d

1317, 1321 (11th Cir. 2003).

When a judge pursues post-judicial employment, numerous canons of

judicial conduct regulate the unique risks that such a job search poses to the public

trust in the judicial system. The pursuit of employment necessarily threatens the

31

"public's confidence in the integrity and impartiality of the judiciary" because of a judge's natural temptation to stay in the good graces of prospective employers. Code of Conduct for United States Judges, Canon 2A (2014). The pursuit of employment impairs a judge's ability to give their judicial duties "precedence over all other activities" because the timetables for scoring the best job may not coalesce with the timetables that justice requires for the cases already on the docket. *Id*. Canon 3. The pursuit of employment, particularly with large government employers, also puts the judge at risk of altering their behavior to curry favor with parties or firms who are likely to have an interest in matters before their court. *Id*. Canon 4D.

These risks not only undermine the judge's personal integrity but the public's perception the judge's integrity. That is why there are strict, bright-line ethical standards governing judges contemplating post-judicial employment. The Guide to Judiciary Policy (2014) states, for example, "After the initiation of any discussions with a law firm,[18] no matter how preliminary or tentative the

---

[18] As the Code on Judicial Policy itself states, the use of the phrase "law firm" is intended to "apply to other potential employers" without distinction. *See also United States v. Sells Engineering, Inc.*, 463 U.S. 418, 471 (1983) (Burger, C.J., dissenting) (describing the Justice Department as the country's "largest law firm"); *Scott v. United States*, 559 A.2d 745, 750 (D.C. 1989) (en banc) ("Nor does it change simply because the prospective employer is a component of the Department of Justice; the negotiations at issue for employment with a unit directly linked to

32

exploration may be, the judge should recuse on any matter in which the firm appears. Absent such recusal, a judge's impartiality might reasonably be questioned." 2B Guide to Judiciary Policy, Committee on Codes of Conduct Advisory Opinion No. 84: Pursuit of Post-Judicial Employment (2016). Furthermore, the Guide makes clear that:

> [A] judge should refrain from negotiating with a firm, if the firm's cases before the court are of a character or frequency such that the judge's recusal (which would be required) would adversely affect litigants or would have an impact on the court's ability to handle its docket. In such cases, judicial duties would have to take precedence over the legitimate personal interest in post-judicial employment.

*Ibid.* To that end, "A judge should not explore employment opportunities with a law firm that has appeared before the judge until the passage of a reasonable interval of time, so that the judge's impartiality in the handling of the case cannot reasonably be questioned." *Ibid.*

The Guide then sets out detailed steps a judge seeking future employment must take to protect the integrity of the proceedings before them as well as the reputation of the judicial system more broadly. A judge contemplating future employment must:

---

the prosecutor's office are ethically analogous to negotiations for employment with a large private law firm.").

33

1) "make[] known a future retirement or resignation date;"

2) refrain from "attend[ing] meetings or engag[ing] in communications with the judge's future employer concerning the employer's business" and, in particular, social functions because "attending social functions sponsored by a future employer gives rise to an appearance of impropriety; and

3) recuse and transfer cases involving prospective employers if doing so can be done without imposing an undue burden on litigants. And if such recusal would cause an undue burden, "a judge should not negotiate for future employment with a firm."

*Ibid.*; *see also United States v. Mikhel*, 889 F.3d 1003, 1028 (9th Cir. 2018) (crediting the actions of a district judge who "promptly and clearly disclosed the alleged grounds for recusal to the parties; [whose] only contact was with a local screening committee; [who] stated he would not seek remuneration for the position, and [where] there was no opportunity for him to negotiate salary, bonuses, or the like; his application was never considered on its merits by the Department of Justice or White House Counsel's office; and he immediately withdrew his application when defendants filed their motion [objecting].").

As this Court is well-aware, these standards apply and recusal is the norm when a sitting judge is simply up for another judicial appointment. The Chief Judge of this Court, the Honorable Merrick Garland, recused himself from all cases, including cases on which he had already heard oral argument, for the year after President Obama nominated him to the Supreme Court. The Honorable Brett

34

Kavanaugh has also recused himself from pending cases since his nomination to the Supreme Court by President Trump.

Similarly, magistrate judges up for re-appointment are required recuse themselves from any case involving a firm, institutions, or attorneys participating in a Merit Selection Panel. That includes not simply the lawyers themselves but, "where the United States Attorney or the Federal Public Defender serves on the panel, … all cases (criminal and civil) involving that attorney and that attorney's office due to the direct supervisory role those officials have over the attorneys and the cases in their respective offices." 2B Guide to Judiciary Policy, Committee on Codes of Conduct Advisory Opinion No. 97: Disqualification of Magistrate Judge Based on Appointment or Reappointment Process (2009).

In addition to the basic norms of judicial conduct, a litigant has a constitutional right to judicial officer unbiased by the unique pressures of a job search as a clearly established matter of due process. A judge's concern with future employment prospects is likely to create "a possible temptation to the average man as a judge … not to hold the balance nice, clear, and true between the State and the accused[.]" *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Such a bias, if uncorrected, "denies the latter due process of law." *Ibid*. In assessing whether such a bias exists, "The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be

35

neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (cleaned up). And the appearance of such a bias is self-evident when the parties or subject-matter of a case have had or will have a "significant and disproportionate influence" on the judge's immediate career prospects. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009).

Recusal in such circumstances is also the explicit requirement of the Manual for Military Commissions (2011), promulgated by the Secretary of Defense. Rule for Military Commission (R.M.C.) 902 lays out two standards for the disqualification of a military judge. The first, like the federal rules, disqualifies any judge from "any proceeding in which that military judge's impartiality might reasonably be questioned." R.M.C. 902(a). And specific to the particular issue here, the R.M.C. states that disqualification is required where a military judge has "an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding[.]" R.M.C. 902(b)(5)(C). In the post-judicial employment context, such interests can arise either because of how the timetables governing a military commission judge's existing judicial duties might impair the availability of other employment opportunities or because of how the perception of a military commission judge's performance in a particular proceeding might appeal to or discourage a prospective employer.

36

Unsurprisingly, in cases where these standards have been breached – even inadvertently – the decisions of reviewing courts have been exacting. The leading case is the Seventh Circuit's decision in *Pepsico, Inc. v. McMillen*, 764 F.2d 458 (7th Cir. 1985); *see also DeNike v. Cupo*, 958 A.2d 446, 455 (N.J. 2008) (quoting *Pepsico* to hold that employment negotiations with a lawyer representing one of the parties, even after all substantive decisions had been rendered, is improper because "*any* sort of employment negotiations with a party— 'preliminary, tentative, indirect, unintentional, [or] ultimately unsuccessful' —right before or during a pending matter, reasonably call into question a judge's impartiality.") (original emphasis).

In *Pepsico*, a district judge had hired a headhunter to pursue future employment opportunities on his behalf and had specifically instructed the headhunter not to pursue firms appearing before his court. Unbeknownst to the judge and in direct violation of his instructions, the headhunter had made preliminary inquiries with a firm that was appearing before the judge. After the judge refused to recuse himself upon learning of the incident, claiming the breach was accidental, the Seventh Circuit issued a writ of mandamus directing the judge's recusal. "The dignity and independence of the judiciary," the Court held, "are diminished when the judge comes before the lawyers in the case in the role of a suppliant for employment." *Pepsico*, 764 F.2d at 461.

37

Courts have held to the same standard when sitting judges seek government employment. In *Scott*, the en banc District of Columbia Court of Appeals vacated an attempted murder conviction where counsel for the prosecution had been assigned by the U.S. Attorney's Office for the District of Columbia and the judge was separately seeking employment in the Justice Department's Executive Office for the United States Attorneys. *Scott*, 559 A.2d at 748. The position in the Executive Office was administrative/managerial and involved no role in Departmental litigation. Nevertheless, Judge Rodgers wrote for a unanimous court that vacatur was required because, "Our criminal justice system is founded on the public's faith in the impartial execution of duties by the important actors in that system." *Ibid*. Citing *Pepsico*, the Court held that negotiating with "a component of the Department of Justice," and in particular "a unit directly linked to the prosecutor's office," created an incurable appearance of partiality. *Id*. at 750.

### B. Col Spath violated every standard and rule governing the pursuit of employment by a sitting judge.

*First*, Col Spath gave no notice at any point prior to his departure that he was seeking employment from the Justice Department. In fact, at no point did Col Spath even make known the fact that he intended to retire. Counsel for Petitioner only learned of this in July 2018, after media reports of his imminent departure and accompanying rumors that he had been hired as an immigration judge.

38

*Second*, Petitioner acknowledges that it is presently unknown what meetings or communications Col Spath had with the Justice Department. It is also unknown the extent to which Col Spath touted his service as a judge on the Guantanamo military commissions in selling himself as a good candidate for immigration judge. But given that Col Spath received the very job he was pursing, those meetings and communications must have taken place. And what is known for sure is that at the very time counsel for the prosecution denied Petitioner's request for discovery, Col Spath was preparing to be feted by Attorney General Sessions at a ceremony for new Justice Department employees.

*Third*, and most significantly, Col Spath did not recuse himself, despite the Justice Department's deep involvement in Petitioner's trial, Attorney General Sessions' intense and publicly stated interest in the proceedings,[19] and the routine appearance of Justice Department attorneys and officials before him. *See*, *e.g.*,

---

[19] *See*, *e.g.*, *Sessions Affirms Use of Prison; Attorney General Sessions Visits Guantanamo Bay Prison*, Associated Press (July 8, 2017); Memorandum for Trial Counsel (July 9, 2018) (disclosing Attorney General Sessions' complaints to Defense Secretary Mattis about plea negotiations in the capital military commissions that could have resulted in foregoing the death penalty) *available at* https://www.documentcloud.org/documents/4615017-The-Defense-Attorney-s-request-for-testimony.html; Sen. Jeff Sessions, Letter to President Obama, 2010 WLNR 584318 (January 10, 2010) (Urging the president to send the so-called "Christmas Bomber" to Guantanamo and "to pursue trial by military commission-an option you have determined appropriate for other terrorists, such as Abd al-Rahim al-Nashiri who was responsible for the U.S.S. Cole bombing.").

39

Trans. 11053 (announcing Justice Department attorneys, including attorneys from the FBI at counsel table); *Id*. 10015 (same); *cf*. R.M.C. 103(24)(B) (defining "party" as "Any trial or assistant trial counsel representing the United States, and agents of the trial counsel when acting on behalf of the trial counsel with respect to the military commission in question."). In fact, at the time Col Spath entered his order of abatement, the lead prosecutor in Petitioner's case was Mark Miller, an Assistant U.S. Attorney.

Rather than recuse himself or evaluate whether his future employment plans might cause an undue burden to the military commission system or the parties, Col Spath kept his plans secret. He ordered what he described as an "aggressive schedule" in April 2017. And he then committed to a pursuit of haste at all costs that was inexplicable given the seriousness of the issues he confronted.

In June 2017, BGen Baker, in his role as Chief Defense Counsel, advised all MCDO attorneys not to "not conduct any attorney-client meetings at Guantanamo Bay, Cuba until they know with certainty that improper monitoring of such meetings is not occurring." Given BGen Baker's supervisory authority over Petitioner's former counsel, they did the responsible thing and requested modest discovery and a hearing to assess the danger to Petitioner's entitlement to attorney-client confidentiality. Col Spath denied these motions so that the case could proceed rapidly to trial.

40

In August 2017, Petitioner's former counsel discovered a hidden microphone in their attorney-client meeting spaces as well as other facts detailed in the Dolphin Declaration. This discovery confirmed, if not exceeded, the worst of BGen Baker's stated fears. Petitioner's former counsel again sought reasonable remedies and Col Spath denied these motions so that the case could proceed rapidly to trial.

In October 2017, Petitioner's former civilian counsel were forced to withdraw from the case. They followed the governing rules for how to do so and did so with the express authorization of BGen Baker. Petitioner's only remaining attorney, LT Piette, asked for a brief period of delay, so that new death penalty qualified counsel could be hired. Col Spath denied this motion so that the case could proceed rapidly to trial, despite the fact that Petitioner was, as a practical matter, unrepresented.

In November 2017, after BGen Baker refused to rescind his excusal orders for Petitioner's former lawyers, Col Spath unlawfully ordered BGen Baker to be arrested and threatened Petitioner's former lawyers with the same. Col Spath then continued to proceed through a series of hearings so that the case could proceed rapidly to trial, despite the fact that Petitioner was, as a practical matter, unrepresented.

From November 2017 through February 2018, Col Spath proceeded as rapidly as he could to trial, presiding over a series of one-sided hearings, issuing numerous rulings, and making international headlines by railing against "the defense community," aping political talking points about "fake news," and attacking the press for reporting accurately on his increasingly erratic behavior. Only after senior Department of Defense officials refused to support his vendetta against the so-called "defense community" did Col Spath take a moment to pause and, the following day, abate the proceedings in Petitioner's military commission.

No reasonable person could observe Col Spath's mad rush and ensuing courtroom histrionics and not suspect that they were at least influenced by his then-secret pursuit of employment. Even in the most forgiving light, a reasonable observer, aware of all the facts, would conclude that Col Spath's haste and his open "frustration" at being stymied in that haste reflected a desire to wrap up a high-profile case quickly, so that he could retire on a full pension and move on to a desirable position in the Arlington Immigration Court.

A reasonable observer, aware of all the facts and aware that Col Spath was secretly negotiating for an appointment from Attorney General Sessions, could also readily conclude that Col Spath was acting as a suppliant. As an immigration judge, Col Spath "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe[.]" 10 U.S.C. § 1101(b)(4). Attorney

42

General Sessions chuckled during his remarks as he quoted that very provision to Col Spath and his fellow immigration judges on September 10, 2018.[20] Given the immigration policies being pursued by the present Attorney General, a reasonable observer, knowing all the facts, could readily conclude that Col Spath's injudicious behavior was, in fact, a kind of audition for a prospective employer whom he suspected would value his ribald invocations of "fake news," his contempt for the press and the American Bar Association, and his willingness to take on the "defense community;" the same amorphous group that Attorney General Sessions presumably warned future immigration judges would try to be like "water through an earthen dam" of the immigration laws.

Indeed, a reasonable observer, aware of all the facts, would rightfully suspect that Col Spath's secrecy regarding his career plans, in violation of settled rules regarding post-judicial employment specifically and the regulatory requirements governing military commissions more generally, evidenced a consciousness of guilt. *Cf. United States v. Clark*, 184 F.3d 858, 869 (D.C. Cir. 1999). Had Col Spath disclosed his intent to retire as a military commission judge and pursue employment as an immigration judge, a reasonable observer today

---

[20] *Available at*
https://www.bing.com/videos/search?q=attorney+general+remarks+to+largest+class+of+immigration+judges at 4:30-41.

would not be justified in suspecting the worst. Had Col Spath acted like the district judge in the *Mikhel* case, Petitioner and the public alike would have confidence that any taint his career ambitions may have put on his rulings over the past two years would have been cleansed by the ordinary checks and balances of the adversarial process. Instead, a reasonable observer, aware of all the facts known today, would have to conclude, based if nothing else on his secrecy, that Col Spath's reckless and often bizarre behavior was at least influenced by the secret employment negotiations he was undertaking with the Justice Department.

No reasonable observer could view Col Spath's conduct, knowing all the facts, and see a neutral judge. Whether Col Spath was privately motivated by his desire to move on to greener employment pastures or some other factors is irrelevant. Col Spath appeared biased and the most obvious explanation for that bias, beginning with the promulgation of his "aggressive schedule" on April 11, 2017, through his ordering the arrest of BGen Baker, through his abatement of proceedings in February 2018, was his private professional interests. That appearance is fatal as a matter of judicial ethics, military law, and due process. "An insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication. Both the appearance and reality of impartial justice

44

are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams*, 136 S. Ct. 1909-10.

The precise reasons the CMCR refused to grant Petitioner any remedy for Col Spath's behavior are difficult to discern from its sparse two-page order. It appears, at least in part, that the CMCR did not credit Petitioner's central claim: that Col Spath had, in fact, been seeking a job with the Justice Department whilst presiding over Petitioner's case. Counsel for the prosecution dismissed this contention as "conclusory," and when reciting the facts relating to Col Spath, the CMCR merely takes judicial notice of the fact that he is "scheduled to retire from the Air Force on November 1, 2018," making no mention of his current employment as an immigration judge. The CMCR erroneously appeared to believe that because the facts surrounding Col Spath only came to light after the interlocutory appeal was already pending, there was "no factual record or findings of the military judge at the trial level to support [Petitioner's] allegations for the Court to review."

As an initial matter, this is not true. Even if Col Spath's precise job plans were uncertain at the time the CMCR ruled, the fact that Col Spath concealed his intention to retire would establish a prima facie claim of judicial misconduct. Col Spath failed to "make[] known a future retirement or resignation date" at a time when that fact would have prompted any reasonable observer to inquire into his

45

long-term career intentions as he unlawfully imprisoned and threatened to imprison lawyers he believed to be impeding his "aggressive schedule." Those job plans are now a matter of public record, just as subject to judicial notice as Col Spath's imminent retirement from the Air Force.

Furthermore, the fact that Petitioner's case was on appeal when the facts came to light is irrelevant. A litigant has an obligation, on pain of waiver, to raise judicial disqualification issues "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. and Medical Ctr.*, 829 F.2d 326, 333 (2d Cir.1987).

As this Court held in *Microsoft*, pertinent disqualification questions not only can be, but necessarily must be, addressed for the first time on appeal where, as here, the judicial officer in question "ensured that the full extent of his actions would not be revealed until this case was on appeal." *United States v. Microsoft*, 253 F.3d 34, 108 (D.C. Cir. 2001); *see also Ligon v. City of New York*, 736 F.3d 118, 124 (2d Cir. 2013) (disqualifying a district judge when the bases for disqualification could be ascertained from the judge's conduct on the record and uncontested media reports). As in *Microsoft*, Col Spath concealed the facts giving rise to his disqualification, those facts only came to light on appeal, and those facts are no longer in reasonable dispute: Col Spath concealed his intent to retire; he concealed his active pursuit of employment with the Justice Department; and he

46

failed to recuse himself despite the routine appearance of Justice Department attorneys before him, the Justice Department's active role in prosecuting Petitioner's case, and Attorney General Sessions' keen interest in the military commission prosecutions generally, and Petitioner's case specifically.

### C. The only adequate remedy to cure the structural error in this case is to vacate the proceedings below.

Col Spath's misconduct in this case violated clearly established rules governing judicial conduct, the Secretary of Defense's clear rules governing judicial disqualification in military commissions, and Petitioner's clear constitutional right to an unbiased judge. Given Col Spath's actual and demonstrated bias on the record, given his deliberate concealment of facts that could have allowed this issue to be aired far earlier, and most crucially given the prejudice that resulted from Col Spath's misconduct, the only adequate remedy is the vacatur of Petitioner's current military commission prosecution (in effect, dismissing the current iteration of this prosecution without prejudice).

Vacatur of proceedings has been ordered to remedy far less egregious judicial misconduct than what is now before this Court. In *Williams*, 136 S. Ct. at 1909, the Supreme Court vacated an appellate court decision due to the disqualification of a single member of the panel to have decided the case. In *Liljeberg*, 486 U.S. at 862, the Supreme Court upheld as "well supported" the

47

Circuit's conclusion that only a new trial could remedy a district judge's *inadvertent* breach of the conflict of interest rules necessitating his disqualification. In *United States v. Donato*, 99 F.3d 426, 438 (D.C. Cir. 1996), this Court reversed a conviction where a judge's "comments, combined with the near-constant criticism of the defendant's counsel, raise[ed] in us a serious doubt as to whether this defendant received a fair trial." In *Mohammad*, 866 F.3d at 477, this Court vacated appellate proceedings in which a member of the CMCR was disqualified even though it was probable that a "reasonable person would disregard [the judge's] violation of Rule 902(b)(3)." And in *Scott*, 559 A.2d at 756, the D.C. Court of Appeals vacated an attempted murder conviction because a judge who secretly was pursuing employment in the Justice Department at the very same time that the Justice Department was prosecuting the defendant "require[d] a new trial in order to assure the continued public confidence in the integrity of the judiciary."

Here, the vacatur of Petitioner's current military commission prosecution is the only way to remove the taint of misconduct and cure the structural error of Col Spath's actual and apparent bias during critical stages of this capital case. Unlike *Microsoft*, where the influence of the district judge's disqualifying conduct pertained to and therefore could be remedied by the vacatur of his remedial orders only, the taint of Col Spath's disqualifying conduct was pervasive and irreparably prejudicial. Because Col Spath never announced his intention to retire and seek

48

employment with the Justice Employment, there is no way to date with certainty when he decided to parlay his work as a military commission judge into his current position. That uncertainty is precisely why the Supreme Court held disqualifying bias of the kind at issue here was structural error requiring vacatur. *Williams*, 136 S. Ct. at 1909.

But even if this Court were to limit the tainted period back to April 11, 2017, when Col Spath issued his "aggressive schedule," his rulings since that time have caused irreparable harm that can only be remedied if Petitioner's case is given a fresh start. Foremost, Col Spath's conduct on the bench during this period provoked the collapse of Petitioner's capital defense team. Mr. Kammen had served as Petitioner's learned counsel since 2007. His involuntary severance from Petitioner's trial defense team and his absence for the past year is structural error that is irreparable. *See United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).

The only adequate remedy, therefore, is to vacate the proceedings below. Doing so will not result in Petitioner's release from custody. It will not even prevent the government from prosecuting Petitioner, either by charging him a third time before a military commission or proceeding on the indictment already pending in the Southern District of New York. Instead, it will ensure a clean slate and restore the public's confidence that even in the prosecution of our nation's enemies, the judiciary's commitment to neutrality is non-negotiable.

49

**D. In the alternative, this Court should vacate all of Col Spath's orders tainted by the period of misconduct.**

In the alternative, this Court should order the vacatur of all orders entered by Col Spath from the time he began his pursuit of post-judicial employment with the Justice Department. At present, that precise date is unknown. However, such an order should encompass all orders presently under review by the CMCR. For the reasons stated above, the current appeal before the CMCR is inseparable from the misconduct at issue. Vacating the orders underlying that appeal will moot the prosecution's interlocutory appeal and return this case to the military commission in Guantanamo. At that time, the current military commission judge will have the opportunity to undertake an appropriate evidentiary hearing to ascertain the extent of the rulings that must be vacated and rule afresh on any issues that remain outstanding as a result.

**E. At a minimum, this Court must direct the CMCR to conduct a proper inquiry into Col Spath's misconduct.**

Finally, and at a minimum, this Court should vacate the CMCR's denial of Petitioner's motion with instructions to conduct an appropriate evidentiary hearing. Because questions of recusal must be addressed "at the earliest possible moment," *Apple*, 829 F.2d at 333, appellate courts sometimes must order additional factfinding when the record below is insufficiently developed. *See*, *e.g.*, *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003) ("[u]nless the court is able to determine

50

without a hearing that the allegations are without credibility or that the allegations if true would not warrant a new trial, an evidentiary hearing must be held."); *Easley v. University of Michigan Bd. of Regents*, 853 F.2d 1351, 1358 (6th Cir. 1988) (ordering an evidentiary hearing for the purposes of enlarging the record regarding the nature of the district judge's affiliations and associations with the law school and "whether, because of such associations, Judge Feikens' impartiality in this matter might 'reasonably be questioned.'"). The question of Col Spath's disqualification goes squarely to the continuing validity of the orders the CMCR is presently reviewing. If those orders are invalid, the CMCR not only risks wasting judicial resources by deciding issues that are moot, it risks permanently prejudicing Petitioner's ability to litigate those issues before a neutral trial judge.

Though the CMCR claimed in its order that it was not in a position to ascertain additional facts, this contention is belied by the CMCR's own conduct during this appeal. In response to a motion to dismiss for lack of subject-matter jurisdiction, the CMCR issued an order specifically directing the filing of declarations by Petitioner's counsel, counsel for the prosecution, and Col Spath to establish additional extra-record facts. CMCR Case No. 18-002, Order (March 22, 2018). Just as the CMCR deemed those facts necessary to evaluating whether the prosecution's interlocutory appeal was properly before it, it can readily ascertain additional facts relating to the validity of the orders under review.

51

Very few relevant facts remain presently unknown. The only continuing uncertainties are what date Col Spath decided to retire, what date he began to pursue employment in the Justice Department, and what meetings and communications he undertook to achieve that goal. All of those facts are readily ascertainable from a declaration from Col Spath.

To the extent other facts remain relevant or questions of credibility arise, the CMCR is also empowered to order a hearing – known in military law as a *DuBay* hearing – where any necessary findings of fact can be made. *See*, *e*.*g*., *United States v*. *Quintanilla*, 56 M.J. 37, 81 (C.A.A.F. 2001) (ordering a *DuBay* hearing on a question of judicial disqualification). The CMCR has already ordered such a hearing in another case, where the validity of a pending appeal was at issue. *United States v*. *Qosi*, CMCR Case No. 17-001, Order (June 19, 2017).

If the CMCR genuinely lacks the "factual record and findings of the military judge at the trial level to support [Petitioner's] allegations for this Court to review," it should stay further proceedings on the prosecution's interlocutory appeal and develop the necessary factual record. That is the only way that it can fulfill its responsibility to ensure that the "shadow [is] dispelled at the earliest possible opportunity by an authoritative judgment either upholding or rejecting the challenge." *Union Carbide*, 782 F.2d at 712.

### III. ISSUANCE OF THE WRIT IS IN THE PUBLIC INTEREST.

This Court has previously recognized that the issuance of mandamus is appropriate in cases of actual or apparent bias because confidence in the integrity of the judicial process "is irreparably dampened once 'a case is allowed to proceed before a judge who appears to be tainted.'" *Al-Nashiri*, 791 F.3d at 80 (citing *In re Sch. Asbestos Litig.*, 977 F. 2d 764, 776 (3rd Cir. 1992)). Indeed, it is the "third *Liljeberg* factor—the risk of undermining the public's confidence in the judicial system—that is most affected by the military judge's refusal to recused [himself] in this case." *United States v. McIlwain*, 66 M.J. 312, 315 (C.A.A.F. 2008).

"[A] military judge is charged with making a number of decisions, any one of which could affect the members' decision as to guilt or innocence, or with regard to the sentence." *McIlwain*, 66 M.J. at 315 (citing *Quintanilla*, 56 M.J. at 41). Here, in addition to the rulings the prosecution seeks to have ratified, Col Spath heard testimony from his fellow employees at the Justice Department and made numerous evidentiary rulings based upon that testimony in the months Petitioner's case rushed forward without learned counsel. "Every time the military judge made a decision," he exercised discretion—a discretion that was biased in fact or in appearance. *Ibid.* "This could not help but to produce a corrosive impact on public confidence in the military justice system." *Ibid.*; *see also United States v. Vargas*, 2018 CCA LEXIS 137 (A.F. Ct. Crim. App. 2018) (dismissing court-

53

martial without prejudice where military judge's failure to recuse "could cast doubt in the mind of the public on the fairness of other rulings by the military judge[.]").

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *Jenkins v. Sterlacci*, 849 F.2d 627, 631 (D.C. Cir. 1988) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)). Petitioner submits Col Spath was biased against him "in fact or apparently." *Al-Nashiri*, 791 F.3d at 79. This Court must "put a stop to it, via mandamus[.]" *Ibid*. ("[I]f prejudice exist[ed], it has worked its evil and a judgment of it in a reviewing tribunal is precarious. It goes there fortified by presumptions, and nothing can be more elusive of estimate or decision than a disposition of a mind in which there is a personal ingredient.") (citing *Cobell*, 334 F.3d at 1139).

## CONCLUSION

For the foregoing reasons, Petitioner respectfully petitions this Court to issue the writ of mandamus ordering the relief requested.

Respectfully submitted,

Dated: October 4, 2018

/s/     Michel Paradis
Michel Paradis
CAPT Brian Mizer, USN, JAGC
LT Alaric Piette, USN, JAGC
U.S. Department of Defense
Military Commission Defense Organization
1620 Defense Pentagon
Washington, DC 20301

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitations imposed by Fed. R. App. P. 32(a)(7)(B) as augmented by Petitioner's motion to exceed the type-volume limitations, because:

[X] this brief contains 12,659 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: October 4, 2018

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

56

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2018, I caused copies of this Petition for Writ of Mandamus and Prohibition and its attachments to be served on the following counsel via the following email addresses at their request:

Joseph Palmer joseph.palmer@usdoj.gov

Danielle Tarin danielle.tarin@usdoj.gov

The only exception to the foregoing is Attachment E, the Declaration of Marc Dolphin (August 4, 2017), which due to its classification as SECRET was delivered to the Court Security Officer for filing in this Court and service on all necessary parties pursuant to the Amended Protective Order for Habeas Cases Involving Top Secret/Sensitive Compartmented Information and Procedures for Counsel Access to Detainees at the United States Naval Station in Guantanamo Bay, Cuba, in Habeas Cases Involving Top Secret/Sensitive Compartmented Information, Case Nos. 08-MC-442-TFH (Dkt. Nos. 1481 and 1496) & 08-cv-01207-RJR (Dkt. Nos. 79 & 80) (D.D.C. 9 January 2009).

Dated: October 4, 2018                   /s/     Michel Paradis
                                         Michel Paradis (D.C. Bar #499690)
                                         U.S. Department of Defense
                                         Military Commission Defense Organization
                                         1620 Defense Pentagon
                                         Washington, DC 20301

                                         *Counsel for Petitioner*

57

**ATTACHMENTS**

A. CMCR Case No. 18-002, Order (September 28, 2018)

B. Government Response to Request for Discovery (September 5, 2018)

C. Brig. Gen. John Baker, USMC, *Improper Monitoring of Attorney-Client Meetings* (June 17, 2017)

D. *United States v. Al-Nashiri*, Transcript of Proceedings (excerpts)

E. Declaration of Marc Dolphin (August 4, 2017) (SECRET)