[ARGUMENT NOT YET SCHEDULED]
**UNITED STATES COURT OF APPEALS**
*for the* **District of Columbia Circuit**

|  |  |
|---|---|
| In re: ABD AL-RAHIM HUSSEIN AL-NASHIRI, | ) No. _____ <br> ) <br> ) **ATTACHMENTS TO** <br> ) **PETITIONER'S** <br> ) **PETITION FOR A WRIT** <br> ) **OF MANDAMUS AND** <br> ) **PROHIBITION** <br> ) <br> ) Dated: October 4, 2018 <br> ) |

Michel Paradis
CAPT Brian Mizer, USN, JAGC
LT Alaric Piette, USN, JAGC
U.S. Department of Defense
Military Commission Defense Organization
1620 Defense Pentagon
Washington, DC 20301

*Counsel for Petitioner*

# ATTACHMENT

# A



# UNITED STATES
# COURT OF MILITARY COMMISSION REVIEW

| | | |
|---|---|---|
| United States, | ) | ORDER |
| | ) | |
| Appellant | ) | DISQUALIFICATION OF |
| | ) | MILITARY JUDGE AND |
| v. | ) | DISCOVERY |
| | ) | |
| Abd Al-Rahim Hussayn | ) | |
| Muhammad Al-Nashiri, | ) | September 28, 2018 |
| | ) | |
| Appellee | ) | CMCR Case No. 18-002 |

━━━━━━━

**BEFORE:**

**BURTON, PRESIDING Judge**
**SILLIMAN, POLLARD Judges**

━━━━━━━

On September 13, 2018, appellee moved this Court as follows: (1) to vacate the rulings of Judge Vance Spath, the military judge who held pretrial hearings for several years in Al-Nashiri's case; and (2) to compel discovery relating to disqualification of Judge Spath and his successor military judge. Appellee Mot. 1 (Sept. 13, 2018).

Appellee claimed that Colonel Spath negotiated for employment with the Department of Justice (DOJ) while presiding over Al-Nashiri's case. *Id*. at 2. Appellee further alleges that the DOJ has employed Judge Spath as an administrative judge (AJ) at the Executive Office for Immigration Review (EOIR). *Id*. at 4. Appellee argues that because of this Judge Spath has a conflict of interest and should have disqualified himself.

On July 18, 2018, appellee filed a discovery request seeking information about Colonel Spath's post-active duty employment discussions with the DOJ. *Id*. at App. A. On August 6, 2018, the Chief Trial Judge of the Military Commissions replaced Colonel Spath as the military judge in Al-Nashiri's case with Colonel Shelly W. Schools. *Id*. at App. C. On August 13, 2018, appellee filed another discovery request seeking information about the relationship with and communications between Judge Spath and Judge Schools. *Id*. On September 5, 2018, appellant declined to provide discovery. *Id*. at App. B.

Thus, appellee contends, the judge's orders for some undefined period should be vacated and that the government should be ordered to produce the discovery requested.

Appellant urges our Court not to grant appellee's motion "because there is no underlying ruling or order from the Commission below. Additionally, ruling on these issues would inherently require this Court to make extensive findings of fact because there is no record for this Court to examine." Appellant Resp. 11 (Sept. 18, 2018). Appellant also challenges the premise of appellee's argument that there is automatic disqualification when an Executive Branch judge seeks employment as a judge in another Executive Department. *Id.* at 13-16. Appellant further argues that the participation of a DOJ attorney in the prosecution of Appellee's case is irrelevant because the Chief Prosecutor, a general officer appointed by the Secretary of Defense, is responsible for the supervision of all attorneys who prosecute military commission cases, including attorneys detailed from the DOJ. *Id.* at 21 (citing 10 U.S.C. § 948k(a) and (d)(1); Reg. for Trial by Military Commission, Ch. 8). Thus, according to appellant, DOD, not DOJ, is the agency responsible for the prosecution of Al-Nashiri. *Id.* at 19-20.

In a verbal ruling on February 16, 2018, Judge Spath abated Al-Nashiri's case indefinitely. Tr. 12,298-99. Appellee does not indicate when Judge Spath allegedly negotiated with DOJ for employment. We take judicial notice that Judge Spath is scheduled to retire from the Air Force on November 1, 2018.[1] None of appellee's contentions were raised before the military commission because the case has been abated. Thus, we have no factual record or findings of the military judge at the trial level to support appellee's allegations for this Court to review.

Upon consideration of appellee's motion, appellant's response, appellee's reply, and the documents submitted, appellee has not shown a "clear and indisputable" right to relief. *Cheney v. U.S. District Court*, 542 U.S. 367, 381 (2004) (internal quotation marks omitted). Appellee has not shown that "a reasonable and informed observer would question the judge's impartiality." *SEC v. Loving Spirit Foundation, Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004) (internal quotation marks omitted). It is

**ORDERED** that appellee's motion is **DENIED**.

FOR THE COURT:

Mark Harvey
Clerk of Court, U.S. Court of Military
Commission Review

---

[1] Carol Rosenberg, "Frustrated USS Cole case judge retiring from military service," Miami Herald (July 5, 2018), https://www.mcclatchydc.com/latest-news/article214354414.html.

# ATTACHMENT

# B

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY, CUBA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABD AL RAHIM HUSSAYN MUHAMMAD AL NASHIRI | **Government Response to Defense Request for Discovery**<br><br>5 September 2018 |

1.  For the reasons below, the Government denies the Defense request of 13 August 2018 (copy enclosed) to preserve and to discover information regarding the supervisory or other relationship between the former military judge and the prospective detailed military judge announced on 6 August 2018.

2.  Neither the existence of a senior-subordinate relationship by military rank or position or unit of assignment, nor a direct supervisory responsibility, establish the existence of the appearance of a conflict of interest in the impartial and unbiased execution of judicial responsibilities, even where a subordinate military judge must rule on controversial matters that may implicate his or her former superiors. *See United States v. Norfleet*, 53 M.J. 262 (2000).*

3.  When the Commission re-opens for trial conduct, the detailed Military Judge will be available to the Defense at which time it may request to *voir dire* the military judge, seek the items identified in paragraph 3 of the its discovery request and thereafter challenge for recusal. Accordingly, unless ordered by the Commission, the Government will not seek to preserve nor disclose the information and documents identified in paragraph 3 of the Defense request.

Mark A. Miller
Trial Counsel

---

* *See also* the Government's denial response to the Defense discovery request of 18 July 2018 suggesting, without reasonable proof, a conflict of interest in the former presiding Military Judge's post-retirement employment (which is incorrectly identified in this subject discovery request as a Defense discovery request dated 10 August 2018).



**DEPARTMENT OF DEFENSE**
**MILITARY COMMISSIONS DEFENSE ORGANIZATION**
1620 DEFENSE PENTAGON
WASHINGTON, DC 20301-1620

13 Aug 2018

MEMORANDUM FOR Trial Counsel

From: LT Alaric Piette, JAGC, USN, Detailed Defense Counsel

SUBJECT: DEFENSE REQUEST FOR DISCOVERY OF AND PRESERVATION OF MATERIALS AND COMMUNICATIONS REGARDING THE SUPERVISION AND CONTACT BETWEEN COLONEL VANCE SPATH AND COLONEL SHELLY SCHOOLS ICO *UNITED STATES V. AL-NASHIRI*

1. Mr. Al-Nashiri is currently facing charges resulting from his alleged involvement in al-Qaeda and its alleged attack on the USS COLE (DDG-67). The Convening Authority for Military Commissions referred the charges capitally, and Mr. Al-Nashiri faces a potential death sentence if convicted of the alleged offenses. Pursuant to 10 U.S.C. § 949j, Rules for Military Commission 701(c)(1) and 701(e)(l)(C), and the Due Process Clause of the United States Constitution, Mr. Al-Nashiri, through counsel, requests the government furnish all documents and/or information and/or communications (in hardcopy or digital) in its possession, or known or discoverable by the government, which are material to the preparation of Mr. Al-Nashiri's defense. This request (and all future and past requests) include a request that all material currently (or originally) in digital form be produced in the raw digital form without alteration to the content or metadata.

2. On 6 August 2018, Colonel James Pohl, USA, Chief Trial Judge of the Military Commissions, detailed Colonel Shelly W. Schools, USAF, as the new military judge in this case. Colonel Schools served as a military judge for three of the last four years, and she was subject to Colonel Spath's rating and supervision during the time period in which Colonel Spath was both the Chief Trial Judge of the Air Force and likely suffering from a conflict of interest in this case (see *Al-Nashiri* discovery request dated 10 August 2018). If so, Colonel Schools may be laboring herself under an apparent or actual conflict, especially if asked to find that her direct supervisor and rater acted improperly.

3. In light of the facts stated above, the defense requests the following be preserved and produced as discovery:

   a) All material pertaining to the supervision of Colonel Schools by Colonel Spath;
   b) All materials regarding any and all ratings and/or endorsements and/or recommendations of Colonel Schools by Colonel Spath including the documents themselves;
   c) All communications between Colonel Schools and Colonel Spath of a supervisory and/or advisory character;
   d) All communications between Colonel Schools and Colonel Spath regarding the Military Commissions and/or this case;
   e) All materials related to Colonel Spath's involvement in Colonel Schools' selection to serve on the Office of Military Commissions Trial Judiciary;
   f) All materials or communications regarding any knowledge Colonel Schools had of Colonel Spath's post-retirement employment search; and

g) Any and all materials, records, and/or communications regarding Colonel Schools' opinions, perceptions, commentary, etc., of the current abatement in this case.

4. Thank you for your prompt attention to this matter. If you have any questions about this request or would like to discuss it further, please feel free to contact me.

Respectfully submitted,

/s/ Alaric Piette
ALARIC PIETTE
LT, JAGC, USN
*Detailed Defense Counsel*

The above discovery request was delivered to trial counsel via email on 13 August 2018.

# ATTACHMENT C



**DEPARTMENT OF DEFENSE**
**CHIEF DEFENSE COUNSEL FOR MILITARY COMMISSIONS**
**1620 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1620**

14 June 2017

MEMORANDUM FOR CHIEF PROSECUTOR FOR MILITARY COMMISSIONS
COMMANDER, JOINT TASK FORCE GUANTANAMO

SUBJECT:  Improper Monitoring of Attorney-Client Meetings

This memorandum is to advise you that due to recently received information I have recommended to Military Commissions Defense Organization (MCDO) defense counsel, to include Learned Counsel, that they not conduct any attorney-client meetings at Guantanamo Bay, Cuba (GTMO) until they know with certainty that improper monitoring of such meetings is not occurring. On 30 November 2016, the Military Judge in *United States v. Khalid Shaikh Mohammed et al.* ordered that intrusive monitoring (i.e., listening and audio and video recording) of attorney-client meetings be formally prohibited in the standard operating procedures for Joint Task Force Guantanamo (JTF-GTMO) and the Joint Detention Group (JDG). The Military Judge further ordered that defense counsel must be advised in advance if a meeting with an accused is to be monitored. The Military Judge issued these orders because he recognized the legitimate concerns of defense attorneys that attorney-client meetings at GTMO were being improperly monitored by government personnel.

At present, I am not confident that the prohibition on improper monitoring of attorney-client meetings at GTMO as ordered by the commission is being followed. My loss of confidence extends to all potential attorney-client meeting locations at GTMO. Consequently, I have found it necessary as part of my supervisory responsibilities under 9-1a.2 and 9-1a.9 of the Regulation for Trial by Military Commission to make the above-described recommendation to all MCDO defense counsel. Whether, and to what extent, defense teams follow this advice is up to the individual defense team.

If you wish to discuss this matter I can be reached at 571-256-9780 or john.baker@osd.mil.

J. G. BAKER
Brigadier General, U.S. Marine Corps
Chief Defense Counsel for
   Military Commissions

cc:
DGC (P&HP)
CA
All Defense Cousnel

UNCLASSIFIED//FOR PUBLIC RELEASE

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY, CUBA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **AE 133QQ** |
| v. | **RULING** |
| **KHALID SHAIKH MOHAMMAD,** **WALID MUHAMMAD SALIH** **MUBARAK BIN 'ATTASH,** **RAMZI BIN AL SHIBH,** **ALI ABDUL AZIZ ALI,** **MUSTAFA AHMED ADAM** **AL HAWSAWI** | **Emergency Defense Motion** to Remove Sustained Barrier to Attorney-Client Communication and Prohibit Any Electronic Monitoring and Recording of Attorney-Client Communication in any Location, including Commission Proceedings, Holding Cells, and Meeting Facilities and to Abate Proceedings |
| | **30 November 2016** |

1. During a session of the Commission on 28 January 2013, audio and video transmissions between the Expeditionary Legal Center Courtroom (ELC Courtroom) (a.k.a Courtroom #2) and the public viewing areas[1] were cut[2] after one of the Defense Counsel referenced the title of an unclassified motion.[3] This closure of the proceeding was not ordered or approved by the Military Judge or the Court Information Security Officer (CISO.)[4] The hearing was suspended until ELC Courtroom personnel could reset video and audio transmissions of the hearing.

---

[1] The public viewing areas include the public seating in the ELC Courtroom galley and closed circuit TV sites authorized by the Commission. *See*: AE 007 Government's Motion For Public Access To Open Proceedings of this Military Commission Via Closed-Circuit Television Transmission to Remote Locations, filed 19 April 2012, *et seq.*; AE 022, Defense Motion To Grant Public Access to Commission Designated Broadcast Sites, filed 4 May 2012, *et seq.*; AE 033, Government's Motion For Public Access To Open Proceedings of this Military Commission Via Closed-Circuit Television Transmission to Remote Locations, filed 11 May 2012, *et seq.*; AE 068, Amended Order, Public Access To Open Proceedings of this Military Commission Via Closed-Circuit Television Transmission to Remote Locations, dated 24 August 2012.

[2] The physical manifestation of halting the transmission is the triggering of a red light on the bench thus later references in argument and pleadings to a "red light" is a cryptonym for a cessation of the public transmission.

[3] Unofficial/Unauthenticated Transcript of *the Khalid Shaikh Mohammed et al.* (2) Hearing Dated 10/19/2012 (*sic*) from 1:31 PM to 2:46 PM at p. 1445. *NOTE*: the correct date of the session is 01/28/2013 from 1:31 PM to 2:46 PM.

[4] At the session of the Commission the next day the military judge stated on the record:

> Yesterday during the close of the hearing, or close to the close of the public hearing, the red light went on and the feed was discontinued to the general public. The purpose of the 40-second delay, which for those who are watching on television, is designed to prevent spillage of classified information. That is its sole purpose. In accordance with that, there are various guidance given to the court security officer of when that light should go on or not. However, only the judge has authority to close the courtroom accordance with the Rule For Military Commission 806.

1

UNCLASSIFIED//FOR PUBLIC RELEASE

2. **Procedural Background**:

a. On 31 January 2013, the Defense filed a motion[5] raising concerns that their attorney-client oral communications were being monitored both in the ELC Courtroom, and in client interview rooms located at the detention center (identified as "ECHO II.") In support, the motion offered a number of vignettes leading to the Defense supposition there was "credible circumstantial evidence that their privileged conversations are being monitored and recorded by the Government, to include the Joint Task Force (JTF) and Joint Detention Group (JDG) at Guantanamo; and/or other government agencies (OGA), to include the Central Intelligence Agency (CIA)." The Defense contended the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, Section 949s of the Military Commissions Act of 2009, and Common Article 3 of the 1949 Geneva Conventions "entitled the Accused to representation by competent counsel, and placed upon the Government the burden of demonstrating why "they are not entitled to such protections during these proceedings." Asserting the Accused, if detained in a "civilian facility" and awaiting trial on capital charges could not "legally" be subjected to monitoring, and there is no legitimate government interest served by monitoring attorney-client communications, the Accused sought, as relief, a Commission order:

---

So when this happens, the explanation is given to me, and I decide whether or not it is appropriate that that particular information should have been held in a closed session. It is not the court security officer's decision or anybody else's whether a particular session or part of a session is closed. Again, the 40-second delay is a prophylactic measure to avoid a more difficult unringing of the bell if improper information is disseminated.

In this particular case, Mr. Nevin's comment that resulted in the interruption I find is not a valid basis for the court to have been closed. Accordingly, I will summarize what Mr. Nevin said in open court that was basically the part that the general public missed. Basically he simply reiterated the caption in a particular appellate exhibit that is unclassified, specifically 080 Joint Defense Motion to Preserve Evidence of Any Existing Detention Facility. And again, closure of the court is not the decision of anybody but the military judge.

*See* Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 1/29/2013 from 9:09 AM to 10:08 AM.

[5] AE 133 (KSM et al), Emergency Defense Motion to Remove Sustained Barrier to Attorney-Client Communication and Prohibit Any Electronic Monitoring and Recording of Attorney-Client Communication in any Location, including Commission Proceedings, Holding Cells, and Meeting Facilities and to Abate Proceedings, filed 31 January 2013. *NOTE*: this motion was originally filed as a classified filing but, after review, is now unclassified; *see* http://www.mc.mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE133(KSM%20et%20al)).pdf.

2

protecting and ensuring their ability to exercise their rights to communicate and consult in private with their respective counsel, their other defense team members and persons necessary to their legal representation; and specifically prohibiting the Government and all others operating with its knowledge, irrespective of whether it is with the Government's direction or control; and/or any individuals or agencies with official access to Guantanamo Bay Naval Base, Guantanamo Bay, Cuba, from electronically monitoring and/or recording any of the Accused's communications with defense personnel at any time, to include during legal visits and Commission proceedings, and to abate Commission proceedings until such time as this matter is properly resolved.

b. On 6 February 2013, Mr. bin 'Attash filed a supplement[6] to the original Defense

motion and, in addition to reiterating the relief sought earlier, expanded Defense concerns

to add suspected monitoring in the holding cells adjacent to the ELC Courtroom.

c. On 6 February 2013, the Defense filed a motion[7] to permit them to listen to the official

court reporter audio recordings of the proceedings to ascertain whether the court reporter audio

feeds provided a capability to overhear in-court conversations between Counsel and the Accused.

The Government response[8] imposed no objection to the Defense request but cautioned there was

no segregation between the recorded tracks of the various courtroom microphones, thereby

permitting any Counsel, if there were in fact any spillage, to hear whatever might have been

captured from conversations of the other parties. The Commission granted the motion to review

the audio recordings and reiterated the concerns of the Government.[9]

d. The response[10] of the Government to the initial Defense motion (AE 133), filed on

7 February 2013, asserted:

No entity of the United States Government is listening, monitoring or recording communications between the five Accused and their counsel at any location.

---

[6] AE 133 (WBA Sup), Walid bin 'Attash's Supplement to Emergency Defense Motion to Remove Sustained Barrier to Attorney-Client Communication and Prohibit Any Electronic Monitoring and Recording of Attorney-Client Communication in any Location, including Commission Proceedings, Holding Cells, and Meeting Facilities and to Abate Proceedings, filed 6 February 2013.

[7] AE 133E, Joint Motion to Review Court reporter Audio Recordings, filed 6 February 2013.

[8] AE 133I, Government Response to Joint Motion to Review Court reporter Audio Recordings, filed 7 February 2013.

[9] AE 133NN, Order, Joint Defense Motion to Review Court Reporter Audio Recordings, dated 23 May 2014.

[10] AE 133A, Government's Response to Emergency Defense Motion to Remove Sustained Barrier to Attorney-Client Communication and Prohibit Any Electronic Monitoring and Recording of Attorney-Client Communication in any Location, including Commission Proceedings, Holding Cells, and Meeting Facilities and to Abate Proceedings, filed 7 February 2013.

3

And later:

> The Prosecution states unequivocally that the evidence presented in regard to
> AE 133 and as a matter of fact, that Counsel's privileged communications with the
> Accused are not being listened to, monitored or recorded by the United States
> Government.

The Government asked the Commission to deny the Defense motions as they failed to

offer any credible evidence to support their contentions.

    e. By way of reply[11] the Defense reaffirmed their belief that actions of the Government

infringed upon the Accused's right to "effective assistance of counsel." The Defense also

expanded their requested relief, seeking (1) a meeting location "free of any microphones,

particularly any which may be lined to recording devices;" (2) a specific prohibition on the "flow

of the unfiltered audio feed to the OCA or anyone else;" and (3) a requirement that the

Government "prove that any evidence it proposes to use is derived from a legitimate source

wholly independent of the information disclosed in the recorded conversations."

3. **Oral Argument**. The Defense requested argument in the original motion and the supplement

thereto,[12] a request reiterated by the Government in their response.[13] A decision to grant oral

argument on a written motion is within the sole discretion of the Military Judge.[14] Throughout the

course of these proceedings both parties have advanced their respective positons, both directly[15]

---

[11] AE 133Q (KSM et al), Defense Reply to AE 133A Government's Response to Emergency Defense Motion to
Remove Sustained Barrier to Attorney-Client Communication and Prohibit Any Electronic Monitoring and
Recording of Attorney-Client Communication in any Location, including Commission Proceedings, Holding Cells,
and Meeting Facilities and to Abate Proceedings, filed 12 February 2013 (classified). An unclassified, redacted, copy
of the pleading is found at
http://www mc mil/Portals/0/pdfs/KSM2/KSM%20II%20(AE133Q(KSM%20et%20al)).pdf.
[12] AE 133 (KSM et al) and AE 133 (WBA Sup).
[13] AE 133A.
[14] Military Commissions Trial Judiciary Rule of Court 3.5 m (1 September 2016).
[15] Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 10/19/2012 (sic)
from 1:31 PM to 2:46 PM; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing
Dated 1/29/2013 from 9:09 AM to 10:08 AM; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh
Mohammed et al.* (2) Hearing Dated 1/31/2013 from 9:01 AM to 9:22 AM; Unofficial/Unauthenticated Transcript of
the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 1/31/2013 from 9:40 AM to 10:19 AM;
Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 1/31/2013 from
10:40 AM to 11:25 AM; Unofficial/Unauthenticated Transcript of *the Khalid Shaikh Mohammed et al*. (2) Hearing
Dated 2/11/2013 from 9:02 AM to 10:12 AM; Unofficial/Unauthenticated Transcript of *the Khalid Shaikh
Mohammed et al*. (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM; Unofficial/Unauthenticated Transcript of

4

and indirectly,[16] a number of times. Further oral argument is not necessary for the Commission's

consideration of the issue before it. The request for [further] oral argument is **DENIED**.

4. **Findings of Fact**:

　　a. In rendering this Ruling the Commission considered the pleadings of all parties; the

exhibits[17] submitted to the Commission for consideration, and the declarations,[18] depositions, or

stipulations of expected testimony,[19] or testimony from pertinent witnesses.[20]

---

the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/12/2013 from 10:25 AM to 11:42 AM;
Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/12/2013 from 1:00
PM to 2:37 PM; Unofficial/Unauthenticated Transcript of *the Khalid Shaikh Mohammed et al*. (2) Hearing Dated
2/12/2013 from 2:47 PM to 5:19 PM; Unofficial/Unauthenticated Transcript of *the Khalid Shaikh Mohammed et al*.
(2) Hearing Dated 2/13/2013 from 10:28 AM to 12:02 PM; Unofficial/Unauthenticated Transcript of the *Khalid
Shaikh Mohammed et al.* (2) Hearing Dated 2/13/2013 from 1:02 PM to 2:36 PM; Unofficial/Unauthenticated
Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/14/2013 from 4:04 PM to 5:43 PM;
Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Motions Hearing Dated 8/22/2013
from 12:00 PM to 12:43 PM; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2)
Motions Hearing Dated 8/22/2013 from 2:18 PM to 4:28 PM; Unofficial/Unauthenticated Transcript of the *Khalid
Shaikh Mohammed et al.* (2) Motions Hearing Dated 12/18/2013 from 9:03 AM to 10:32 AM;
Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al* (2) Hearing Dated 5/31/2016 from 3:28
PM to 4:17 PM; and sessions, closed pursuant to Military Commission Rule of Evidence 505 (h) to address classified
issues, on 28 January 2013; 20 June 2103; and 16 December 2013.
[16] e.g. *See*: AE 284 (WBA), Defense Motion to Compel the Production of Information Related to the Monitoring
and/or Collection of Attorney-Client Privileged Information, filed 26 March 2014; AE 292, Emergency Joint Defense
Motion to Abate Proceedings and Inquire into Existence of Conflict of Interest Burdening Counsel's Representation
of Accused, filed 14 April 2014; and AE 367 (MAH), Motion to Dismiss Because National Security Considerations
Make a Fair Trial Impossible, filed 22 July 2015. *See also*: Unofficial/Unauthenticated Transcript of the *Khalid
Shaikh Mohammed et al.* (2) Motions Hearing Dated 6/16/2014 from 9:05 AM to 11:05 AM;
Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Motions Hearing Dated 8/14/2014
from 11:18 AM to 1:00 PM; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al* (2)
Hearing Dated 2/11/2015 from 10:00 AM to 11:15 AM.
[17] **Exhibits**:
Attachment B, AE 133 (WBA Sup), MEMORANDUM FOR Commander, JTF-Guantanamo Joint Detention Group,
dated 19 May 2008, SUBJECT: Military Commissions Counsel Visitation of Detainees Practices Guide (Buzby
Memo);
Attachment C, AE 133 (WBA Sup), MEMORANDUM, dated 27 December 2011, SUBJECT: Order Governing
Logistics of Defense Counsel Access to Detainees Involved in Military Commissions;
AE 133T (AAA), ELC Courtroom Wiring Schematic;
AE 133U (KSM), p. 1, Email ████████████ Capt Thomas J. Welsh, dated October 12, 2012, 12:56 PM;
Subject: Re Question Regarding Monitoring Attorney Client Meetings;
AE 133U (KSM), pp. 2-8, Email from Paul W. Rester ████████ dated August 05, 2008, 12:22; Subject: Re
U.S. May Have Taped Visits To Detainees;
AE 133U (KSM), p. 9-11, Email ████████████ CAPT Patrick McCarthy, dated May 08, 2008, 2:45; Subject:
eavesdropping article;
AE 133U (KSM), pp. 12-14,Email from CAPT Patrick Rabun ████████ dated March 08, 2012, 6:37 AM;
Subject: FW HOT (unclassified);
AE 133U (KSM), p. 15, Email from CAPT Thomas J. Welsh to COL John Bogden, dated February 05, 2013, 1:33
PM; Subject: JDG Order On Monitoring;
AE 133U (KSM), pp. 16-17, Email from CAPT Thomas J. Welsh to COL John Bogden, dated February 08, 2013,
9:38; Subject: FW Request for Interview;
AE 133U (KSM), p. 18, Email from COL John Bogden to CAPT Thomas J. Walsh, dated February 04, 2013, 9:24
AM; Subject: RE Declarations Regarding Issues We Discussed Thursday With Prosecutors;

5

b. As to the ELC Courtroom:

(1) A session of the Commission held on 28 January 2013 was temporarily halted

when the sound and video feeds of the proceedings going to the public viewing areas were

suspended by a third party, not the military judge. The ELC Courtroom is a Sensitive

Compartmentalized Information Facility (SCIF).[21] Access to the courtroom is controlled at all

times.[22] Closed circuit audio and video (CCTV) feeds of the proceedings in the ELC Courtroom

are transmitted to locations on the U.S. Naval Station, Guantanamo Bay Cuba (GTMO),[23] and

viewing locations in the United States.[24] The CCTV feeds, both at GTMO and within the United

States, are viewed on a 40 second delay ordered by the Commission.[25] The CCTV feed is also

monitored in real-time by the court interpreters to provide simultaneous translation and by an

---

AE 133V (KSM), Photograph;

AE 133U (KSM), Extract (pp. 9-10) JTF-GTMO-CDR (memo) Subject: Order Governing Logistics of Defense Counsel Access to Detainees Involved in Military Commissions;

AE 133X (MAH), Joint Task Force Guantanamo (Web Capture) www.jtfgtmo.southcom.mil;

Attachment B, AE 133Z (Mohammad), Louroe Electronics AP-2/AP-4/AP-8 Audio Monitoring Base Station Installation and Operating Instructions;

[18] **Declarations**:

Attachment B, AE 133A (Sup), Declaration of Maurice Elkins, dated 7 February 2013;

Attachment C, AE 133A (Sup), Declaration of Col John V. Bogdon, dated 7 February 2013;

Attachment D, AE 133A (Sup), Declaration of ████████ dated 7 February 2013;

Attachment B, AE 133S (KSM), Declaration of CDR James R. Longo, dated 12 February 2013;

Attachment B, AE 133A (Sup), Declaration of CAPT Eric Schneider, Director, J-2, dated 13 February 2012.

[19] **Deposition/Stipulation**:

*United States v. Jawad*, AE 109, Deposition of CAPT Patrick M. McCarthy, United States Navy;

Stipulation of Ms. Sadiq, Unofficial/Unauthenticated Transcript of the Khalid Shaikh Mohammed et al. (2) Hearing Dated 2/12/2013 from 1:00 PM to 2:37 PM, at p. 1954;

AE 133BB (MAH), Stipulation as to Visitation Log. *See*: Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et a*l. (2) Hearing Dated 2/14/2013 from 4:04 PM to 5:43 PM at pp. 2653 – 2654.

[20] AE133R, Government Updated Notice of Witness Availability for 11-14 February Hearings, filed 12 February 2013.

[21] To the Commission's knowledge this is the only United States trial court so configured; the United States Foreign Intelligence Surveillance Court (FISA Court) meets in a "secure" environment but is not a criminal trial court in the classic sense. *See* Rule 17(b), United States Foreign Intelligence Court Surveillance Court Rules of Procedure.

[22] Attachment B, AE 133A, dated 7 February 2013.

[23] ELC Media Center, Building AV-29 Building AV-34" and spaces in the ELC assigned to the OMC-CA, OCP, OMCD, the OMC Special Security Officer ("SSO,") the court interpreters, and the Data Trailer.

[24] The CCTV feeds are transmitted specified locations within the United States so that victim family members, first responders, the media, and members of the public may watch the proceedings. *See*: AE 007 *et seq*; AE 022, *et seq*; and AE 033 *et seq*.

[25] Para 8a(3), AE 013P (KSM), Protective Order #1, To Protect Against Disclosure of National Security Information, dated 6 December 2012 and subsequent amendments to the original order.

6

Original Classification Authority to conduct classification review.[26] There is a device (euphemistically referred to as the "red button") that terminates any transmission feed from the courtroom. The Judge and the CISO have the ability to terminate transmissions of the proceedings, both audio and video.[27] The Commission has previously determined

> the brief delay is the least intrusive and least disruptive method of meeting both responsibilities. The delay permits the Commission to assess and remedy any negligent or intentional disclosure of classified information without unduly impacting on the ability of the public and press to fully see and understand what is transpiring.[28]

In accordance with the Commission's Order of 29 January 2013,[29] there is no longer a third-party capability to terminate the transmissions.[30] The incident, however, both established that an OCA monitors the proceedings in real-time and served as the predicate for Defense concerns as to their communications with the Accused.

(2) In 2011, the court reporter recording system was upgraded to insure the court reporters could identify who was speaking for the trial record when more than one participant was speaking at the same time. The "For The Record" (FTR) system is the standard for court reporting and is the same system used to record and prepare a record of trial in courts-martial and most courts throughout the United States.[31] There are 23 microphones located throughout the ELC Courtroom and the audio from these microphones feeds into one of eight (8) channels which are recorded by the court reporting software system. One channel is for the microphones located on the counsel tables for the five Defense teams. When the system is active, the base of each microphone has a green light indicating that it is "hot" (i.e., live), unless a "mute" button is pushed; when the mute button is pushed, no audio transmits from that microphone. There is also a

---

[26] Attachment B, AE 133A; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM at p. 1862.
[27] *Id.*
[28] AE 013O, Ruling, Government Motion To Protect Against Disclosure of National Security Information, dated 6 December 2012.
[29] The clear directive was issued on 31 January 2013; *see* Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 1/31/2013 from 9:01 AM to 9:22 AM at pp. 1720-1721.
[30] Attachment B, AE 133A.
[31] Attachment D, AE 133A.

7

mute button on the computer panel touch-screens on each counsel table. If only the touch-screen mute button is pushed, the counsel table microphones will not amplify or broadcast in the courtroom, and will not send audio to the CCTV transmission. However, they will still feed audio to the court reporter recording system, the translators, and the OCA.[32] If the individual microphone is not muted, it is activated by a voice tone of a specified decibel level (the "gate."). If the tone is "gated" (i.e., meets or exceeds the decibel threshold), it is heard in the courtroom and made part of the record of trial. If the audible is below the threshold, it is "pre-gated," meaning the "pathway will pick up even a low tone, maybe not with clarity, but it will pick it up."[33] The gated feeds, whether in real-time or on 40 second delay, transmit the audio that is heard in the courtroom.[34] The "pre-gated" feed, going to the court reporters, translators, and the OCA,[35] may transmit background voices and discussions, depending on the volume of any particular voice and the number of people being picked up by different unmuted microphones.[36] All Counsel were provided briefings on the necessity of muting the counsel table microphones and were advised that failure to do so could result in ungated discussions being recorded by the court reporters FTR system.[37] As a reminder, there are signs on both the doors the ELC Courtroom and the counsel tables warning Counsel of the need to "mute microphones for sidebar conversations."[38] The Accused were afforded the opportunity to listen to the court reporter recordings to ascertain if the pregated feed provided a capability to overhear in-court

---

[32] Attachment B, AE 133A; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM at pp. 1861-1862.

[33] Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM at p. 1854.

[34] *Id*.

[35] Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM at p. 1866.

[36] Best summed up by Mr. Connell during questioning:

Q…the filtered or gated audio that we hear contains less sound information than the audio flow, the pre-gated audio flow that the three entities receive, correct?

A. Depending on the volume in which you are speaking, yes.

Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al*. (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM at p. 1862.

[37] Attachment D, AE 133A.

[38] *Id*.

8

conversations between Counsel and the Accused.[39] The Commission is unaware if the opportunity was ever taken or, if it was, what it indicated.

      c. As to the Holding Cells adjacent to the ELC Courtroom:

Defense Counsel have the opportunity of meeting with the Accused prior to or immediately after proceedings. Meetings occur either in the ELC holding cells, which provide a private meeting area, or in the ELC Courtroom. In the ELC holding cells there is camera coverage for security monitoring only; there are no audio capabilities or listening devices in the ELC holding cells.[40]

      d. As to the interview rooms at ECHO II:

          (1) Captain (CAPT) Thomas J. Welsh, U.S. Navy (USN), Staff Judge Advocate, JTF-GTMO testified[41] the issue of being able to monitor meetings in the interview rooms at ECHO II first came to this attention in January 2012. ECHO II is used for multiple purposes, including attorney-client meetings, meetings between the International Committee of the Red Cross (ICRC) delegates and detainees, and for some medical meetings where specialists meet with the detainees on specific issues. He was unaware any previous use for ECHO II or who controlled it before it came under the control of JTF-GTMO. In January 2012 there was a meeting between a detainee and his defense counsel, prosecutors, and law enforcement officials. CAPT Welsh walked into the control room and saw a law enforcement official with headphones listening to the meeting. There was also a video monitoring capability. Prior to that time he had not known there was the capability to audio monitor at the facility. Later he queried the previous Joint Detention Group commander about the monitoring capability; the commander's response indicated that there was an ability to do so, but it was not used to monitor attorney-client meetings. CAPT Welsh concurred with the Defense proposition that the microphones in the

---

[39] AE 133E.

[40] Attachment B, AE 133A.

[41] Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/12/2013 from 1:00 PM to 2:37 PM at pp. 1954–2029; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/12/2013 from 2:47 PM to 5:19 PM at pp. 2030–2062.

9

ECHO II rooms were not apparent as such and could have been mistaken for smoke alarms. Upon further questioning by the Defense, CAPT Welsh stated he had no prior knowledge about the monitoring capability before his arrival; his predecessor did not convey any information about monitoring during the short period of turning over responsibilities; and after the discovery in January 2012, he made no further inquiry into the matter until the defense in this case brought it to his attention in October 2012. The Defense also questioned CAPT Welsh whether the requirement to identify the language to be used during attorney-client meetings was a precursor to being able to monitor meetings. CAPT Welsh testified the requirement was not enforced but was, to his belief, initiated to make sure that translation capabilities were available for counsel. When asked why such a capability would be needed unless the Government was going to monitor the conversation, CAPT Welsh was unable to offer an explanation, but did not agree that it was meant to enable audio monitoring of such meetings.

(2) In an affidavit,[42] Commander (CDR) John Longo, USNR, special investigator for the Defense Team representing Mr. Mohammad, stated he conducted an interview with CAPT Eric Schneider, USN, J2 Director, JTF-GTMO, on 11 February 2013. The purpose of the interview was to elicit CAPT Schneider's knowledge of video and audio surveillance equipment located at Camp Echo II. In his affidavit, CDR Longo stated that CAPT Schneider confirmed the J2 is responsible for all audio and video surveillance equipment located at Camp Echo II. He advised that he has been in his current assignment as the J2 Director at GTMO for approximately three weeks, and was briefed by his predecessor in regard to this audio and video surveillance equipment. In conclusion CDR Longo wrote that CAPT Schneider "advised that to his knowledge, no recording of the audio or video takes place, though monitoring of both … has taken place during attorney client meetings in Echo II for force protection purposes only." By affidavit, executed in response to that of CDR Longo, CAPT Schneider filed a "responsive"

---

[42] Attachment B, AE 133S (KSM).

declaration.[43] After reviewing CDR Longo's statement, CAPT Schneider disagreed with the statement that attorney-client meetings are monitored by both video and audio means for force protection and stated he was unaware of any such monitoring both from his own knowledge and from having checked this with his predecessor.

(3) In his affidavit,[44] and during his testimony,[45] Colonel (COL) John V. Bogdan, Commander, JDG, JTF-GTMO, Guantanamo Bay, Cuba, avowed he had the responsibility to facilitate meetings between detainees and their Defense Counsel. These meetings took place in individual meeting rooms at ECHO II. These meeting rooms are also used for purposes other than attorney-client meetings. Each of the rooms in ECHO II is equipped with video cameras to facilitate remote video monitoring (real-time ability to watch or listen) for security purposes by the guard force. This enables the guards to respond instantly in the event a detainee attempts to harm himself or another individual in the room. There is no capability to record (electronically save) audio or video from the meetings, and additional equipment would need to be installed in order to do so. Guard force personnel are trained and directed to not listen to conversations between attorneys and detainees. He was not aware of any instance, either before or during his tenure as commander, in which guards or other personnel have monitored or recorded, whether intentionally or unintentionally, meetings between detainees and attorneys. Meetings between detainees and the ICRC are not recorded. He has also issued written guidance to the JDG regarding the monitoring of Attorney-Client Meetings and ordered that all audio capability be disconnected.[46]

---

[43] Attachment B, AE 133A (Sup).

[44] Attachment C, AE 133A (Sup).

[45] Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/13/2013 from 10:28 AM to 12:02 PM pp. 2169-2247; Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/13/2013 from 1:02 PM to 2:36 PM at pp. 2248-2294.

[46] JTF-GTMO-CJDG MEMORANDUM FOR ALL PERSONNEL ASSIGNED TO THE JOINT DETENION GROUP (JDG), dated 4 February 2012; Subject: Monitoring of Attorney-Client Meetings, Attachment I, Government Response (Attachment I, AE133A).

11

(4) The deposition[47] of CAPT Patrick M. McCarthy, USN, was taken pursuant to an order by Judge Henley, in *United States v. Jawad,* to ascertain "his knowledge, if any, of video teleconferences involving Brigadier General (Brig. Gen.) Thomas Hartman (former Legal Advisor to the Convening Authority), other General Officers and senior JTF-GTMO and United States Southern Command (SOUTHCOM) officials in which Military Commission cases were discussed." At the time of the deposition CAPT McCarthy was the JTF-GTMO Staff Judge Advocate.[48] During the deposition, upon cross-examination by Col Morris, the (then) Chief Prosecutor, CAPT McCarthy addressed issues of contention between himself and Brig. Gen. Hartman. One of the issues brought up, pertaining to the motion now before this Commission, went to "access to videotapes of foreign delegations meeting with their nationals," addressed in order for the prosecution to perform due diligence in providing discoverable information for the defense.[49] The responses of CAPT McCarthy in this context would support the contention that there is, or was at that time, an ability to make and retain audio and visual records of meetings in ECHO II.

(5) The Commission has looked at the picture[50] of the microphone in an ECHO II room and concurs that, with casual observation, it can be mistaken for a fire alarm. No representation was made by the Accused that it was actively claimed to be such by the JDG.

(6) As a sworn officer of the Commission, the Chief Prosecutor, Brigadier General Mark Martins, USA, has avowed that, "No entity of the United States

---

[47] *United States v. Jawad*, AE 109, Deposition of CAPT Patrick M. McCarthy, United States Navy. The Commission was requested to take judicial notice of this deposition. See AE 133, para 4a.

[48] CAPT McCarthy was a predecessor to CAPT Welch in this position.

[49] *See* AE 062, *United States v. Khadr,* Government Response to Defense Special Request for Relief from the Terms the Protective Order, filed 23 January 2008, and AE 306, *United States v. Khadr*, Notice of Defense Motion To Compel Production of Video and/or Audio Recordings of Interrogations of the Accused and Photos of Accused, filed 4 March 2008. The fact that some interviews and meetings with Accused could be audio and/or videotaped does not appear to be a particularly heavily guarded fact.

[50] AE 133V (KSM).

12

Government is listening, monitoring or recording communications between the five

Accused and their counsel at any location."[51]

5. **Law**:

a. As a basic proposition the Defense has asserted the Government bears the burden of

demonstrating why the Accused are not entitled to protection of their communications with

Defense Counsel.[52] Rule for Military Commissions (R.M.C.) 905(c)(2) directs that, except as

otherwise noted in the Manual for Military Commissions, the burden of persuasion for any motion

lies with the moving party. The Defense contends constitutional protections entitle the Accused to

their requested relief as a matter of right, thereby requiring the Government to prove a negative.

This begs the question actually before the Commission - factually whether there was any

infringement at all of the right to protected communications. To this end, since the Defense

supposition does not go to what must be proven to convict, the Defense must show, by a

preponderance of evidence, an actual, improper, inhibition of communication has occurred. *See*:

*United States v. Hsia*, 81 F.Supp.2d 7, (D.D.C. 2000) citing *United States v Kelly,* 790 F.2d 130

(D.C.Cir.1986).

b. Assuming, *arguendo*, that the Defense assertions are supported by facts in the record,

the Supreme Court, in *Weatherford v. Bursey*, 429 U.S. 545 (1977), set forth the factors the

Defense must satisfy to show a cognizable infringement of a protected right. To do so, the

Defense must show (1) evidence used at trial that was produced directly or indirectly from an

intrusion; (2) the intrusion by the government was intentional; (3) the prosecution received

otherwise confidential information about trial preparations or defense strategy as a result of the

intrusion; or (4) the information was used in any other way to the substantial detriment of the

defendant. *United States v Kelley*, 790 at 137. To establish a *prima facie* showing of prejudice the

Defense must show the Government acted affirmatively to effectuate their intrusion. *Weatherford*

---

[51] AE 133A.
[52] AE 133 (KSM et al), para 3.

UNCLASSIFIED//FOR PUBLIC RELEASE

at 558. Further, the result of any such intrusion must work to the "substantial" detriment of the

Accused, a standard requiring demonstrated use of "confidential information pertaining to defense

plans and strategy, and from other actions designed to give prosecution an unfair advantage at

trial." *US v Danielson* 325 F.3d 1054 (9th Cir. 2003).

6. **Analysis and Ruling**.

    a. <u>As to the ELC Courtroom</u>:

        (1) There is no specific prohibition against an individual, with the appropriate need

to know, from monitoring the Commission proceedings, either through physical presence in the

courtroom or electronically, in the manner being challenged by the Defense. For example, a

motion has been filed for the Chief Defense Counsel to be physically present in the courtroom

during classified sessions in furtherance of his duties[53] and the Government has routinely had law

enforcement members of their team observing the proceedings from within the courtroom.[54] The

error on the OCA's part was their unauthorized interruption of the proceeding; not their having

followed the trial in real time in performance of their responsibilities to be mindful of national

security interests and so advise the CISO when appropriate. The crux of the issue before the

Commission lies in whether "pre-gated" information from the court reporting system was being

used to assist the Government in the prosecution of this case. Evidence before the Commission

has shown the pre-gated feed is the one used by the OCA to follow the proceedings.

        (2) The Defense assertion in this regard fails at least two requirements of the

"Kelly" test. First, there has been no proof offered that the pre-gated feed captures any retrievable

information, confidential or otherwise. The Defense was provided the chance to test the system,

and apparently decided to forgo that opportunity. More importantly, there is no evidence that the

alleged intrusions, assuming they occurred, were intentional. The "pre-gated" feed is part and

---

[53] AE 013HHHH (AAA), Mr. al Baluchi's Motion to Modify Third Amended Protective Order #1 to Allow Chief Defense Counsel to Review Classified Information, filed 17 September 2015.
[54] *See, e.g.*, Unofficial/Unauthenticated Transcript of the Khalid Shaikh Mohammed et al. (2) Hearing Dated 2/12/2013 from 9:02 AM to 10:07 AM at p. 1836.

14

parcel of the court reporting system; there is no evidence selection of the FTR system was done as a means to provide the Government the ability to eavesdrop.[55] In fact, the contrary is shown. Counsel were warned[56] of the consequences of not muting their microphones both during courtroom technology training and by signs placed on the door to the ELC Courtroom, and at the counsels' tables, to remind them of the need to mute the microphones to preserve confidentiality.[57] This can hardly be construed as a covert intrusion when the Defense was both on notice as to the possibility and had the power to mute the system if they believed it compromised confidentiality.

(3) The Defense has not shown their attorney-client communications in the ELC Courtroom are being purposely intruded upon; or, in fact, whether any such intrusion has occurred at all. Accordingly, the Defense motion to deny the OCA the ability to monitor the proceedings in real time is **DENIED**.

b. As to the ELC Courtroom holding cells: Evidence indicated the Government has the ability to video monitor the holding cells, but nothing was adduced to indicate there was an ability to monitor conversations between Defense Counsel and client in the cells. The Defense has not shown their attorney-client communications were being intruded upon in the ELC Courtroom holding cells. As to that aspect of their motions, the specific relief sought is **DENIED**.

c. As to the interview rooms at ECHO II: The Government had the ability to monitor, by both audio and visual means, meetings in the interview rooms at ECHO II. The Commission understands why the uninitiated could mistake the system for doing so was a fire or smoke alarm. Evidence of record shows these rooms were used for a number of functions besides attorney-

---

[55] Ms. ▮▮▮▮▮ affidavit indicates it is a commonly used system. *See* Attachment D, AE 133A.
[56] *Id.*
[57] A "low tech" solution to the problem was instituted; now instead of having to turn the microphones off to mute them they have to be turned on to be active. See: Unofficial/Unauthenticated Transcript of *the Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/11/2013 from 9:02 AM to 10:12 AM at p. 1824.

15

client meetings. There was, however, no evidence offered[58] indicating Defense Counsel were purposely misled as to the function of these "fire alarms" nor, from information provided in other cases, was the fact that there was audio and video monitoring capability a closely held secret. The Government did provide evidence that they were aware of the responsibility to respect attorney-client privileged meetings in ECHO II. Their witnesses uniformly indicated that no audio monitoring of meetings between the Accused and their attorneys occurred. Evidence of the capability to monitor does not by itself establish the fact or probability of abuse or misuse of that capability, especially where there are unrelated legitimate reasons for the capability's presence. As to this portion of the motion by the Defense, the specific relief sought is **DENIED**.

d. An overarching remedy sought by the Defense is that the Government be required to "prove that any evidence it proposes to use is derived form a legitimate source wholly independent of the information disclosed in the recorded conversations." While this relief would be appropriate had a substantial infringement of the privilege been sufficiently shown, the facts as developed do not warrant this drastic relief. The Defense motion in this regard is **DENIED**.

e. The Defense is correct in asserting the attorney-client privilege is sacrosanct, and while a breach of such privilege was not demonstrated by the issues and facts before the Commission at this time, the Commission recognizes the Defense concern about protecting that privilege. The Commission is all too aware that, with continual changes in the personnel comprising JTF-GTMO and the JDG, what has been done right at one point may become a historical notation, especially after several changes of the guard force. To address these concerns, the motion of the Defense for a prophylactic remedy is **GRANTED** as set forth in paragraph Seven (7) of this Order.

7. **Order**. The Commission directs that the salient points of the directive issued by COL Bogden be formally made part of the standard operating procedures for JTF-GTMO and the JDG. Further,

---

[58] Defense Counsel proffered that a guard had assured them the device was a smoke detector and not a listening device, however no evidence was provided to support this contention. *See:* Unofficial/Unauthenticated Transcript of the *Khalid Shaikh Mohammed et al.* (2) Hearing Dated 2/11/2013 from 9:02 AM to 10:12 AM at p. 1807.

16

when new Defense Counsel are being shown or briefed on the interview rooms at ECHO II, they must be specifically made aware of the monitoring capability and its uses. Lastly, if a meeting with an Accused involving Defense Counsel (e.g., a plea negotiation) is to be monitored, the Defense Counsel involved will be advised in advance of the monitoring.

So **ORDERED** this 30th day of November, 2016.

*//s//*
JAMES L. POHL
COL, JA, USA
Military Judge

17

# ATTACHMENT D

[Tr. 3120 - 3122]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1      MJ [COL POHL]:  So let me go through the 505 procedure

2   and then we say the initial thing is whether or not, again

3   applying the standard, but they say -- defense says we want to

4   discuss this with our accused to prepare for his defense, is

5   that part of the 505 procedure also?

6      ATC [MR. SHER]:  It is not.

7      MJ [COL POHL]:  Okay.  So the first time the accused

8   would hear this evidence would be in court during the case in

9   chief?  Is that the government's position?

10     ATC [MR. SHER]:  Well, it is with the exception of,

11  again, I mean, stuff that he knows he can talk about with

12  them.

13     MJ [COL POHL]:  Okay.

14     ATC [MR. SHER]:  Which really narrows the subset of ----

15     MJ [COL POHL]:  I got your position.  Let me ask you

16  about the second part though, because you carefully used the

17  word "case in chief."  How about presentencing, does the

18  government intend to use any classified information in

19  presentencing that ----

20     ATC [MR. SHER]:  No, the government is not going to rely

21  on classified information.

22     MJ [COL POHL]:  So when you said your case in chief,

23  you're saying -- I understand, Mr. Sher, you're going to be

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  held to this.  You're saying the government does not intend to

2  use any classified information in its case in chief or in its

3  presentencing presentation?

4      ATC [MR. SHER]:  That's correct.

5      MJ [COL POHL]:  Okay.

6      ATC [MR. SHER]:  May I have one second, sir?

7      MJ [COL POHL]:  Sure.

8      ATC [MR. SHER]:  The reality is, Your Honor, there's a

9  very small set of -- a small subset of information that may

10  not be shared with the accused.  Again, he can access all of

11  the discovery that's not classified, and only 14 percent of

12  what's produced is classified.  And the accused can talk,

13  again, with his attorneys about whatever information he knows.

14      That narrow limitation on the accused's right to

15  learn classified information from his attorneys does not deny

16  him right to counsel.  The Fourth Circuit found that in

17  Moussaoui, which was a capital case.  They found it in

18  Abu Ali.  Second Circuit came to the same conclusion in

19  Embassy Bombings, and, again Marzook is another instance,

20  pretrial hearings, suppression hearing where the government

21  produced documentary and testimonial evidence outside the

22  presence of the accused.

23      The defense hasn't cited to any case where any

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  court has sanctioned the government by dismissing the capital

2  referral because an uncleared accused can't access classified

3  information.  The only case they cited today was the

4  Gardner v. Florida case.  A jury sentenced an accused to life,

5  the trial judge increased that punishment to death on his own

6  based on information never shared with the accused, never

7  shared with his lawyers.  They had zero opportunity to explain

8  or work through that issue.  That is not the case here.  The

9  accused has at least five cleared defense counsel that are

10  representing his interests and that can access the classified

11  information.

12          In Abu Ali, which is a Fourth Circuit case I think

13  in 2008, the court didn't allow the accused or his uncleared

14  counsel to attend hearings involving classified information,

15  they didn't allow his -- the accused or his uncleared counsel,

16  which were his lead counsel, to review classified information

17  or to cross-examine government witnesses that were relating

18  classified information, relating to classified information.

19  Rather, the accused had to have his cleared defense counsel do

20  so.

21          Your Honor, the statute's clear, the accused may

22  not access classified information pretrial.  He is in no

23  different a position than a criminal defendant tried in

[Tr. 6498 - 6512]

[Tr. 6498 - 6512]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  previous substitutions that had been approved by Judge Pohl,

2  which were just under 900 pages, 888 pages of substitutions,

3  in ten separate installments.

4       In addition to that, they've had the great amount of

5  information regarding the RDI program that's included in the

6  Senate study's executive summary.  Now, to be clear on this,

7  I'm stating there are verifiable pieces of that that will

8  relate to statements of relevant facts, stipulations, if we

9  agree the underlying information is accurate.  And because we

10 viewed all of the underlying information, we will be prepared

11 to stipulate to much of that.  And in addition, all of that

12 was declassified and has been available to -- for the defense

13 to discuss with their client the different aspects of that.

14      So that's part of the framework associated with all

15 of this, was the declassification of nearly 500 pages of an

16 executive summary of the report.  And that's been part of the

17 holistic process by which we've analyzed the information at

18 issue.

19      So turning now to the ten paragraphs of the --

20 they're really subparagraphs of paragraph 13 of the

21 commission's order in 120AA, and I can report volume of pages

22 that are either in the pipeline or have already been

23 delivered.  And with regard to the -- to all ten paragraphs,

1 the amount of material that has been produced, and that has

2 already been -- gone through a request for substitutions and

3 other relief with the commission and has been produced to the

4 defense, and this is as against eight of the ten categories

5 now you've approved and -- provided protective orders and

6 approved 219 pages as against paragraphs -- subparagraphs

7 13.a, b, c, d, f and g, and then i and j.

8        So you've -- the statements of the accused and

9 co-conspirators piece you've not yet provided under the

10 ten-category framework.  And nor have any of the orders

11 included the SOPs and guidance in subparagraph 13.e.  So all

12 but 13.e and h, they've received some information amounting to

13 219 pages.

14        Now, let me now go through what's coming.  There are

15 multiple thousands of pages total associated with the ten

16 paragraphs that are coming.  You know, you've got a

17 significant amount of that being reviewed now and you will be

18 reviewing the adequacy of the substitutions, looking at the

19 originals and determining if more needs to be produced.

20        Our expectation, our reasonable expectation, based on

21 looking at this and the process, of course, subject to what

22 you approve, Your Honor, is that for subparagraphs 13.a and b,

23 these are a chronology of the accused's detention within the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  program and the conditions of transport, A and B, a small

2  number of pages, because this is mostly just a chronology

3  that's been ordered by the commission.

4       And then let me just go to paragraphs i and j, 13.i

5  and j, and this is the requests to employ enhanced

6  interrogation techniques, if any, and the approvals of those,

7  also a relatively small number of pages, because it deals with

8  the -- whether or not requests happened and whether they were

9  approved.  And only a small number of pages thus far of those

10  have been provided.

11       In the area of e, this is SOPs and guidelines.  There

12  will be hundreds of pages, we expect, based on what we have

13  submitted and are going to be submitting between now and

14  September 30 to you.

15       In the area of statements of the accused and

16  co-conspirators, paragraph 13.h, that will be into the many

17  hundreds of pages, potentially more than 1,000, in that

18  subparagraph alone.  Hundreds of pages of 13.c, conditions of

19  confinement, and hundreds of pages of synopses regarding

20  persons who had direct and substantial contact, their

21  employment and training records pertinent to their work in the

22  program.

23       So again, overall, either in the request phase with

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  you or coming your way very soon, multiple thousands of pages

2  associated with the ten paragraphs.  So that, again, with the

3  bottom line being I'm -- I have tempered optimism that we're

4  going to get through all of that, we're going to have to you

5  by September 30 or we will deliver some records, additional

6  records, to the defense prior to September 30, and that we

7  will be in compliance with 120AA, and thus -- you know, we've

8  given you 46 notices as to our status on that.  You get them

9  every two weeks, Your Honor, as you know, under the 120

10 series.

11      So my expectation, based on what we're doing, again,

12 tempered optimism, is the 47th will be our last such report,

13 and that we will have complied with 120AA and our other

14 affirmative discovery obligations.  Acknowledging, of course,

15 even though we will be complete with our affirmative discovery

16 obligations, there's still litigation pending relating to

17 discovery.  We certainly understand there may be motions to

18 compel.  You're still going to have to review this, and you --

19 you know, it's going to take time to go through what we have

20 been spending a lot of time gathering, and we fully appreciate

21 that.  But by September 30, we're going to be saying we are in

22 compliance with regard to 120AA.

23      And, again, I'm not stating we've provided witness

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  specificity.  We're not at that point yet from either side to

2  name our witnesses, and thus comply with <u>Jencks</u> or <u>Giglio</u>, but

3  at this point those discovery obligations in 701 and the ones

4  I've mentioned under the 120 series met.

5      So that's the basic report, Your Honor.  And then to

6  speak about how this bears upon trial scheduling, we have

7  previously provided trial schedules.  There was some

8  commentary on this yesterday from defense counsel.

9      When 120AA was decided back in June, we were thinking

10  toward a trial date.  That order changed the process and then,

11  of course, we were in -- we had a stay of proceedings related

12  to the appeals, and so this commission stated that those

13  circumstances caused it to not -- to dismiss -- I think you

14  dismissed as moot that, for the time being, that scheduling

15  effort, which was certainly appropriate.

16      But to understand, I mean, 13.h, in particular in

17  that order, is a very expansive view of the prosecution's

18  requirement to produce statements.  I mean, these are

19  statements not specifically associated with the offenses, and

20  some context related to that is appropriate at this point.

21      We felt we had complied with the statements

22  requirement in particular.  We did seek reconsideration in

23  part of the order in 120, the original order 120C, and the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  commission did grant, in part, that.  But there was, you know,

2  still in that order a very burdensome -- the 120H paragraph.

3  And we've obviously deliberated on it, you know, considered

4  our avenues of recourse and so forth, decided not to appeal

5  that, and have been dutifully trying to comply with all of

6  that since that time.

7        So just putting that in perspective on the scheduling

8  now at the point where we are, I believe you are going to need

9  some time to go through this material, as is the defense, but

10  that we have done our due diligence in finding all of those

11  statements and considering their discoverability, and then

12  providing you the originals and offering you a substitute that

13  we believe protects the national security information while

14  providing the accused, as you must find, is -- could

15  substantially -- is in substantially the same position to make

16  a defense as he would have been with the original information.

17        So subject to your questions, Your Honor, that's my

18  report.

19    MJ [Col SPATH]:  Let me take a look at my notes.  So

20  delivery to me on or about 30 September, at least for the 120

21  piece, you believe.

22    CP [BG MARTINS]:  Yes, my -- as of today, with three weeks

23  to go, I have tempered optimism we're going to get there.  We

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  are going to, by 30 September, be able to say no more of the

2  notices to the commission that you ordered in December of

3  2014, of which we were up to 47, and we are in compliance with

4  120AA, and our affirmative discovery obligations otherwise.

5        MJ [Col SPATH]:  Do you have an estimate -- and you may

6  not, but an estimate of pages in 47, the last notice?  Do you

7  have -- how many more pages are heading my way?

8        CP [BG MARTINS]:  Multiple thousands.  And of course,

9  you're viewing the original.  What I was providing ----

10       LDC [MR. KAMMEN]:  Excuse me, sir.  What was the answer to

11  that?  I didn't hear it.

12       MJ [Col SPATH]:  Multiple thousands.

13       CP [BG MARTINS]:  Multiple thousands.

14       MJ [Col SPATH]:  Multiple thousands.

15       CP [BG MARTINS]:  Multiple thousands.  And, again, the

16  page numbers you are getting, you are seeing the original.

17       MJ [Col SPATH]:  Yes.

18       CP [BG MARTINS]:  The numbers that I was giving before is

19  what they're receiving.

20       MJ [Col SPATH]:  I'm just trying to understand.

21       CP [BG MARTINS]:  I was trying to provide an estimate so

22  people -- parties and commission could sort of understand

23  what's coming their way.  So multiple thousands coming your

1  way.

2    MJ [Col SPATH]:  Of the -- as it's been the original, the

3  produced redactions and then what it looks like in the

4  redacted form?

5    CP [BG MARTINS]:  Yes.  And then they'll receive the

6  summarized version that has the discoverable information in

7  it, and that, too, will be multiple thousands.  Yours will be

8  greater because you will be seeing the originals and the

9  substitutes.

10    MJ [Col SPATH]:  Then you had moved and made a comment

11  about witness lists, and then any discovery that may flow from

12  that ----

13    CP [BG MARTINS]:  Right.

14    MJ [Col SPATH]:  ---- because of <u>Giglio</u> and <u>Jencks</u> and the

15  others.  Do you have an idea of when your team will be in a

16  position to provide the defense with things like that, a

17  witness list, a realistic witness list?

18    CP [BG MARTINS]:  Well, again, these are trial rights and

19  <u>Jencks</u> is a trial right.  So we are -- the commission is

20  setting the time, place and manner of discovery at this point,

21  Your Honor, and we are engaged in that.  We're complying with

22  this stage of 120AA, and affirmative discovery to this point.

23  You've been making statements to the effect of one to two

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  years.

2        We have a good feel for our case and have provided

3  them extensive discovery on the case, but we're in a position

4  pretty rapidly to provide witnesses and so forth; but we,

5  frankly, believe we ought to be litigating this.

6        MJ [Col SPATH]:  It wasn't a request to do it right now,

7  it was more of a -- here's what I'm trying to get a feel for:

8  We are in the discovery phase still, clearly, just based on

9  our discussions here.  And when I say one to two years, it

10  is -- I'm guessing, but I'm trying to use kind of the

11  experiences I've have thus far and how long things take ----

12        CP [BG MARTINS]:  Sure.  Sure.

13        MJ [Col SPATH]:  ---- and a feel for moving forward.

14  Because getting it to us is half the battle.  And then it

15  moves over to the OCAs after it comes out of our office to

16  determine if they're going to comply with the changes, if any,

17  that I've made.

18        Do we have a feel for their timeline?  Because I've

19  reviewed thousands of pages, and we've sent them back.

20        CP [BG MARTINS]:  Now, Your Honor, the requests for

21  substitutions of the relief come to you.  We provide you the

22  summary, and then at some point you determine if the summary

23  is adequate.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  Yes.

2    CP [BG MARTINS]:  The ----

3    MJ [Col SPATH]:  I was given suggested changes.  Some.

4  Again, I don't want to comment on how many or how little, but

5  it's just in general we've made some suggested changes to some

6  of the requests that have come to us, and the trial judiciary

7  has come back with those.  And I know they have to go to the

8  OCAs for their decision.  They don't have to comply, we know

9  that.

10       What I'm trying to figure out is, when are they going

11  to do that so that information goes to the defense?

12    CP [BG MARTINS]:  Your Honor, I would ask you to review

13  our requests, which are ex parte requests, perfectly allowed

14  and authorized under the statute.

15    MJ [Col SPATH]:  Absolutely.

16    CP [BG MARTINS]:  Would ask that you please review those

17  and consider them.  And ----

18    MJ [Col SPATH]:  We do.

19    CP [BG MARTINS]:  ---- and I think you're -- I hope you're

20  seeing there's a promptness and a responsiveness to the

21  inquiries related to the material.

22       So the government is seized to this.  We want to

23  provide the information that's required for this commission to

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  go forward that allows the accused to make legally cognizable

2  defenses, rebut our case, or provide a sentencing case, and

3  we're just committed to it.

4        So I would ask that you review what we provide, and

5  we will remain very attentive to, you know, issues the

6  commission raises in this -- in that ex parte process, and

7  will enable you, as you have already, ultimately conclude that

8  the substitution is adequate and sign a protective order and

9  make the finding that they are in substantially the same

10  position.

11        So I think this is a major milestone in completion,

12  and it does extend also to our other affirmative discovery

13  obligations that are appropriate for this point in the

14  discovery process that the commission is now seized of as well

15  and managing, in terms of time, place and manner of discovery.

16        Subject to any further questions -- if I may, just as

17  I was hearing the summarization of the 802, the commission is

18  still envisioning two single-week sessions in this calendar

19  year, correct?

20  MJ [Col SPATH]:  I am envisioning some combination of two

21  weeks, be it the originally scheduled weeks, but I'm not sure

22  how effective our first week is going to be if we don't

23  identify what we're going to do in that week.  Then the week

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  of December where we just talked about that, where we have a
2  conflict, it appears.

3      CP [BG MARTINS]:  I understand.  We have offered some
4  alternatives to that second week, but I just wanted to see if
5  I'm understanding.

6      MJ [Col SPATH]:  Mine was a proposal that we could travel
7  down here once and be here for two weeks, which would give --
8  which would give myself satisfaction that I set out a
9  three-week schedule, a relatively reasonable schedule for
10  2016, and I just want to comply with the intent of that, if I
11  can, as I indicated to Mr. Miller a moment ago.

12      And so I offered up, as one reasonable alternative,
13  Veterans Day week and the week after, which takes into account
14  the move so that they're not trying to do multiple things and
15  we don't have the move stress upon them, and takes into
16  account that we need to figure out a battle plan for 332 so
17  that we effectively use our time here with any witness
18  testimony and any other issues with that, plus fully brief and
19  respond to issues related to the Limburg.

20      And so if it makes more sense to use two weeks
21  together, I hesitate to say save the taxpayers money -- I have
22  no idea if that does or not, and there's not a study -- but it
23  does save wear and tear on everybody traveling because we're

1  here for an extended period of time.  It was an offer.  I'm

2  hoping you all will talk about it and let me know how it

3  sounds, but that was it.  Right now, October is on the

4  board ----

5      CP [BG MARTINS]:  I understand.

6      MJ [Col SPATH]:  ---- and so is December.

7      CP [BG MARTINS]:  Your Honor, just in context of the

8  discovery, and I'm trying to provide information to the

9  commission to assist in its scheduling of things in light of

10  the discovery information update that I just provided, the

11  session -- series of sessions, 17 to 21 October would seem to

12  enable some digestion on your part of the material coming your

13  way with regard to discovery now.

14      MJ [Col SPATH]:  Yes.  I plan to use my time ----

15      CP [BG MARTINS]:  Right.

16      MJ [Col SPATH]:  I want to be -- General Martins, I think

17  you know this.  I have been very responsive when your material

18  has flowed to me.  And so I -- I'm not trying to get in -- I'm

19  not getting into any of the ex parte discussions.  We all know

20  the process that's unfolding.

21      CP [BG MARTINS]:  Right.

22      MJ [Col SPATH]:  But it has occasionally taken some

23  lengthy period of time when there have been suggested

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   revisions to get an answer back.  And it's not from you.  I

2   recognize that.  This is not a "it's you."  What I'm asking

3   is, coming to us is only part of the battle.  If I agree with

4   your substitutions, sign the protective order and the

5   information moves to the defense, that's great.

6        It's when we have questions or minor issues, or major

7   issues or wholesale revision, I'm not saying which ones they

8   are, because I'm not suggesting you're not complying.  I'm

9   just saying that when we have those changes, it has

10  occasionally taken OCAs a really long time to respond to you

11  all.  And I presume it's them, because I know if they

12  responded to you all, you would come to us quickly.

13      CP [BG MARTINS]:  Your Honor, I wasn't -- I was making no

14  commentary.  You're clear ----

15      MJ [Col SPATH]:  I understand.

16      CP [BG MARTINS]:  ---- we're hard at work at this

17  material, as all of we are.

18      MJ [Col SPATH]:  So in October, I plan to use my time in

19  October to start, if not work through, what I'm getting from

20  you all, as I have as every notice has come in, to work

21  through that.  And I plan to do that.  And I have people who

22  are going to help me with their initial review so I can do my

23  review.  We really are working to get those back to you as

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1 quickly as we possibly can.  Mine was more directed at,

2 getting it to us is half of that concern.

3    CP [BG MARTINS]:  Understand.  But yet, when you do get us

4 material that you've cleared on, we are then putting Bates

5 numbers on it and getting it out to them.

6    MJ [Col SPATH]:  Absolutely.

7    CP [BG MARTINS]:  I was merely making the comment in the

8 context of this discussion that, from the point of view on

9 discovery, the volume of material that has come to you that --

10 we know there is some of this -- that is being pretty close to

11 being ready to go.  Because there's been that back and forth

12 that we've talked about, it's been ongoing, that we believe

13 that the October week can be well spent, that there's

14 nondiscovery-related things and stuff on the docket that's

15 been discussed here that could be done.

16    And then, you know, we have our eyes on other weeks

17 in November, December -- October, November, and December,

18 hopefully getting actually some space between the October 17

19 to 21 week.  Our view at this point is two consecutive weeks,

20 maybe there's not enough unclassified material on the docket.

21 So, the -- and the -- and that the schedule on -- that you've

22 laid out for 2017 will enable us to then get into any

23 contested issues, again relating to discovery and the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 10015 - 10017]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  **[The R.M.C. 803 session was called to order at 1001, 31**

2  **October 2017.]**

3      MJ [Col SPATH]:  This commission is called to order.

4          Trial Counsel, Mr. Miller, let's account for the

5  government representatives and make any announcement regarding

6  the transmission of these proceedings.

7      TC [MR. MILLER]:  Good morning, Your Honor.  Present for

8  the prosecution are Brigadier General Mark Martins; myself,

9  Mark Miller; Colonel John Wells; and Major Michael Pierson.

10          In addition to detailed counsel, we have at the

11  counsel table Master Sergeant Vanessa Pichon, who is one of

12  our paralegals; Staff Sergeant Kevin Creel, again, a

13  paralegal; and our analyst, Parker Smith.

14          Additionally seated in the back, Your Honor, we have

15  Patrick O'Malley of the Federal Bureau of Investigation,

16  Joseph Castellano of the Federal Bureau Investigation, and

17  Supervisory Special Agent Amanda Strickland.

18          These proceedings are being transmitted by

19  closed-circuit television to the locations authorized in your

20  order.  Thank you.

21      MJ [Col SPATH]:  Thanks, Mr. Miller.

22          Lieutenant Piette, I see that learned counsel,

23  Mr. Kammen, and the two assistant defense counsel, Ms. Eliades

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  and Ms. Spears, are absent.  Do you have any other members of

2  the defense team you need to account for on the record other

3  than yourself?

4      DDC [LT PIETTE]:  Yes, Your Honor.  Present for

5  Mr. al Nashiri are myself, Lieutenant Alaric Piette, JAG

6  Corps, United States Navy.  I'm a lawyer within the meaning of

7  Article 27(b) of the Uniform Code of Military Justice.  In

8  addition, we have present Ms. Brandi Janes; Ms. Kristina Hon;

9  Tech Sergeant Travis Gale; Mr. Roosevelt Roy; and the

10  translator.  Additionally present is Brigadier General John

11  Baker, United States Marine Corps; Colonel Wayne Aaron, United

12  States Army; and Mr. Phil Sundel.

13      MJ [Col SPATH]:  With regard to General Baker, Colonel

14  Aaron and Mr. Sundel, are they of record for Mr. al Nashiri?

15      DDC [LT PIETTE]:  No, Your Honor.  They are -- Brigadier

16  General John Baker is the chief defense counsel.

17      MJ [Col SPATH]:  I understand.  Is he entering an

18  appearance for Mr. al Nashiri or not?

19      DDC [LT PIETTE]:  No, Your Honor.

20      MJ [Col SPATH]:  Okay.  And the same for the other two?

21      DDC [LT PIETTE]:  Yes, Your Honor.

22      MJ [Col SPATH]:  All right.  Thanks.

23          Mr. al Nashiri, I'm going to talk to you about your

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  rights to be present and your right to waive your presence at

2  any hearing.

3         You have the right to be present during all sessions

4  of a commission; this includes any contempt proceedings

5  against anyone.  If you request to absent yourself from any

6  session, such absence must be voluntary and of your own free

7  will.

8         Your voluntary absence from any session of the

9  commission is an unequivocal waiver of your right to be

10 present during the session.  Your absence from any session may

11 negatively affect the presentation of the defense in your

12 case.  Your failure to meet with and cooperate with your

13 defense counsel may also negatively affect the presentation of

14 your case.

15        Under certain circumstances your attendance at a

16 session can be compelled regardless of your personal desire

17 not to be present.  The proceedings today constitute one of

18 those occasions, as we are going to be discussing the

19 circumstances that have led to you being in court without your

20 outside appointed learned counsel, Mr. Kammen, and two other

21 members of your defense team.

22        Do you understand what I have explained to you so

23 far?

[Tr. 10041-10043]

1    MJ [Col SPATH]:  And you filed it with your name.

2    CDC [BGen BAKER]:  -- in response to a request from you --

3    yes, absolutely.

4    MJ [Col SPATH]:  With your name.

5    CDC [BGen BAKER]:  And in any pleading that anybody files,

6    the lawyer that files that does not become a witness.

7    MJ [Col SPATH]:  You're not an attorney of record.

8    CDC [BGen BAKER]:  Your Honor, this was filed in response

9    to your invitation.

10    MJ [Col SPATH]:  If you wanted to.  You also have sent

11    e-mails to General Martins ----

12    CDC [BGen BAKER]:  Absolutely.

13    MJ [Col SPATH]:  ---- that have been attached.  You also

14    have excused counsel.  Not privileged there.  Maybe some of

15    the discussion you had with those counsel, they may or may not

16    be privileged.  That's a debate we could probably have.  But I

17    don't care what your discussions were.  I don't plan to ask

18    you about your discussion.

19        I plan to ask about the affirmative acts you took in

20    this case that are public knowledge and have been reported

21    both in the press and here through e-mail.  That is not

22    privileged.  Those are acts you took affecting this case.

23        And again -- and I plan to issue you an order from

1  the commission.  You can choose to accept it or not and go

2  from there, but we're not going to spend all day doing this.

3      CDC [BGen BAKER]:  Your Honor, again, under Rule 501(b)(1)

4  I refuse to appear as a witness.

5      MJ [Col SPATH]:  All right.  So, I'm ordering you to

6  testify.  You are refusing to come up here, take the oath, and

7  testify; is that accurate?

8      CDC [BGen BAKER]:  That is accurate; yes, sir.

9      MJ [Col SPATH]:  All right.  I'm also ordering you to

10 rescind the direction you gave when you excused both learned

11 outside -- appointed learned counsel and the two civilians.

12 Are you refusing to comply with that order as well?  You

13 excused them; you released them.

14     CDC [BGen BAKER]:  Yes, sir.

15     MJ [Col SPATH]:  I'm ordering you to send them a note

16 saying you are not releasing them.  I can't order Mr. Kammen

17 here.  I know that.  I know you've got two DoD employees that

18 work for you.  I know what their government contract says.

19 But that is your choice as their supervisory attorney, and

20 everybody can deal with that, including your supervisor.

21         My question to you is:  I'm ordering you to send them

22 a memo telling them their withdrawal is not approved because

23 you don't have the authority.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    CDC [BGen BAKER]:  Oh, I'm definitely not going to ----

2    MJ [Col SPATH]:  Okay.

3    CDC [BGen BAKER]:  ---- I am definitely not -- Your Honor,

4    Rule 5-0 -- I understand your ruling.  I understand your

5    ruling.

6    MJ [Col SPATH]:  You don't, because you haven't done

7    anything to fix the ruling.  How does this normally work?  I

8    issue a ruling.  You disagree with it -- or you all disagree

9    with it and we go to the appellate court and they tell me I'm

10   right or wrong.  They do it every week.  And I'm okay with it.

11   That is the normal process.

12        You interpreted a rule, and now there are two rulings

13   from this commission that tell you you got it wrong.

14   CDC [BGen BAKER]:  Your Honor, if your -- if your order to

15   me is to -- I want to make sure that I understand what -- your

16   order to me.  If your order to me is, General Baker, you must

17   rescind your action that you took on October 13th ----

18   MJ [Col SPATH]:  Yes.

19   CDC [BGen BAKER]:  ---- whatever the date -- whatever the

20   correct date is, excusing learned counsel and assistant

21   defense counsel, I refuse to follow that order.

22   MJ [Col SPATH]:  And you are also refusing to testify.

23   CDC [BGen BAKER]:  Yes, sir, pursuant to ----

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 10047 - 10049]

1  gave to have a filing by 1600.  And I want to give the court a

2  heads up that it is my position, it is the defense's position

3  that right now Mr. al Nashiri has the statutory right to

4  learned counsel at all ----

5    MJ [Col SPATH]:  You can stop.  It says to the extent

6  practicable.  I've already interpreted the statute.  I mean,

7  that's simple for me.  To the extent practicable he can have

8  learned counsel on matters of capital litigation.

9      What I'm talking about is a filing telling me what

10 our proposed way ahead is now that he is not here.  And what

11 I'm talking about is your ability to do cross-examinations,

12 which you have done before, direct examinations, which you

13 have done before, and pretrial information and motions, which

14 you have done before.

15      If I'm wrong, your client will get a windfall because

16 I have ordered us to move forward without learned counsel.

17 But if you refuse, you too, at noon tomorrow, will be here for

18 a contempt hearing.

19    DDC [LT PIETTE]:  Yes, Your Honor.

20    MJ [Col SPATH]:  It's that simple.  I've already

21 interpreted, and there will be a ruling, based on the

22 government's filing, about the ability to have learned

23 counsel.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1        The chief defense counsel has decided that

2    Mr. al Nashiri does not need defense counsel here.  That's his

3    choice.  To the end -- in his filing, said it is not

4    practicable to get them here.  Well, the law discusses just

5    that.  It isn't practicable, and we are not going to wait

6    right now.

7        Hopefully, by the time we get to any findings case,

8    we will have learned counsel to assist you, or more counsel.

9    But we are going to continue to move forward.  And if we need

10    to come back and redo some things, we've got all the time in

11    the world, as we've demonstrated for the last nine years.

12        So again, you are detailed counsel, and I have

13    interpreted the rule.  So you can defy the order to be here;

14    you can sit here and do nothing.  I would read <u>Strickland</u> and

15    some other cases where we have had defense counsel who feel

16    like you do, a judge's ruling was unfair and they didn't like

17    it so they didn't engage in an opening statement, closing

18    argument, crosses of witnesses, directs of witnesses, or

19    filing motions.  And the appellate court said that is a

20    strategy.  It's a strategy that may well work, but it didn't

21    work here, and they didn't find the counsel ineffective.

22        So that is your choice, and that is your issue.

23        DDC [LT PIETTE]:  Yes, I understand, Your Honor.  And as

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  the only counsel in this room who has been detailed

2  specifically to defend Mr. al Nashiri, I aim to defend him.

3  And I cannot do that without a learned counsel because, by

4  statute, he has to have one.

5      MJ [Col SPATH]:  We have already dealt with that.

6      DDC [LT PIETTE]:  Yes, Your Honor.

7      MJ [Col SPATH]:  The issue is resolved.  You are welcome

8  to file a writ.  You've got your chief appellate counsel here,

9  apparently, to make an appearance on the record to a case that

10  he's not detailed to.  I would file a writ, and maybe the

11  C.M.C.R. will step in quickly, or maybe they won't.  Maybe

12  three weeks from now they will step in and say, Spath, you got

13  it wrong again, like I have twice already.  Sorry.  And we

14  will come back and do it again.

15      But again, your order is easy.  We will be here

16  Thursday -- we will be here at noon tomorrow and we will be

17  here Thursday with the government's witness, who flew down

18  here on an airplane.  You can engage in the direct or you can

19  waive it affirmatively on the record.  But again, I would read

20  those cases after Strickland, understand where we are at, and

21  understand that I find learned counsel are not practicable in

22  the near term, if ever, by the actions of General Baker.

23      And again, maybe you have set your client up for

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 10053 - 10055]

1      Just some general comments about yesterday and the

2  process that brought us here.  We already went through the

3  findings of fact yesterday, but as they indicated, I've ruled

4  on two occasions that General Baker acted in a manner outside

5  his authority.

6      His decision to approve a requested release of

7  counsel for good cause, or release counsel for good cause

8  shown on the record, as stated by him, was unreviewable and

9  unilateral, and that flies in the face of commonsense judicial

10  review, as far as we can tell, every states' bar rules, court

11  precedent and two orders of the commission.

12      For defense counsel to have the authority stated by

13  the chief defense counsel would effectively give the defense

14  counsel the ability to dismiss any commission case or any

15  criminal case at any stage in the process for any reason when

16  they determine good cause, and then refuse to testify in court

17  to even explain what the good cause shown is, other than what

18  is submitted in written form.

19      CDC [BGen BAKER]:  Your Honor, at this point I want to

20  object to the proceedings.

21      MJ [Col SPATH]:  General Baker, you're not a party of

22  record and we're moving forward.  You need to take your seat.

23      CDC [BGen BAKER]:  I just want ----

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  General Baker, you need to take your

2   seat.

3    CDC [BGen BAKER]:  I again object.  This court does not

4   have personal jurisdiction over me.

5    MJ [Col SPATH]:  I appreciate that.  We certainly have

6   considered that, and I disagree.  And I'm not even going to go

7   through why I disagree with that.  I would suggest reading

8   950t and the language that precedes every single rule until

9   you get to (31) and (32).

10    CDC [BGen BAKER]:  Your Honor, I just want to make sure

11   that you are denying me the opportunity ----

12    MJ [Col SPATH]:  I'm denying you the opportunity to be

13   heard.  Thank you.  It's a summary proceeding.

14    CDC [BGen BAKER]:  I understand.  I just want the record

15   clear.  There's things that I want to say, and you're telling

16   me that I cannot say them.

17    MJ [Col SPATH]:  General Baker, this is the last chance.

18   I don't want to -- this is really not a pleasant decision.

19   And I know that some of you might think that this is fun or

20   lighthearted, right?  I've heard commentary out around the

21   base.  Alls you've got to do is get on the Internet.  None of

22   this is fun.  None of this is easy.

23        I have spent a lot of time reviewing the rules that

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

**10054**

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  apply to this commission, and I appreciate -- General Baker,

2  no more.  Sit down, please.

3      CDC [BGen BAKER]:  Your Honor, I have spent a lot of time,

4  too.

5      MJ [Col SPATH]:  I have spent a lot of time as the judge.

6  And any system of justice understands that, except apparently

7  participants in the commission, about following orders and

8  following a process.  I know there's a habeas filed.  If we

9  get the suspension in here in time, I'll stop.

10      Do you know what I won't do?  I won't tell that judge

11  I'm not going to follow your order, because I know better.

12  I'm going to ignore that order and press on because I disagree

13  with you.  That's not going to happen.  And so if that order

14  comes in and this is suspended, I will stop.

15      CDC [BGen BAKER]:  Your Honor, again, I request to be

16  heard.

17      MJ [Col SPATH]:  General Baker, I don't want to have to

18  have you removed.

19      CDC [BGen BAKER]:  I got it, sir.

20      MJ [Col SPATH]:  And I don't want to add to the contempt

21  findings.

22      This is a difficult, unpleasant decision, and

23  frankly, it's an affront to the process of justice that we

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 11052 - 11054]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  those occasions, as we're going to be discussing the

2  circumstances that have led again to you being in court

3  without your learned counsel and the defense team.

4          Do you understand what I've explained to you thus

5  far?

6      ACC [MR. AL NASHIRI]:  Yes.  Yes.

7      MJ [Col SPATH]:  And that's a yes.  Thank you.

8          For everybody in the audience, we had an 802 session

9  back at Andrews Air Force Base, or Joint Base Andrews, at the

10 terminal, where we discussed some of the issues we're going to

11 deal with as we move forward.  I asked the government at that

12 802 session to subpoena Ms. Eliades and Ms. Spears since they

13 are not here despite multiple orders to be here.

14          I asked the defense counsel about any detailed

15 counsel to the case.  And defense counsel let me know that

16 he's the only detailed counsel to this particular case.

17          I discussed also securing Mr. Koffsky to come

18 testify -- I'll add some more to that based on some e-mail

19 traffic -- but at the 802, I just asked for him to be

20 contacted to provide some testimony.  I asked if Mr. al Darbi

21 was available, and I -- the government indicated he was, and I

22 covered how many witnesses we were going to call each day.

23          Trial Counsel, do you want to add anything to my

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

**11052**

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   summary of the 802?

2       TC [MR. MILLER]:  Nothing from the government.  Thank you,

3   Your Honor.

4       MJ [Col SPATH]:  Defense Counsel?

5       DDC [LT PIETTE]:  Defense concurs.  Nothing to add.

6       MJ [Col SPATH]:  All right.  Let's deal with the parties.

7          Trial Counsel, if you would cover the parties -- I

8   believe they're the same parties who were present last time --

9   and then whether or not you are transmitting.

10      TC [MR. MILLER]:  Good morning, Your Honor.  These

11  proceedings are being transmitted via CCTV to locations in the

12  United States pursuant to the commission's order.

13         Present for the United States are Brigadier General

14  Mark Martins; myself, Mark Miller; Colonel John Wells; and

15  Major Michael Pierson.  Also present is Mr. Forrest Parker

16  Smith, Master Sergeant Vanessa Pichon, and Staff Sergeant

17  Kevin Creel.  Present in the back of the courtroom are

18  supervisory -- excuse me, are OGC lawyer Patrick O'Malley;

19  Joseph Castellano of the FBI.  No other further persons are

20  here.  Thank you.

21      MJ [Col SPATH]:  Thank you.

22         Defense Counsel, do you want to cover who's here for

23  you?

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1     DDC [LT PIETTE]:  Yes, Your Honor.  Good morning.  Present

2   for the defense on behalf of Mr. al Nashiri is myself,

3   Lieutenant Alaric Piette, and Ms. Brandi Janes, civilian.

4   Also present with the MCDO, but not directly representing

5   Mr. al Nashiri, is Colonel Aaron.

6     MJ [Col SPATH]:  All right, thanks.  All right.  So since

7   we had the 802, a couple of things have transpired.  One is we

8   received a brief related to the DoD civilians, and it was a

9   motion to quash the subpoena.  I had a chance to look at it

10  today.  And so while I recognize it did not receive an AE

11  exhibit ahead of time, I've already indicated we're going to

12  accept it so that we can kind of move forward and figure out

13  the road ahead.  And I communicated that to the staff.

14          Once we accepted it, I read it.  And in general, my

15  plan is to establish a briefing cycle and then work to have

16  their attendance secured at either the February or March

17  sessions.  I more than recognize that I asked the government

18  on Wednesday to secure their attendance for Friday, and it was

19  short notice.  And so understanding that sometimes people

20  don't like to be notified that they're going to have to show

21  up and testify in a day or two and the issues at hand, I don't

22  have any concerns with securing their attendance later in

23  time.

[Tr. 11536 - 11570]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  the government last time to work to secure their attendance to

2  testify.  That process got underway.  While that was going on,

3  we got third-party filings, which I accepted the first time

4  where the civilians through counsel made various arguments to

5  either quash the subpoena or alter the attendance requirements

6  or something like that.

7         It was pretty clear by the end of the session that I

8  wanted them to come and testify, as was made absolutely clear

9  when I issued the docketing order.  The docketing order I

10  think was a fair indication that I'm not granting any motion

11  to quash.  I am certainly amenable to working on their

12  schedule to have them come testify by VTC to a point, but they

13  need to be here.

14         In response to the docketing order, we received

15  proposed third-party filings that, frankly, were a

16  cut-and-paste from the original third-party filings with the

17  very same arguments, so I'm not accepting those.  I've already

18  seen them.  There's nothing new.  So there's going to be no

19  new briefing order, no new briefing cycle.  We've already

20  covered this.

21         And so, Trial Counsel, any updates on -- to -- are

22  they going to show up at the Mark Center?  Do we need to

23  subpoena them again?

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MATC [COL WELLS]:  Your Honor, briefly, we have no

2    indication from the individuals that they will comply with the

3    subpoenas which are, as written, to appear at the Mark Center

4    to be ready to testify at 10:00 tomorrow, Tuesday, with the

5    change in events.  You were not scheduled to convene at that

6    time until 1300.  But I think a reasonable interpretation is

7    to be ready at the Mark Center and wait further instructions

8    to be ready to testify.  That's where we are.

9         Maybe a further inquiry with their supervisor would

10   be important.  Also with Lieutenant Piette, since you have not

11   released any of the defense counsel, he should know where they

12   are, and if he needs to, he should communicate with them and

13   find out exactly what their plans are.

14        Sir, about these third-party filings, 393, I

15   understand that you're not going to accept them, but I do

16   believe there is new information in there that should concern

17   the commission.  They have attached an agreement of

18   responsibilities to that which neglects to include the two

19   required provisions that are specified in the regulation:  one

20   is to follow all rules and regulations, and number two, to

21   comply with all orders of this commission.

22        So that agreement is something that the prosecution

23   has not seen, other components of the government have not

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  seen.  This is within the MCDO files and seems to be out of

2  compliance with the regulation for their qualifications.  And

3  so an appropriate inquiry with them personally would be

4  prudent, and the reason why they should appear as witnesses.

5  And then number two, also with their supervisory chain.  So I

6  think that is more concerning, and the government would like

7  an opportunity to make that on the record ----

8      MJ [Col SPATH]:  You all are welcome -- you all are

9  welcome to file whatever you think is appropriate.  I will

10 accept your filings as a party standing by.  But as for any

11 more third-party -- third party filings with the same

12 arguments that we've already spent a whole session discussing,

13 I'm not interested.

14      If there's a reason to quash the subpoena, i.e., it's

15 oppressive in some manner to have them travel to the Mark

16 Center close to where they work, I'd be interested.  But I

17 haven't heard any of that.  I just keep hearing the same

18 thing, I don't have the authority, which I do.  And the

19 defense community can unilaterally act and it's unreviewable,

20 even though I disagreed with that.  And again, not a single

21 appellate court has said differently yet.  They have been

22 remarkably silent, so ----

23      MATC [COL WELLS]:  Yes, sir.  And to comment on that point

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    then, this filing in 393 from Ms. Eliades and Spears where the

2    requested relief is that you accept that filing in lieu of

3    their appearance to discuss good cause on the record, you've

4    rejected that, will not accept those filings.

5         You want them personally to appear.  We've issued a

6    subpoena.  They should appear at the Mark Center at 10:00

7    tomorrow.  We've requested that the VTC suite be made

8    available.  If the commission gives us other orders and

9    directions about their appearance time, we will modify that

10   appropriately.

11   MJ [Col SPATH]:  I think -- it appears tomorrow there's

12   going to be some use of this facility by another court

13   proceeding.  And so kind of two things:  10:00 tomorrow is

14   what the subpoena says.  It's reasonable for them to be there

15   at 10 in accordance with the subpoena, even though we

16   shouldn't have to subpoena DoD employees that taxpayers pay

17   for.  But separate from that whole effort, it's reasonable

18   they'll be there at 10:00 tomorrow.  I imagine we won't get to

19   them until sometime after 10 because the schedule for tomorrow

20   is that other proceeding to be here from 8 to 10.  So however

21   long it takes to get them out and get us in, hopefully by 11,

22   we'll get started.

23   MATC [COL WELLS]:  Okay, sir.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  If they're not there, different issue,

2  and then we can talk through our next steps, which we've been

3  down this road before.  If that's the next step, that's the

4  next step.

5    MATC [COL WELLS]:  All right, sir.  Thank you.

6    MJ [Col SPATH]:  All right.  All right, Colonel Aaron, if

7  you could, could we chat for a few minutes?  Same as last

8  time, I just -- I want to get some updates and make sure I

9  understand where we're going.

10    I assume you're still the Acting Defense Counsel --

11  Chief Defense Counsel in this case?

12    DCDC [COL AARON]:  I am, Your Honor.  Before we start, I

13  would like to start, again, by saying that I'm here

14  voluntarily to answer what questions I feel that I can answer

15  from the court.  But I renew my objection to the court's

16  opinion that it can order me to be here and would ask the

17  court to state on the record the basis upon which it believes

18  it can order me to be here.

19    MJ [Col SPATH]:  I would do this.  If you don't think I

20  have the authority, don't show up.  Orders are -- orders are

21  presumed to be lawful.  That's -- I think we learned that

22  early on in our military careers.  They're presumed to be

23  lawful.  And you violate them at your own risk.  So if you

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  don't want to be here, leave.  We'll figure out what happens.

2      DCDC [COL AARON]:  Your Honor, I'm trying to cooperate

3  and ----

4      MJ [Col SPATH]:  Right.

5      DCDC [COL AARON]:  ---- assist the court in understanding

6  the situation.

7      MJ [Col SPATH]:  Right.  And that's why I said last time,

8  it's not meant to be -- I'm not going to explain, justify, and

9  debate why I think I have authority as a commissions judge to

10  compel the attendance of somebody who has supervisory

11  responsibilities over this team.  If there comes a point where

12  you think I'm wrong and it's worth taking that risk, then

13  don't show.  I wouldn't advise it, but I'm not your lawyer.

14  I'm doing the best I can with the tools I have or I don't

15  have, so ----

16      DCDC [COL AARON]:  I understand your position, Judge.

17      MJ [Col SPATH]:  With regard to Ms. Eliades and

18  Ms. Spears, I assume you're familiar with civilian witnesses

19  in government employ and their requirements to make themselves

20  available for this process and their supervisor's role in that

21  process.

22      DCDC [COL AARON]:  I am.

23      MJ [Col SPATH]:  And so are you assisting the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    prosecution -- and them, frankly -- in understanding -- I

2    didn't write 13-4, and I didn't write those rules.  But are

3    you helping communicate that particular issue to these two

4    counsel?

5       DCDC [COL AARON]:  Your Honor, I think there's room for

6    interpretation as to what 13-4 provides, and I certainly

7    disagree with what I think is a superficial reading and

8    understanding of that that Colonel Wells has proffered.

9          The issue is -- is significantly more difficult when

10   dealing with a situation such as this where the witnesses are

11   unwilling to appear, have sought, through a legal process, to

12   have that subpoena quashed, and are represented by counsel in

13   that effort.  There's a number of employment-related legal

14   issues that greatly complicate the simplistic approach that I

15   can simply order them to be here and the concept that my order

16   would have any significance, whatsoever, on their intention of

17   what to do.

18      MJ [Col SPATH]:  No, and I appreciate that.  Mine wasn't a

19   request for you to order them.  I mean, again, I think you can

20   read this a few ways, but it does say, "Civilian employees of

21   the United States can be required to testify incident to their

22   employment with appropriate travel orders issued for this

23   purpose," and you don't need a subpoena.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    DCDC [COL AARON]:  And, Your Honor, I have provided for

2    travel orders to be issued for them and to have them put on

3    the manifest on the flight down here.  Obviously, they have

4    not done so.

5    MJ [Col SPATH]:  No, I appreciate that.  That helps.  So

6    it seems to me you are, within the rules, at least, trying to

7    communicate to them what their requirements may be.

8         Colonel Wells?

9    MATC [COL WELLS]:  Your Honor, if I could, I don't think

10   there's been an inquiry whether or not he's communicated with

11   them.

12   MJ [Col SPATH]:  Well, and I'm walking a cautious line.  I

13   don't want to get too much into what the communications may or

14   may not be yet.

15        The other is, as a supervisory attorney -- we all

16   have these rules.  As the supervisory attorney with

17   responsibilities over anyone, so if you have supervisory

18   responsibilities over Lieutenant Piette, for example, as the

19   chief defense counsel, do you agree one of those

20   responsibilities is that he conforms, or any of those who work

21   for you conform with their Rules of Professional

22   Responsibility?

23   DCDC [COL AARON]:  I would say so, yes.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  All right.  It appears the Army Rules of

2    Practice -- or the Army Rules of Professional Responsibility,

3    your bar rules, Ms. Eliades' and Ms. Spears' bar rules all say

4    the same thing, word for word, so I think yes.  And I've been

5    through the when ordered by a tribunal to continue

6    representation or to be somewhere, Rule 1.16, which is the

7    same for everybody, whether you like it or not, you're

8    supposed to show up.

9         So -- and I get they're not coming.  But part of that

10   responsibility, when you read through that is, if you are

11   released, or believe you don't have to be there, you have some

12   requirement to work some kind of turnover with the people who

13   you've left behind.  Ms. Yaroshefsky said as much.  It doesn't

14   contemplate you just walk away and never return a phone call.

15        And so have you communicated to them their need to be

16   working a turnover with Lieutenant Piette -- because, like it

17   or not, he's here, they're not -- and to make sure that they

18   are doing what they can to assist him, because he's still here

19   representing Mr. al Nashiri.

20   DCDC [COL AARON]:  I believe they understand their

21   responsibilities in that regard.

22   MJ [Col SPATH]:  As their supervisory attorney in relation

23   to this case, have you ensured they understand their

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  responsibilities?

2      DCDC [COL AARON]:  I would say that I have.

3      MJ [Col SPATH]:  Have you detailed any other defense

4  counsel to this case yet?

5      DCDC [COL AARON]:  I have not detailed any counsel.

6      MJ [Col SPATH]:  And, I don't know, what are we, four

7  months into this?  Are you going to detail any counsel, or are

8  you just going to leave Lieutenant Piette sitting there?

9      DCDC [COL AARON]:  Judge, it is the longstanding practice

10  of chief defense counsel before me and myself in this case to

11  fulfill our responsibility to make resources available to the

12  team.  I have made resources available.  And consistent with

13  the longstanding approach of the organization, it is the

14  learned counsel's responsibility and right to determine

15  whether or not they want counsel detailed and when and what

16  counsel they want.

17          And without learned counsel, the most important

18  resource that is necessary for the continuation of this

19  capital case, we are not in a position to determine whether or

20  not counsel should be detailed or not.  Those resources are

21  available and, upon learned counsel indicating their desire, I

22  stand prepared to detail counsel to the case.

23      MJ [Col SPATH]:  Well, I guess my question would be that I

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  recognize that with learned counsel here, they have unique --
2  they have a unique role to play under the rules.  Mr. Kammen
3  didn't excuse Ms. Eliades or Ms. Spears.  General Baker
4  decided to excuse Ms. Eliades and Ms. Spears.

5        I mean, the way it could have been done for those
6  two, pretty clearly, was Mr. Kammen could have excused those
7  two and then, at least in his world, asked General Baker to
8  excuse him.  But instead what happened is the three of them
9  went to General Baker, and they were all three excused.  Not
10 by learned counsel.

11       Again, for the two DoD civilians -- I know you
12 recognize that distinction -- they were excused, no matter how
13 the learned counsel felt, because he never told us how he
14 felt.  And those three walked away.  And two military lawyers
15 at least, and another, I think, civilian were still detailed
16 to this case.  So you just told me that learned counsel would
17 be the ones to undetail them, and you undetailed them.

18       DCDC [COL AARON]:  Sir, learned counsel indicate their
19 desire when we provide -- make resources available, if they
20 would like them detailed.  The chief defense counsel, yes,
21 signs the memo detailing or undetailing them, but in
22 accordance with the wishes and desires and the stated
23 preference of the learned counsel.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  Well, I understand, but after the learned

2    counsel left and said he had no more responsibilities in this

3    case, are you saying he then communicated that you should

4    undetail the two detailed military defense counsel and the

5    civilian?

6    DCDC [COL AARON]:  Judge, the situation ----

7    MJ [Col SPATH]:  No, I just want to understand.  You told

8    me learned counsel decide.  Okay.  He was gone.  And when he

9    left, in his wake there were other counsel detailed to this

10    case.

11    DCDC [COL AARON]:  And I had no way of knowing, without

12    learned counsel, whether those counsel would be acceptable on

13    the case.  And in order to maintain the status quo, and not to

14    allow the court to lock the defense team in by requiring their

15    appearance, I undetailed them.

16        Your Honor, I have an independent responsibility to

17    exercise my judgment to determine which members -- which

18    attorneys would best constitute a team for this client, and by

19    ordering attorneys who had not yet met with the client and

20    entered into an attorney-client relationship with the client,

21    you were thereby interfering with my ability to exercise my

22    independent judgment as to what attorneys would best

23    constitute the team for this client.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  Well, did you consult with the learned

2  counsel to see if this is the best idea?

3    DCDC [COL AARON]:  Your Honor, as you know, I don't have

4  learned counsel to consult with.

5    MJ [Col SPATH]:  Right.  So learned counsel need to be

6  there to figure out whether or not you're going to detail them

7  or keep them.  But without any consultation with learned

8  counsel or any -- did you make an effort to consult with legal

9  counsel?  I've said he's still detailed.  So did you pick up

10  the phone, send him an e-mail and tell him, what do I do here?

11  You've walked away and left me with nobody.  What do I do

12  here?

13    DCDC [COL AARON]:  Your Honor, we obviously have a

14  difference of opinion as to the status of Mr. Kammen.

15    MJ [Col SPATH]:  Colonel Aaron, stop that.  We do have a

16  difference of opinion.  But the way court systems work is

17  judges rule and then people follow those rulings, or they go

18  and appeal, and then an appellate judge or judges agree or

19  disagree with me, and then we respond to those.

20      The way court systems do not work anywhere in the

21  United States, and, frankly, almost every other country -- the

22  way court systems don't work is when parties disagree with the

23  judge, they say I disagree.  Thanks for your input.  We don't

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  agree.  And they just march on in that direction without

2  something else.  That's why we have 62 appeals.  That's why we

3  have courts that we can appeal to.  That's why we have

4  higher-level courts.

5          I mean, so the fact that you and I disagree is

6  irrelevant to the conversation.  My conversation is, you told

7  me you need learned counsel to figure out what to do with this

8  stuff for every decision, even though, again, that's not

9  exactly what the law says in many jurisdictions, but okay.

10         I'm just trying to figure out when you made the

11  decision to undetail them, all of the resourcing for the team

12  except for Lieutenant Piette and the mitigation specialist who

13  we know is here helping.  Unlike mitigation specialists, when

14  you undetailed those three attorneys, did you consult with

15  learned counsel to figure out if that was a good plan or not?

16  DCDC [COL AARON]:  I did not feel I had a learned counsel

17  with which -- whom I could consult, Your Honor.

18  MJ [Col SPATH]:  Okay.

19  MATC [COL WELLS]:  Your Honor, if the prosecution could be

20  heard on that point?

21  MJ [Col SPATH]:  You'll be heard, I promise.  I'm just

22  trying to figure out the lay of the land.  It certainly seems

23  obvious to me, but that's where we're at.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1        Okay, Colonel Aaron, as always, I appreciate you

2   coming to chat.  Thank you.

3        Trial Counsel, come on up.

4   MATC [COL WELLS]:  Your Honor, the prosecution would

5   request that you inquire of Colonel Aaron again on this point.

6   The defense filing, AE 389 Attachment C, is a letter from

7   Brigadier General Baker to the convening authority explaining

8   that Mr. Kammen would remain on the case and available for the

9   transition of other learned counsel and that he may bill for

10  that.  So it cannot be that the defense is without learned

11  counsel.

12       Additionally, you have ruled that they are not

13  released until they have a discussion with you about good

14  cause, and that's what you're seeking from Ms. Eliades,

15  Ms. Spears, and from Mr. Kammen.  So it seems to be an

16  inconsistent position from Colonel Aaron.  And maybe he's

17  uninformed that General Baker has filed this with the

18  convening authority indicating that learned counsel will still

19  remain.  Additionally, it seems to be that the current

20  military defense counsel, Lieutenant Piette, has learned

21  counsel available to him to consult and advise him about the

22  approach.

23       So it's clear that the approach, at least from

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   Colonel Aaron, if he believed that he made an independent

2   decision, is to gut the defense of any other military defense

3   counsel to assist and he is blocking communications and

4   failing to communicate with learned counsel.

5        Sir, do you have any questions of me on that?

6   MJ [Col SPATH]:  I don't.  For the record, I mean, yes,

7   that appears obvious to the court.  I've made comments before.

8   It appears to be a strategic decision to under-resource and

9   make it appear as if this team is under-resourced.

10        But let me ask this for the government.  I view my

11  responsibility to be neutral, most importantly, and to attempt

12  to move a process fairly through any -- whatever justice

13  process we're in.  If I'm, you know, home station through a

14  courts-martial, if I'm here through the commission, fairly --

15  right? -- and judiciously, and the fair administration of

16  justice -- and that's the charter, and we all know that.  So

17  I'm trying to do that.

18        But I've got to tell you I feel like I'm in the

19  wilderness on the -- fighting this particular issue because

20  it's not my fight.  I am attempting to do what I can, but

21  really, what are you all doing to -- what are you all doing to

22  make sure the people who are doing this are held responsible?

23  I can't do it, that's clear.  And again, is it in my lane?

1    How much is in my lane?

2            And I'll be very open with both sides.  I went home.

3    I was trying to review -- I mean, obviously I'm spending a lot

4    of time reviewing my cases to figure out my options.  I

5    watched the military judge in a courts-martial, <u>Hassan</u>, take

6    on a battle that was not his, right, the beard issue, and

7    ultimately have to recuse himself.

8            And so a judge's responsibility is, one, right,

9    recuse yourself if you have to.  But the responsibility is to

10   remain with the case and not recuse yourself if you don't have

11   to, whether you like it or not, right?  The presumption is

12   non-recusal unless there's a reason to recuse yourself.  And

13   that is for a good purpose, because otherwise, if judges don't

14   like a process they'll just walk away.  I'm going to recuse

15   myself.  And in the spirit of full disclosure, there are days,

16   right, where this is tough work.  And it would be a lot easier

17   for me to say I'm going home, which is exactly, by the way,

18   what happened on this side, which is so frustrating:  I'm

19   going home.

20       MATC [COL WELLS]:  Yes, sir.

21       MJ [Col SPATH]:  So what are you all doing?

22       MATC [COL WELLS]:  Yes, sir.  What the response to that

23   would be, number one, always the interest of the accused to

1    have proper counsel.  The court must remain neutral, detached,

2    and objective.  I think that you are on pace with everything

3    that you've done to make the appropriate inquiries and put in

4    place the appropriate mechanisms to request voluntary

5    compliance by civilian counsel and learned counsel.

6            And as you do that, new information comes out.  For

7    example, in the filings from Ms. Eliades and Ms. Spears, they

8    present their agreement of responsibilities, which indicates

9    pretty shocking and appalling mismanagement by the MCDO chain

10   of command by not having them obligated with two essential

11   requirements to appear in front of this court, is to comply

12   with rules, regulations, and with orders and directives from

13   this commission as to the conduct of proceedings.

14           So with that, I think it's dawning on us since last

15   Friday in that filing that supervisors, Mr. Koffsky, perhaps

16   the Navy JAG, and others, should take a closer look, as the

17   prosecution is interested in getting to the evidence of the

18   case.  We have an obligation for the family members and the

19   victims, and for justice.  We have an obligation to make sure

20   that the accused has proper counsel that's required under the

21   law.  So we should not rush to judgment.  We should proceed at

22   the proper pace.

23           And we also know that the individuals involved, the

1   learned counsel and the two civilian counsel, have options to

2   pursue collaterally, which they've indicated that they would.

3   There are other options that this commission has, considering

4   their failure to respond to the subpoena.  I know the chief

5   prosecutor and the trial counsel in our matter will have a

6   discussion with the convening authority's office and, if need

7   be, to the Office of General Counsel to talk to the next

8   higher superior.

9          So all of these are going forward to implement the

10  commission's instructions and directives.  But there seems to

11  be a fundamental defect in the Military Commission Defense

12  Organization that they believe they do not have to follow the

13  orders.  General Baker spoke in front of this commission and

14  said, "I am not an enforcement mechanism," but clearly the

15  rules and regulations place that on the whole organization and

16  its members, including the chief defense counsel.

17         But here you have a writing now in 2015, as early as

18  that, that General Baker should have reviewed, and it clearly

19  neglects to include that provision.  So I think we have some

20  professional mismanagement, and inquiry is appropriate.

21         Sir, that's all I can say at this point.

22  MJ [Col SPATH]:  Well, I think they're important

23  inquiries, because I think we all know if we don't resolve

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   these issues this time, even if we get another -- another --

2   because the other learned counsel is still detailed to this

3   case, based on my rulings and the lack of any other court

4   saying differently, it seems obvious.

5          But when we get another learned counsel, we all know

6   what can happen six, seven, eight months in, middle of trial,

7   day before trial starts, we do this again.  And we sit around

8   and we talk about how we are -- you know, defense counsel is

9   looking into other options.  How long are we going to look?

10  This case has been pending for years.

11         And so as I've said, we are moving forward.  If I

12  were the defense community, I would resource the team.  If I

13  were the defense community, I would recognize my obligations.

14      MATC [COL WELLS]:  Sir ----

15      MJ [Col SPATH]:  But I have to stay in my lane, too.  How

16  much can I order it?  I ordered detailed counsel to make an

17  appearance, and you saw what happened.  They undetailed

18  them ----

19      MATC [COL WELLS]:  Yes, sir.

20      MJ [Col SPATH]:  ---- without consulting learned counsel.

21      MATC [COL WELLS]:  Well, yes, sir, and I think that's

22  their choice.

23      MJ [Col SPATH]:  And in a federal filing -- looking at it,

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    I forgot -- in a federal filing, the defense community told a

2    federal judge, We can have learned counsel assigned to the

3    case in 30 days.  That's in a federal filing to a federal

4    district judge.  We're 120 days out.  I wonder if they've gone

5    back and amended the filing to let the judge know, well, when

6    we said 30, we meant probably a year because that's since, of

7    course, come to pass.

8        MATC [COL WELLS]:  Sir, we will look at that point.

9        MJ [Col SPATH]:  There are many out there.  Again, I can't

10   refer a case to DoJ.  If I could, I would, because walking

11   away from your representational responsibilities wholesale,

12   after being paid the kind of money that somebody was paid,

13   seems to me to be something I'd look into.  But again, I can't

14   refer a case.  I work really hard to stay in my lane.

15       MATC [COL WELLS]:  Yes, sir.  I think at this point the

16   commission is still in a fact-finding mode, requesting the

17   three counsel to show cause on the record and have a

18   discussion.  Some of their bases for withdrawal may be

19   incorrect.

20           You've already heard testimony from Professor

21   Yaroshefsky that she was not advised that there was an

22   outstanding ruling or request from the defense to use the

23   courtroom or other parts of the ELC to conduct attorney-client

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   meetings.  It seems that that was pivotal and material,

2   because she said he had no further options based on the

3   information presented to her.  But if she had had knowledge of

4   that other option, she might not have walked down the analysis

5   of a mandatory withdrawal, but a voluntary withdrawal.

6         At the end of the day, though, if you disagree with

7   commission rulings and you do have an ethical conflict, the

8   rules do say if the commission issues an order that you are

9   retained, then you are retained; and there's strong case law

10  that provides the attorneys protections against claims of

11  unethical conduct in that circumstance.

12        So we are doing everything we can first and foremost

13  to save the learned counsel and the DoD civilian counsel from

14  an adverse finding of fact that they've walked away and

15  abandoned their client.  So the prosecution would suggest

16  we're still in that process, sir.  And ultimately, I believe

17  if they will not participate, you will be bound to make

18  specific findings of fact as to their conduct before this

19  commission.

20        We have made a filing suggesting that there's ways to

21  disqualify them and bar them from further proceeding here, and

22  that would be adverse.  And we've suggested that in that case,

23  to preserve objectivity, you would refer that to the chief

1  judge.  I don't think we're there at that point yet; that's

2  just a procedural suggestion.  You're still doing

3  fact-finding.  After all, nobody knows this case better than

4  the attorney who has served Mr. Nashiri for eight years,

5  Mr. Kammen, going forward.

6       So while we pause to have MCDO explore their ability

7  to create dysfunction in the commission by their conduct, you

8  should maintain the course that you're doing right now and

9  make the appropriate inquiries of both the defense and the

10 government and the prosecution pointedly and directly, and we

11 will respond to them, sir.

12 MJ [Col SPATH]:  Just a couple points.  Just for the

13 withdrawal in this case, I just want to be clear that I have

14 made more than one factual finding:  Not only was there not a

15 basis for withdrawal in this case, but that there was no

16 intrusion into attorney-client conversations in this case.

17 That's not a conversation on any other case pending down here.

18 I have no idea.  I don't care, frankly.

19      In this case, having access to everything, classified

20 and unclassified, I've made a finding that there's no

21 intrusion.  Now, fake news.  If you don't want to listen, I

22 can't help, right?  I mean, I can only say it.  If you don't

23 believe findings of fact from a court and you think I'm part

1  of the -- part of the effort, well, I can't fix that.  But

2  I've made those findings.  They're clear.

3        So I think my question -- yes, there are some

4  mechanisms for me.  But again, I'm trying to maintain my own

5  impartial and neutral and objective behavior.  And if I --

6  clearly, if -- you've seen me withhold moving into contempt

7  proceedings with the civilians, DoD, and the learned counsel.

8  And I think and it's obvious why I am doing that, because that

9  will cause a conflict likely with their client and a conflict

10  between -- a perceived conflict between the bench and those

11  counsel, and that can lead to recusal.

12        There's federal case law about judges who engage in

13  contempt proceedings, about lawyers appearing in front of them

14  in the middle of the trial, even if there's not the actual,

15  right, lack of fairness from the judge, the public may

16  perceive, because it's adversarial.  And so you're right,

17  that's why I'm really trying to walk slowly through the

18  process.  But it's also why there's some responsibility on

19  your side to be taking whatever actions you believe are

20  appropriate to make this move.

21        Because I agree, slow, steady, working through this

22  process makes sense.  But I know that if I am the public or a

23  family member or an alleged victim, or, frankly, the accused,

1  we've had slow, steady progress for a long time.

2      MATC [COL WELLS]:  Yes, sir.

3      MJ [Col SPATH]:  And so there's always going to be

4  appropriate progress, but we need to continue to make

5  progress, because that is important to the administration of

6  justice.  It is.

7          And the only other point I make is for

8  Ms. Yaroshefsky, I haven't finished some findings of fact I'm

9  going to make, but she did testify that even if the facts were

10  different, her opinions, frankly, were her opinions and she

11  may not have changed it, for what it's worth.

12      MATC [COL WELLS]:  Yes, sir.

13      MJ [Col SPATH]:  It's interesting testimony.

14      MATC [COL WELLS]:  From the prosecution's perspective, we

15  believe we're still at the process and procedure to explore

16  good cause on the record for withdrawal, whether it's

17  mandatory or voluntary.  Contempt proceedings or disbarment

18  from the commission is not really before you at this point.

19      MJ [Col SPATH]:  Not yet.

20      MATC [COL WELLS]:  We -- we -- there could be explanations

21  from counsel as to their belief and their good faith belief.

22  Could be some misunderstanding from Ms. Eliades and

23  Ms. Spears.  If they signed the agreement that was presented

1   to them by the chief defense counsel or others in there, then

2   they have a right to rely on that.  But you would also think

3   that they would read the rules and the regulations and the

4   preamble to the Model Rules of Ethical and Professional

5   Conduct, which say that you do comply with the commission's

6   rulings.  It does ----

7       MJ [Col SPATH]:  It's Rule 1.16(d) in both of their

8   jurisdictions, Indiana and Illinois, in mine, I think probably

9   in all of ours, frankly, but the ones that matter, the same

10  rule.

11      MATC [COL WELLS]:  Sir, and so the underlying matter about

12  their problem with a meeting place to exchange confidential

13  information here at Guantanamo and the chief defense counsel's

14  letter that they seem to rely on, you know, the answer to that

15  with Ms. Yaroshefsky is, did not know that they had requested

16  for another location, said that it exhausted.

17          But the answer to that would be:  Your Honor, we

18  cannot meet at the location that the Joint Task Force has

19  provided us.  We cannot exchange information with our client

20  in that environment.  We need your assistance to help

21  otherwise.

22          And you have authority, which could include to the

23  government:  I am not going forward.  We are abating these

1  proceedings until that is fixed, which could -- is an option

2  for you.  I'm not suggesting that that would be appropriate in

3  that circumstance at this point.

4         I do believe that the location for attorney-client

5  meetings has been changed in JTF, and the commander has

6  designated a new location, which I believe that Lieutenant

7  Piette and his client have used and met.  It's in addition to

8  the option at AV-34, so there's another location.  So that

9  underlying problem seems to have been resolved.

10     MJ [Col SPATH]:  If there was -- well, let me make sure,

11 because my understanding is the underlying problem was more of

12 a perception of concern.  If you all have any evidence of

13 intrusions into attorney-client meetings that have occurred,

14 I'm confident, as officers of the court, you'd be

15 communicating that to me.

16     MATC [COL WELLS]:  Sir, absolutely.

17     MJ [Col SPATH]:  Okay.

18     MATC [COL WELLS]:  My comments are as to the problem as

19 the defense has articulated in their latest filing from

20 Ms. Eliades and Spears, it was their perception of ----

21     MJ [Col SPATH]:  I just want to make sure we're clear.  I

22 know you all know your obligations, like the defense

23 community.  If you all are aware ----

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MATC [COL WELLS]:  Yes, sir.

2    MJ [Col SPATH]:  ---- of intrusions into attorney-client

3    matters, and especially any intrusions you are aware of or

4    received, you would let me know.

5    MATC [COL WELLS]:  Sir, absolutely.  The -- we need the

6    counsel here to converse with you and discuss all issues.

7         Sir, that's all we have.

8    MJ [Col SPATH]:  All right.  Thank you.

9    MATC [COL WELLS]:  Thank you.

10   MJ [Col SPATH]:  Lieutenant Piette, I've just got a couple

11   questions, if you don't mind.  Mine has to do with just

12   training.  I know self-help leads, again, people who don't

13   take the time to understand the proceedings to chuckle and

14   think that's funny.  I don't think it's funny.

15        Self-help, of course, in the case law, as opposed to

16   just some whim where I've made up the words, has to do with a

17   lawyer who is in an untenable position, whether they like it

18   or not, working to take care of the issues at hand.  And

19   again, the public -- I suggest it all the time, I take the

20   time to actually read the cases that are relevant before I

21   comment on them, but that won't happen.

22        So have you made any efforts to go to training?

23   DDC [LT PIETTE]:  Yes, Your Honor.  As you know, I have an

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  ethical obligation to do that, and it's just a moral

2  obligation as well, so yes.  This court can expect, probably

3  before the next hearings, to have a motion regarding that,

4  since some of the trainings conflict with some of our

5  scheduled times, absolutely.

6      MJ [Col SPATH]:  And that's what I was going to recommend

7  to you.  I am amenable, as you continue to get ready -- I

8  recognize you don't agree with it, but you seem to

9  recognize -- agree or not, we seem to be moving forward.

10          So if there are courses -- so I went out and looked.

11  I know there's the Fundamentals of Federal Capital Defense

12  Practice in Atlanta April 30th to May 2nd.  National Capital

13  Voir Dire Training in Boulder in May.  So there's a whole host

14  of them.

15          So what I offer to you is -- you might not agree with

16  the comment, but if MCDO is just not going to resource you and

17  leave you to work with your mitigation specialist and your

18  paralegal and nobody else, or whatever other experts you have,

19  I'm amenable to taking off some time for training.  So I know

20  you'll let us know what courses and things those would be.

21          Without -- without telling me any conversations -- I

22  know you know that -- have you reached out to Mr. Kammen or

23  Ms. Eliades to receive assistance from them?  And I pick

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    Ms. Eliades particularly because she appears to be capitally

2    qualified.  So have you reached out to Mr. Kammen or

3    Ms. Eliades particularly to receive assistance in this case

4    turnover to you?

5         DDC [LT PIETTE]:  Yes, Your Honor, they've been available

6    for turnover.

7         MJ [Col SPATH]:  Okay.  And I'm not going to ask.  I would

8    suggest communicating with MCDO.  Maybe you are.  But they

9    seem to have a lot of lawyers.  I know al Hadi has quite a few

10   who have managed to come down here on island.

11        So if you want more help, even outside the courtroom,

12   the resources exist, and that organization has the resourcing

13   requirement for you.  So just -- I would take advantage of it.

14        DDC [LT PIETTE]:  Yes, Your Honor.  And I can speak to

15   that briefly, because it seems a lot of what's on the record

16   about resourcing and how we use it on the al Nashiri defense

17   team is just a lot of speculation.

18        As Colonel Aaron said, he's made resources available,

19   and resources are available, so -- and we are utilizing those

20   resources; however, there's a difference between using even

21   other counsel as resources and having them detailed.  The --

22   and frankly, because of the way things are right now,

23   essentially I am acting or de facto team lead, so nobody gets

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  detailed or undetailed without kind of my say-so right now.

2       And the response of undetailing the attorneys, to

3  your order, while it's been portrayed as kind of a strategic

4  decision because it -- to some people, I guess think it maybe

5  looks better to have me sitting here alone as some sort of

6  strategy, when, in fact, it might look better to have four

7  military attorneys in the uniforms of three different

8  services, all of them standing behind the position that we

9  cannot take a position until we have learned counsel.  If

10  anything, that would look better.

11       So the -- this isn't a strategic decision.  I think

12  no attorney, no lawyer would trade the presumption of

13  innocence for the standard of review in post-conviction for

14  nothing more than the appearance of unfairness.  That's

15  absurd.  So the response of undetailing those attorneys was,

16  rather than getting into sort of a sideshow issue about

17  whether or not you can order them to appear in court, it was

18  easier to just undetail them and avoid that.

19       But we still do have the resources, and no attorneys

20  who are not capitally qualified are going to be detailed until

21  we have somebody actually on the case, not just on turnover,

22  but actually on the case who can advise and assist

23  Mr. al Nashiri, as is statutorily required from a learned

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  counsel perspective.

2      MJ [Col SPATH]:  Again, I've ruled on that.  And I've

3  ruled -- first, there are jurisdictions that disagree with

4  you, you know that.

5      DDC [LT PIETTE]:  Uh-huh.

6      MJ [Col SPATH]:  Flat out.  There are jurisdictions that

7  frankly do not buy into this ABA requirement -- a policy

8  group -- this ABA requirement -- and it's not even a

9  requirement, a guideline of capitally qualified counsel.

10  There are jurisdictions who believe that is not helpful for a

11  variety of reasons, many of them political, frankly, and you

12  know that.

13       Here I have told you I don't read the statute the way

14  you do.  I read it the way it's written.  But most

15  importantly, I've ruled on it.  So you're making your decision

16  in the face of a ruling that has yet to have any success by

17  any appellate court telling me I've read it wrong or I've

18  implemented it wrong.

19       And what I have said to you is we're going forward,

20  and we're going forward right now with evidentiary matters

21  that any trial lawyer understands because it's real evidence.

22  At some point that's going to change, as you can tell by my

23  scheduling order.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1      And so in the face of that, you continue to opt to

2  hang your hat on capitally qualified learned counsel are

3  required; and I've told you they're not.  And so that's why,

4  yes, it appears strategic, because I've already ruled on it.

5  If you disagree, get some help and go get a stay.  Get some

6  help and get a writ filed.  Get some help and get an appellate

7  judge to step in.

8      So far those efforts seem to have met with silence --

9  seem to have been met with silence, and that's why I believe

10  your decision is, one, strategic -- and again, that's a

11  finding, and I'm going to continue to make it; and two, it's

12  in the face of a ruling adverse to you.  So if you don't -- if

13  you don't want more assistance in the courtroom, that -- and

14  you believe that's your decision as lead counsel, okay.

15      All right.  Well, we've certainly talked about this

16  enough.  We've gone an hour without a witness, so we're going

17  to get to that next.

18      Trial Counsel, let me just ask government one other

19  thing.  We had to deal with the declassification, to the

20  extent possible, of the issue surrounding this alleged

21  intrusion.  Are we working to declassify this information with

22  the appropriate authorities?

23  MATC [COL WELLS]:  Your Honor, we are.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  Okay.

2    MATC [COL WELLS]:  We're in discussions with them.  I

3  would say that this depends on the specific facts and that you

4  would find -- we would like an opportunity at the appropriate

5  stage to make suggested findings of fact to the commission.

6         I would, as I stand here at the podium, suggest that

7  perhaps the classified information that's been alluded to is a

8  red herring because there is no intrusion.  You found it.  You

9  reviewed everything that affects this accused in the location

10  that the command had designated for him to have

11  attorney-client meetings.

12         To the extent that the defense objects to that, the

13  command has responded and provided them a new location that

14  may be to their liking.

15    MJ [Col SPATH]:  No, I understand.  But again, part of

16  this is in this spirit of full disclosure, right, the openness

17  of the process.  My hope is, again, to the -- first off, the

18  government has a duty anyway, right, to the extent possible,

19  declassify information.

20    MATC [COL WELLS]:  That can be used at trial or the

21  commission.

22    MJ [Col SPATH]:  Here I'm looking in relation to this

23  issue ----

1    MATC [COL WELLS]:  Yes, sir.

2    MJ [Col SPATH]:  ---- for the public, more is better ----

3    MATC [COL WELLS]:  Sir ----

4    MJ [Col SPATH]:  ---- on this specific issue.

5    MATC [COL WELLS]:  Understood.  As you know, the chief

6    matter that arose related to another detainee and another

7    location that did not involve the command designation, and it

8    was nested in the AE 369 series with Mr. al Darbi.  And so the

9    prosecution's view is that this issue was raised in that

10   series by the defense to avoid the cross-examination of

11   Mr. al Darbi and have to confront him while he is still

12   available and he isn't serving the rest of his sentence with

13   the Kingdom of Saudi Arabia.

14        So he is available for that purpose ----

15   MJ [Col SPATH]:  You've already -- you already got to my

16   last note that I had to ask:  Is Mr. al Darbi still here and

17   available for cross-examination?

18   MATC [COL WELLS]:  Yes, sir.

19   MJ [Col SPATH]:  Lieutenant Piette, if you decide you want

20   to engage in any cross-examination this week, just need to let

21   us know.

22   DDC [LT PIETTE]:  Understood, Your Honor.

23   MATC [COL WELLS]:  Sir, nothing further.

[Tr. 11718 - 11720]

1  representation of their client.  And it causes problems with

2  the representation of their client that then probably lead to

3  good cause and conflict.

4        As adverse things happen when people are arrested

5  typically, or apprehended, or transported to testify, adverse

6  things happen to your security clearance, adverse things

7  should happen to your employment.  Those aren't helpful if

8  we're trying to maintain a relationship.

9        But, on the other hand, if the intent is never to

10  help and never to come back, well, then, the answer is that

11  that's not one of the concerns, right?  It's doing the right

12  thing for the commission.  So we'll talk through it.

13  MATC [COL WELLS]:  Sir?

14  MJ [Col SPATH]:  More soon.  We've got witnesses, we're

15  going to deal with those, and then we'll have some more

16  conversation about this today.

17  MATC [COL WELLS]:  Yes, sir.  And just to depart on this,

18  we will continue to pursue the supervisory chain.  At one time

19  you had the inclination to request Mr. Koffsky ----

20  MJ [Col SPATH]:  More than inclination, that I want to

21  hear from him.  He, too, doesn't want to just show up.  We

22  want to go through this process of send me your questions.

23  Well, we don't really want to send you questions; that's not

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  how it works.  There are lots of reasons I shouldn't have to

2  do this.  Well, okay.

3       This behavior by the civilians makes his testimony

4  even more relevant than it was before, when I already thought

5  it was relevant.  And if there's intransigence there, who's

6  next?  And who's going to show up?  Or are we just down here

7  truly on an island with nobody willing to come speak to this,

8  deal with it, and assist?

9       So you can tell right now I'm a little frustrated.

10  And so, because judges are human, I'm going to take a deep

11  breath, listen to the testimony that we had planned for today,

12  ponder kind of what the options are as we move forward, and

13  have some discussions about that.  There will not be any

14  rulings from the bench on this issue today, because I want to

15  reflect, and reflect in the right state of mind.  I find that

16  helpful all the time.

17       So why don't we get to those witnesses and we'll move

18  forward.  Trial Counsel.

19      TC [MR. MILLER]:  Thank you, Your Honor.  The government

20  calls Jeff Miller.

21      MJ [Col SPATH]:  And while we await Mr. Miller --

22  Mr. Miller, let me ask you a question.  Yesterday, maybe I

23  misunderstood you or -- were you saying we weren't going to be

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  finished by the end of Friday, or you were saying we're

2  probably not going to need Friday for witnesses?

3      TC [MR. MILLER]:  Probably not going to need Friday.

4      MJ [Col SPATH]:  Okay.  That helps just with some options

5  on Friday with some of these other issues that are kind of

6  swirling around us.  I misunderstood you or we weren't clear,

7  but got it.

8      TC [MR. MILLER]:  Sir, if you would step forward to the

9  jury box, remain standing.  Would you raise your right hand,

10  sir, please.

11  **JEFFREY R. MILLER, civilian, was called as a witness for the**

12  **prosecution, was sworn, and testified as follows:**

13                     DIRECT EXAMINATION

14  **Questions by the Trial Counsel [MR. MILLER]:**

15      Q.  Please be seated and, if you would, please, state

16  your name for the record.

17      A.  Jeffrey R. Miller.

18      Q.  And I believe you have testified at least two times

19  here before the commission; is that correct?

20      A.  Yes, sir.

21      Q.  And you are a special agent with the Federal Bureau

22  of Investigation?

23      A.  I am.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 11909 - 11912]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  Regarding materiality, that's for me,

2    frankly.  I've said they've not been excused.  And in order

3    for me to determine if good cause exists, I have to hear from

4    them, because they've provided little.  What I have is a

5    statement from Yaroshefsky addressed to Mr. Kammen; doesn't

6    even talk about them.

7        I have a statement from General Baker, pretty minimal

8    in facts, as to why he excused three counsel.  And frankly, if

9    General Baker is to be believed, you could excuse the defense

10   counsel who's sitting here by his same analysis, and he's

11   still sitting here, which tends to undermine that.  So of

12   course they're material.

13       So I can understand, is Lieutenant Piette different

14   somehow?  Or we've just left him here?  Making it much more

15   strategic and much more visible that we've under-resourced the

16   defense team.  So of course they're material.  So it looks to

17   me like so far we've complied.

18       The witness clearly refused, through counsel, because

19   I saw the e-mail.  And the Attorney Fox said they're not

20   showing.  And I assume he can speak for them since he's their

21   attorney.  And so I can't see a valid excuse.  Again, the

22   e-mail that I was shown said I lack jurisdiction; I don't.

23   And that the -- having to appear at the Mark Center by VTC for

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  DoD civilians employed in D.C. would be oppressive, with no

2  evidence to the contrary.

3        So what I would like is some homework overnight.

4  Would you at least craft the two writs.  Because I'm going to

5  issue warrants of attachment -- I plan to do it tomorrow -- to

6  have them brought sometime on Thursday or Friday.

7        Also -- again, I don't know yet.  I really do mean

8  I'm going to pause overnight to take some time to work through

9  the different options and to make sure that I am proceeding in

10  a manner that is judicious and fair, and not based on any

11  frustration, because sometimes it is easy to feel some

12  frustration, and I find it's best to take a pause.

13        But inquire into Mr. Koffsky's availability this

14  week.  We've discussed it with him.  We've given some warning

15  to him.  For him -- if you all can work it out that there's

16  VTC capability in the Pentagon that satisfies the crowd here,

17  he doesn't even have to go to the Mark Center.  And I'm pretty

18  confident there is.  But what we need are:  What are his

19  windows of availability?  Or do we also need to also subpoena

20  him?  In which case we'll go through the process.

21        But first I need to know is -- I know he wants

22  interrogatories.  I know he wants us to send the questions.

23  That's not going to happen.  I want to know what he's doing to

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  assist in getting these witnesses here; what he's doing to

2  assist in resourcing this team; does he know what's going on;

3  what does he believe his role is; and what's he doing about

4  the clear evidence of misconduct in all of these cases?

5  That's -- I mean, I think we all know what I want to talk to

6  him about.  It should be easy, frankly, for -- if he's

7  engaging with legal counsel, for them to help him in the areas

8  that I have questions about.

9         And as always, I take privilege seriously.  If he's

10  concerned about privilege, just tell me in answer to -- just

11  pause before you answer the question and we'll work through

12  it.  I'm not ordering him to appear yet.  What I want to know

13  is if I order his appearance, is he available any time

14  tomorrow or Thursday or Friday, or are we going to have to go

15  down this road of subpoenas?

16         So if you could give me some updates on that

17  tomorrow, and again, if you guys could draft like you did last

18  time we went through this, I would sure appreciate drafts for

19  the warrants so we can issue the writs.

20      MATC [COL WELLS]:  One moment, sir.

21      MJ [Col SPATH]:  Please.

22  **[Pause.]**

23      MATC [COL WELLS]:  All right, sir.  I just conferred with

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  co-counsel to make sure that I understood your intent and your

2  directions.  And we also discussed to make sure that we filed

3  with the court and with the defense the necessary paperwork

4  that supports the questioning you just had of me of whether or

5  not the warrant was properly issued and all other instructions

6  and fees were tendered.  We understand that, sir, and we will

7  move forward.

8     MJ [Col SPATH]:  All right.  The other -- because I'm

9  certainly not communicating with any of these people.  I want

10  to make sure that we have communicated clearly to their

11  attorneys and them, I denied their motion to quash.  I said it

12  in here.  I heard myself say it.  I double checked.  I was

13  pretty clear.

14        But separate from that I issued a scheduling order

15  telling them to be here after we had gone through one round of

16  briefing, which reasonably you can read that I denied their

17  motion to quash.  But then I remember on Monday -- I didn't

18  remember.  I read the record again.  I know I said on Monday.

19  It's denied, and I rejected the second set of filings ----

20     MATC [COL WELLS]:  Yes, sir.

21     MJ [Col SPATH]:  ---- because I've already given them a

22  briefing cycle.  So did you communicate that clearly to their

23  attorney?  And I hope you did, and do it again.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 11924 -11925]

1   point.  Sunday the weather looks better.  But that affects

2   everybody who has travel plans on Saturday, and I know that.

3   So no decisions.  Just -- it came to me as I was working

4   through it.

5           This next part, I want to talk through.  I pulled up

6   my notes.  It's some frustration over -- it's not frustration.

7   It's just -- it's a lack of clarity from people who talk about

8   this process, and I think it's important to be clear as we

9   work through these difficult decisions that are affecting this

10  commission.

11          Not that anyone cares about my reading habits, but I

12  do professional reading typically in the evening a couple days

13  a week.  Makes sense to me.

14          And yes, I use CAAFlog.  I don't read the comments

15  and I tend not to read the analysis; I don't need their help,

16  because some people suggest it has a bias.  But what I

17  appreciate about them is they tell me what cases have been

18  decided, what cases are of interest.  And then I can click on

19  those links and go right to the case and I can read the case

20  law, right, from CAAF or from AFCCA, or from the Supreme

21  Court, and I can keep track of even cases that are affecting

22  us.  Seems like a reasonable one-stop shopping mechanism.

23          So I was a little surprised last night when I opened

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  it to find this case making their -- the top of the banner,

2  and noticed very quickly that it said that I had ordered, or

3  was going to order today, writs be issued against civilians to

4  be dragged to GTMO.  Imagine my surprise.  Fortunately, there

5  was a link to figure out where in the wide, wide world of

6  sports is that coming from.

7         And it's coming from a reporter who we brought down

8  here and we bring down here willingly, and you know, put up,

9  who got it wrong.  I said very clearly yesterday I want draft

10 writs so I have options as I figure out what to do, and I

11 hadn't made a decision yet.  I don't know if I could have been

12 more clear.

13        So I'll say it again, I said yesterday I haven't

14 decided yet to issue any writs.  If they're issued, they're

15 not being brought to GTMO.  Anybody paying attention to this

16 process knows that, right?

17        In the case of the two civilians, they're going to be

18 brought -- get this -- from where they work in D.C. or in the

19 D.C. area to another building in the D.C. area for a VTC.  To

20 figure that out you just have to read the rules, that's it,

21 and report correctly.

22        Again, you don't have to; I have no control.  But

23 it's just always remarkable to me that words matter and

[Tr. 12285 - 12287]

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   replete with me stating that they have abandoned their client

2   and they have refused orders, now refused a subpoena, refused

3   to resource, undetailed -- Mr. Koffsky didn't know the timing

4   of that, right? -- undetailed detailed defense counsel as soon

5   as I said they should make an appearance or would make an

6   appearance.

7       MATC [COL WELLS]:  Sir, I would suggest this:  I'm not

8   sure when he actually undetailed them.  I'm not sure the

9   pointed question to Colonel Aaron was asked.

10      MJ [Col SPATH]:  It was asked.  He was very -- he was very

11  up front when he talked to me last time.  I asked him, "Did

12  you undetail them after I gave you -- or that order came out?"

13  And he said, "Yes."

14      MATC [COL WELLS]:  I missed that point, but you ----

15      MJ [Col SPATH]:  He was very clear.

16      MATC [COL WELLS]:  Sir, I would suggest that the

17  commission has important power still to implement,

18  fact-finding to do.  It seems that it has been exhausted with

19  Mr. Koffsky, exhausted with Colonel Aaron, perhaps exhausted

20  with the two employees.  There are other options that relate

21  to writ of attachment.  You said that you were going to

22  cautiously consider those.  I'm not suggesting that that's

23  appropriate in this circumstance.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    MJ [Col SPATH]:  That's right.  And I -- I thought I was

2  very clear, right?  Apparently there is a lot of confusion

3  about "I'm going to think about it overnight."

4    MATC [COL WELLS]:  Correct, sir.

5    MJ [Col SPATH]:  And now that I've had a chance to listen

6  to audio, I actually know what I said, which is, of course,

7  what I think you all heard, "if I issue the subpoenas," but

8  can't listen to audio because we don't put the audio out

9  there.

10      But, most importantly, I'm going to think about it

11  overnight.  And I am pausing on issuing those writs, because I

12  have every belief that they are enforceable.  I think there's

13  no doubt you all can get the marshals, we can get the

14  civilians, we can make them travel all of 10 miles, right, in

15  this oppressive world to the Mark Center, testify, refuse to

16  testify, do whatever it is they're going to do.  We could do

17  that.  That guarantees a conflict with their client -- it

18  does -- because of the adverse, right, responses to people who

19  have to be apprehended because they avoid showing up for

20  court.  It has adverse consequences to them.  It relates to

21  the representation of this client.

22      So if I'm them, of course, what do you do?  You turn

23  around and go, well, there's good cause.  I mean, there's good

1  cause.  If nothing else, this has become a different kind of

2  relationship with our client.  And that's why I have paused on

3  issuing those writs.  Because can I blow it up and get rid of

4  them?  Yes.  But is that the right answer when they have an

5  attorney-client relationship with a person nobody's bothered

6  to get any input from, except for me ----

7        MATC [COL WELLS]:  Yes, sir.

8        MJ [Col SPATH]:  ---- that has been presented to me about

9  what does he want in all this.  Does he want Mr. Kammen back?

10        And this -- this belief that he doesn't know what the

11  issue is -- he was in here for Ms. Yaroshefsky's testimony.

12  He's been in here for multiple discussions, when he chooses to

13  come, about what the underlying issue is.  He knows it has to

14  do with intrusions into attorney-client discussions.  He knows

15  that.  So this belief that he hasn't been informed is wrong,

16  and we all know that.

17        MATC [COL WELLS]:  He's in the hands of his attorneys,

18  sir.

19        MJ [Col SPATH]:  And where is his input?  Does he want

20  Ms. Eliades released?  Does he want Ms. Spears released?  You

21  heard his answers, I can't make them come here.  Well, that's

22  self-evident.

23        MATC [COL WELLS]:  I think important findings would be

[Tr. 12343 - 12345]

1      The only reasonable explanation is Lieutenant Piette

2   said he remained on the case in order to continue to represent

3   his client and that his client had some representation.  He

4   made a choice according to what he has said in here.

5      General Baker also left every other defense team

6   across the commissions intact, which indicates to me none of

7   them have asked for a release, based on all of this

8   information.  What this shows me is it's more information that

9   General Baker, Mr. Kammen, and the two DoD learned counsel's

10  actions are both arbitrary and purposeful.  They are directed

11  at stopping or mortally harming these proceedings.

12      This commission continues to find, as supported by

13  significant evidence, this course of conduct shows a

14  strategic, concerted effort by the Military Commissions

15  Defense Office, which is different than Lieutenant Piette, a

16  strategic course of conduct by the Military Commissions

17  Defense Office to undermine the commissions process and

18  attempt to halt the only commissions case entering the

19  evidence pretrial admissions stage -- capital commissions case

20  entering the pretrial admissions stage.

21      All of this has occurred, also, as the commission was

22  approaching the deposition cross-examination for Mr. al Darbi

23  who, according to the defense, is the only eyewitness and most

1  critical government witness, after months of preparation time

2  provided at defense request to prepare that cross-examination,

3  and delays at defense request to prepare that

4  cross-examination.

5          This decision was also made very soon after the

6  commission issued what some have called an aggressive 2018

7  calendar year schedule, with significant time to be spent here

8  at Guantanamo Bay, to which learned counsel immediately

9  expressed tremendous reservation, despite an employment

10  contract that indicates he has to comply by those schedules.

11          After multiple refusals to appear by learned counsel

12  and DoD civilian counsel, the commission ordered all other

13  detailed counsel who had yet to make an appearance to do so at

14  the next scheduled commission proceedings.  That would have

15  been January 2018.  Immediately after that order the acting

16  chief defense counsel for this case released all those counsel

17  from representing the accused.  Of note, when he testified, he

18  did mistakenly identify how many counsel were released;

19  Lieutenant Piette properly pointed out actually three were

20  released, not the two military counsel, leaving the accused

21  with a single detailed defense counsel.  Of note, it's the

22  least experienced.  If you go look at the three who were

23  detailed, compare them to Lieutenant Piette, as much as I

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  appreciate Lieutenant Piette and have empathy, those three

2  have more experience, and MCDO released them rather than have

3  them make an appearance.

4        As we learned this week, the detailed defense counsel

5  was comfortable in taking part in that decision regarding the

6  release of additional counsel and determining this was the

7  right course of action in a capital case, although he will not

8  take any other action in this capital case, for the most part.

9  His explanation was better one attorney saying nothing in

10 court than more than one just doing the same.  But what that

11 ignores is each defense counsel's independent duty to advocate

12 and represent for their client zealously.

13       What it does is it shows a coordinated plan on behalf

14 of the defense community to not defend their client in court

15 when given the opportunity to do so.  It shows a refusal to

16 acknowledge a ruling by the commission that at the time we're

17 going to move forward with pretrial admission of real

18 evidence.

19       As I said multiple times, I believe the way the

20 statute is written and it is to be applied here, defense

21 counsel -- or the accused, rather, is entitled to learned

22 counsel to the greatest extent practicable, and that learned

23 counsel is not practicable in this proceeding at this time.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

[Tr. 12363 - 12377]

1    MJ [Col SPATH]:  All right.  I do find the absence is

2  voluntary and knowing.  There's the form that is read and then

3  signed, so there's certainly an acknowledgment of the rights.

4  And there's nothing written on this one, unlike the one we saw

5  on Monday, which was a little different for the first time,

6  about the mode of transportation.

7        I do believe the mode of transportation likely

8  factors into a voluntary, knowing decision to absent yourself

9  from the commissions.  I would encourage, to the extent

10  possible, after all of this, to file pleadings to deal with

11  that.  That's the right road ahead as we try to figure out

12  what to do -- to do with this.

13        I don't have a lot to say.  One is in relation to

14  this alleged intrusion issue.  I mentioned yesterday that --

15  in the morning, that after I had made the best effort I could

16  to shed some sunlight on what is classified, both sides

17  approached my CISO to see if he would assist, because it was

18  my CISO who went to work with the OCAs to get things, to the

19  extent possible, reviewed, so I could read them to the public,

20  because the public has an interest in this.  That was my goal.

21        And as I said yesterday when both sides approached my

22  CISO and said can you help, of course he called me and said,

23  "Is this something I can do?"  And I said, "Please, to the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  extent you can, assist."

2          In the theme I have said, I think, for four years, no

3  good deed goes unpunished.  The defense gave him some things

4  to see if he could get declassified.  The government objected

5  to it last night and said, "That's not the full story.

6  Lieutenant Piette needs to submit more."

7          I'm out.  We're out of the business.  My CISO is not

8  helping.  So the defense counsel, unfortunately, you're going

9  to have to work through the government in the normal process

10  of declassification, and you all can get things declassified.

11  I've asked you for five months, I'm asking you again, to the

12  extent possible, declassify matters surrounding the alleged

13  intrusion.

14          I keep getting asked what.  I would declassify all of

15  it.  That's what.  I keep saying it.  So I'll say it again.

16  But we're out of the business.  The e-mail back from the

17  government had to do with we're objecting to the process.

18  There's no process.  It was a favor.  And so now it's not a

19  favor.  My CISO is not doing it.  So work through the process.

20  Good luck.  Because in five months nothing got declassified.

21          And here we are.  Over the last five months -- yes,

22  my frustration with the defense has been apparent.  I said it

23  yesterday and I'll continue to say it.  I believe it's

1   demonstrated lawlessness on their side; they don't follow

2   orders; they don't follow direction; they don't obey

3   commission regulations, or rules, or subpoenas, as we saw.

4          And I keep getting asked for more and more findings.

5   I don't know what more findings to make.  The record

6   conclude -- the record contains findings.  You don't have to

7   put it on paper.  We make this process as cumbersome as we

8   can.  I don't know why.  I have said on the record, multiple

9   times, I've entered findings of fact.  They've been in

10  writing, they've been verbal, they've been communicated.

11  They're there.  They're there.

12         I held a general officer in contempt.  That should

13  have stood out.  And it's ongoing.  And I said yesterday, I'm

14  not oblivious to Colonel Aaron's, frankly, contemptuous

15  behavior the first time he appeared before me when I asked him

16  to come up here; when he scoffed at my authority and said I

17  don't know what -- how you can make me.  Well, that's the

18  theme over here, frankly.  But I'm not going to waste time on

19  another contempt proceeding if ultimately I have determined it

20  incorrectly.  That's why we have appellate courts.  And so I

21  am waiting and continue to wait.

22         Frankly, I've been -- I've been in courts for 26

23  years.  I've been involved in courts-martial.  I was very

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  lucky in the Air Force to be involved in courts throughout my

2  career, unlike so many advocates.  I know a lot of them come

3  in to do that and they don't get to.  I've never seen a judge

4  advocate show up in Class B's time after time.  I'm not

5  oblivious; I know what that says.  What little respect you

6  have for the commission is obvious.  A short-sleeve shirt, no

7  tie, no coat; I get it.  That's the message.  That's been the

8  message from the defense for five months.  And it's well

9  received.  I got it.  I've heard you.

10          But I'm not going to waste time.  I'm not going to

11  get in the mud.  I mentioned the <u>Hassan</u> case the other day,

12  right, that judge got in the mud all about whether or not we

13  should shave the beard, and of course ended up having to

14  recuse himself.  Because when you get in the mud, you get

15  dirty.  It doesn't work.

16          And I'm not saying I never have in my 26 years.  I've

17  come close to it here occasionally, getting dragged into it,

18  into debates, or what I really said or what's going on.  It's

19  easy to do because we're all human.  I know we all like to

20  think that judges aren't human, too, but we are, and I know

21  that.

22          And I tell my staff all the time, we can't get in the

23  mud.  You have to, have to, have to stay above the fray and

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    try to navigate the rules.  Not about me.  I'll tell you, it

2    was a sleepless night.  The -- I laid out kind of what I

3    thought my options were yesterday.  I thought about them again

4    last night.  I thought about them overnight.  I wrote and

5    rewrote what I was going to do.  I went to the gym.  I thought

6    maybe the treadmill would either calm me down -- which it has,

7    of course.  Give me more -- more reflection.  It did.  And I

8    went back and looked again, and looked again.

9          Yesterday's remark by Mr. Koffsky was incredibly

10    telling, wasn't it?  "The devil is in the details."  The

11    details are pretty straightforward.  I mean let's keep in mind

12    that a witness who is the principal deputy to the general

13    counsel wears three or four hats, all acting or whatever, very

14    serious positions, said apparently that there's a bar rule I'm

15    unaware of, and that is you can disobey court orders if you

16    don't think they're ethical.

17          I went and looked last night.  I went and reread the

18    New York ones, because I was surprised by that.  And clearly

19    he was, too, because I asked him to give me the rule, and then

20    it became, well, it depends on the question and what the order

21    is.  So then, of course, I gave him the hypothetical -- it's

22    pretty simple -- subpoenas, rightfully served, as the

23    government has indicated, on two DoD civilians.  That

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    hypothetical doesn't seem very hard to me.  Subpoenas

2    rightfully served on two DoD civilians that they ignored.  And

3    the answer was the devil's in the details.  Remarkable.  Which

4    tells you how infected the process is and how far it goes

5    within the Department of Defense that owns the process.  And

6    again, you all can have opinions about whether or not DoD

7    should own the process.  I've said it before, go vote.  I

8    mean, I've got nothing there.  But that's what he said

9    yesterday, right?  A duty to violate orders, an ethical duty.

10          So again, like I said, I went and read my bar rules.

11    I was shocked.  What I have found again in mine is what I have

12    found in everybody's who is here, is the ethical duty to

13    zealously represent your client, and -- again, 1.16(d) seems

14    pretty standard.  It's in the Model Rules.  Law students know

15    it, and it's in every state that matters to this proceeding.

16    I haven't looked at all 50 states; looked at mine.

17          But even if good cause is shown -- it doesn't even

18    say to who, right?  Even if good cause is shown, if a tribunal

19    orders you to continue, you will continue.  So even if you

20    feel you have an ethical conflict, even if you've demonstrated

21    it, good cause shown, you've convinced somebody I have good

22    cause, your bar rules say too bad if you're ordered to keep

23    going.  Got to keep going.

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1      Because there's lots of reasons for that, right?

2  What if we're on the eve of trial?  What if we've invested

3  seven years and 1.8 million dollars in your representation?

4  What if?  What if?  I mean, you can think of all the

5  hypotheticals.

6      What I think is happening is that Mr. Koffsky is

7  conflating military orders with orders from a tribunal or

8  military court.  That's what I think is happening, and it's

9  easy to do because DoD owns this process.  So it's -- you

10  could conflate those.  I don't think it's correct.  But I hope

11  cool minds reflect on what my orders have been.  I'm not

12  ordering the Third Reich to engage in genocide.  This isn't My

13  Lai, or My Lai.

14      You know what this is?  Comply with subpoenas; comply

15  with your bar rules.  And as the chief defense counsel, you

16  are responsible to ensure that people who work for you obey

17  the orders of the commission.  Those are the extent of my

18  orders.  Not war crimes, people.

19      It's just stunning where we have come.  And if you do

20  conflate them, if you want to go out and look at military

21  orders -- just again, for the people here who are unfamiliar

22  with our process, you can defy a military order that you think

23  is illegal.  Illegal, by the way.  However, if you go look at

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  Article 92 of the UCMJ, the discussion about it and then the
2  case law that follows, orders are presumed to be lawful.  You
3  violate them at your own risk, and commanders have broad
4  discretion in giving those orders.

5          Because can you imagine what the Department of
6  Defense would look like if we just violated orders willy-nilly
7  as we went through the process?  It would be quite a sight the
8  next time we actually have an armed conflict that we are
9  fighting, which we are, by the way.  Imagine what it would be
10 like out there on the battlefield.  Because we've seen what it
11 would be like here in the commissions.  Frankly, by the
12 Military Commission Defense Office and their representatives.

13         Courts and tribunals require adherence to the law, we
14 know that.  They're different than military orders.  As the
15 General Baker issue unfolded, everybody in here knows the
16 right process, and people back there, if they think about it,
17 will know it right away.

18         I issue many orders in a court that people disagree
19 with.  And so what people do in that circumstance is they
20 either ask for a continuance so they can go file a writ, and
21 we see that with our special victims counsel, we see that from
22 defense counsel, and frankly even from the government
23 occasionally, if it's not an Article 62 kind of appeal, right?

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   They ask, can we have time so we can go to a superior court

2   and file an emergency writ. And then my answer to them is yes

3   or no, and I've given different answers on different

4   occasions.

5        When my answer is no, remarkably, counsel show up the

6   next day and keep going forward. You know what they're also

7   doing? Filing a writ. They're dual tracking, and they're off

8   trying to get help from that appellate court to see if that

9   court will stay the proceeding. And that has happened to some

10  of the judges who work for me; the appellate court has stepped

11  in and stopped them. Or, of course, I pause and I say, "Sure,

12  go file your writ, I'll wait and see what they say. I'm

13  interested," because I recognize the authority of appellate

14  courts and courts that are superior to me.

15       We all saw what happened here. General Baker didn't

16  do that. He simply defied the order and said I'm not doing

17  it. And I believe, as the commission, I know why he wouldn't

18  do that. Because if he went to an appellate court or a

19  superior court about the issue at hand, who excuses counsel,

20  and then what do you do in the face of excusing counsel with a

21  tribunal that orders continued representation and a clear

22  mandate in your bar rules, he would have lost. I don't know

23  if that's cynical or not; I think it's reality.

1    I also think it's why the civilians, the two DoD

2   civilians have yet to file anything in federal court to stop

3   the writs, as Mr. Kammen did moments after I indicated I might

4   require his appearance at the Mark Center.  And I believe that

5   is because they don't mind being taken to the Mark Center to

6   testify.  It will empower the behavior that has been

7   demonstrated by MCDO, and it will continue to undermine a

8   process they signed up to work within.  Not work for, work

9   within.  They all signed up to work within the rules that were

10   given, and they knew what the rules were when they signed up

11   for it, and they continue to ignore them.

12    And again, alls I've done is order people to follow

13   the Regulations for the Military Commission, the Manual, the

14   statute, their bar rules, and comply with properly issued

15   subpoenas.

16    These last few months, I think we can all say, have

17   demonstrated significant flaws within the commission process,

18   particularly within the defense organization, and it

19   demonstrates an organization intent on stopping the system,

20   not working within the system that they signed up to work

21   within.  If you look at their employment contracts, if you

22   look at their rules, if you look at the standards, if you look

23   at the Regulations for Trial by Military Commission, they all

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1    agree they will follow them.  And what they are doing is not,

2    of course.  What they're doing is engaging in revolution to

3    the system.  And they've demonstrated it completely,

4    repeatedly, and publicly with little response, encouraging

5    them to continue to demonstrate it repeatedly, publicly, and

6    constantly.

7        I've got to tell you, after 26 years of service, it's

8    shaken me more than I would have expected.  I've spent 26

9    years trying to adhere to the law.  I'm sure I've made

10   mistakes.  I've spent 26 years believing that adherence to the

11   law, whether I agree or disagree with it, absent the most

12   extreme of circumstances, is required of the participants.

13   It's what let me be both a prosecutor and a defense counsel.

14   Because it's not that I agree with my clients, support my

15   clients, agree with their life choices -- and this is clients

16   on both sides, because we have clients on both sides -- it is

17   because my ethical responsibilities are to my client, and it

18   is what has allowed me to do that.

19       And so when I've disagreed with a judge, I have

20   marched on, assessing all of the responses I might have, head

21   for the appellate court, attempt to change the system with

22   elected officials outside of the, like, everyday process, of

23   course, and comply with the order.  Frankly, it's what called

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1   me to criminal law all those years ago.  It allowed me, as I

2   said, to be both a defense counsel and a prosecutor, and

3   follow the calling to be a judge.  It's been the strength of

4   our system for hundreds of years, and it demonstrates why our

5   system is better.

6           Probably rose-colored glasses.  Thought about that

7   last night, too.  I took a moment to clean them; they're not

8   as rose-colored today.  And it's been pretty shaken, and it

9   might be time for me to retire, frankly.  That decision I'll

10  be making over the next week or two.  I think it might be

11  here, because I've never seen anything like it.  I'll just

12  ponder it as we go forward.

13          But, as for going forward, I talked yesterday about

14  all the different options I have, and I weighed through them.

15  We need action from somebody other than me, and we're not

16  getting it.  This morning's debacle, frankly, about working

17  with the CISO shows it.  We're going to continue to spin our

18  wheels and go nowhere until somebody who owns the process

19  looks in and does something.

20          I've been thinking about how to resolve the apparent

21  standstill while getting Mr. al Nashiri adequately resourced

22  defense, which he had, consistent with what you see in the

23  Military Commissions Act of 2009.  I've reviewed all the

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  pleadings again regarding Brigadier General Baker, Colonel

2  Aaron, the prosecution's efforts, the testimony of

3  Mr. Koffsky.  I mean, I went through it all again to figure

4  out where we are and what we could do to fix this.

5         Yesterday I listed kind of questions that we need

6  answered, frankly, from a court superior to me.  And again, I

7  would have hoped we had started that process.  Maybe we have

8  and I haven't seen it, but I don't think so.  There's a little

9  bit of it in General Baker's filings in federal court, but not

10  much.  That's mostly focused on the contempt issue.

11         If General Baker's reading the statute correctly and

12  the Manual correctly, he can excuse counsel at any time and

13  we'll be right back here next time.  Again, I don't believe he

14  is.  Doesn't matter.

15         We need somebody to tell us, is that really what that

16  says, despite, obviously, every other court system in America

17  thinking differently, despite the clear intent of when people

18  make an appearance, despite the clear difference of learned

19  counsel.  Maybe I'm wrong, but nobody's asked anybody in any

20  appellate court or court above me.

21         And then, of course, the other issue is learned

22  counsel.  Is Lieutenant Piette right, that he gets them all

23  the time?  Because that's what he thinks, right?  He's said

1  that over and over.  Any questions?  Nope, can't do it without

2  learned counsel, even though I've ruled you don't get learned

3  counsel.  Nope.

4          Because again, the efficient administration of

5  justice means we do this one time, not twice, if we can help

6  it; and that everybody who has an interest doesn't travel down

7  here for the next 25 years doing this.  Because that's what we

8  keep doing.

9          So hopefully somebody is going to take action.  I am

10  abating these proceedings indefinitely.  I will tell you right

11  now, the reason I'm not dismissing -- I debated it for

12  hours -- I am not rewarding the defense for their clear

13  misbehavior and misconduct.  That would be the wrong answer.

14  But I am abating these procedures -- these proceedings

15  indefinitely until a superior court orders me to resume.

16          And whatever that looks like, either myself or my

17  successor will pick it up and start going.  If it is -- the

18  superior court tells me next week, Spath, you abused your

19  discretion, get to work, I'll get to work, or whoever takes my

20  place.  Hopefully the appellate court will give us some

21  guidance.  Maybe they'll say Lieutenant Piette, you're stuck.

22  Colonel Spath got the law right, you don't get learned counsel

23  if it's not practicable, and it's not practicable.  Get to

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*

1  work.  And then Lieutenant Piette can sit there and not ask

2  questions from now until we finish the trial.

3         But that's where we're at.  We're done until a

4  superior court tells me to keep going.  It can be CMCR.  It

5  can be the Washington -- or the District in D.C.  They're all

6  superior to me.  But that's where we're at.  We need action.

7  We need somebody to look at this process.  We need somebody to

8  give us direction.  I would suggest it sooner than later, but

9  that's where we're at.

10        The March hearing, obviously, isn't going to happen,

11 I don't think.  Again, maybe I'm wrong.  Maybe we'll have

12 quick guidance from CMCR, and then we'll be here in March.

13        As I said, I follow the law.  I follow orders.  I

14 don't just disobey them at will, scoff at the process; but we

15 do have a situation where people are.  They've demonstrated

16 it, and we can't fix it without somebody getting involved.

17        I have great empathy to everybody involved; I really

18 do.  I mean that across the board, everybody.  It's a lot of

19 work, a lot of time, a lot of effort.  It is -- it's not easy.

20        So that's what I meant when I said filings might not

21 be particularly helpful for a little while, Lieutenant Piette.

22        We are in abatement.  We're out.  Thank you.  We're

23 in recess.